José R. Caquías Mendoza, etc., demandantes y recurridos, *v.* Asociación de Residentes de Mansiones de Río Piedras, etc., demandados y recurrentes; Asoc. de Residentes de Mansiones de Río Piedras, Inc., demandante y recurrida, *v.* Wilfredo Báez y otros, demandados y peticionarios.

*Números:* RE-91-139
CE-91-786

*Resueltos:* 25 de agosto de 1993

184

*Maritza Juliá Ramos*, abogada de los demandantes y recurridos en *Caquías Mendoza, etc. v. Asoc. de Residentes*, y de los demandados y recurrentes en *Asoc. de Residentes v. Báez y otros; Héctor M. Collazo*, abogado de los demandados y recurrentes en *Caquías Mendoza, etc. v. Asoc. de Residentes*, y de los demandantes y recurridos en *Asoc. de Residentes v. Báez y otros*.

EL JUEZ ASOCIADO SEÑOR HERNÁNDEZ DENTON emitió la opinión del Tribunal.

En 1987 la Asamblea Legislativa aprobó la Ley Núm. 21 de 20 de mayo de 1987 (23 L.P.R.A. sec. 64 *et seq.*) para autorizar a urbanizaciones y comunidades a controlar el acceso vehicular y el uso público de sus calles residenciales. El propósito principal de esta ley es proveer a nuestra ciudadanía un instrumento adicional para combatir la criminalidad y así procurar su cooperación activa en la lucha contra el crimen. La ley propende, además, a mejorar la seguridad y tranquilidad de nuestras comunidades, de modo que los vecinos puedan lograr una sana convivencia e interacción comunitaria.

El concepto de control de acceso implica que se preserva *la naturaleza pública de las calles residenciales*, mientras se permite a los residentes establecer unos medios para controlar el tráfico de vehículos y el uso público, y así velar por su propia seguridad, y cultivar un ambiente propicio para una mejor convivencia. La delicada política pública tras este ordenamiento requiere armonizar el interés de los ciudadanos en su seguridad y bienestar con los derechos de propiedad y libertad de otras personas, así

como de aquellos residentes que se oponen al control de acceso o a sus términos. Tanto la Ley Núm. 21, según enmendada, *supra*, como el reglamento de la Junta de Planificación de Puerto Rico y las ordenanzas municipales que la implantan, intentan armonizar estos intereses.

Los casos ante nuestra consideración nos permiten aclarar los derechos y las obligaciones de los residentes de aquellos sectores que han sido autorizados por los municipios a establecer controles de acceso. En particular, nos pronunciamos sobre los derechos de unos residentes de Mansiones de Río Piedras, que alegadamente se opusieron al sistema control de acceso, a obtener gratuitamente los medios para operar dicho sistema.

■ Antes de emprender nuestro análisis es preciso señalar que, en nuestro ordenamiento actual, las calles son bienes de uso público y que en el pasado, a los efectos del ejercicio de la libertad de expresión, las hemos considerado foros públicos. Véanse, *e.g.*: Art. 256 del Código Civil de Puerto Rico, 31 L.P.R.A. sec. 1025; *Pacheco Fraticelli v. Cintrón Antonsanti*, 122 D.P.R. 229 (1988); *Saldaña v. Concejo Municipal de San Juan*, 15 D.P.R. 37 (1909).

En el caso *José R. Caquías Mendoza etc. v. Asociación de Residentes de Mansiones de Río Piedras, etc.* (en adelante *Caquías etc. v. Asoc.*) la Asociación de Residentes de Mansiones de Río Piedras, etc. (en adelante la Asociación) solicita la revocación de una sentencia del Tribunal Superior que declaró con lugar la moción de sentencia sumaria de los residentes opositores y que ordenó a la peticionaria a poner a disposición de los demandantes todos los beneficios del sistema de control de acceso, sin que ellos estuvieran obligados a pagar cuotas de mantenimiento.

En el segundo caso, Wilfredo Báez y otros residentes nos piden que revoquemos la resolución del Tribunal Superior en el caso *Asociación de Residentes de Mansiones de Río Piedras, Inc. v. Wilfredo Báez y otros* (en adelante *Asoc. v. Báez y otros*) que declaró sin lugar su moción de sentencia

sumaria parcial. Ellos habían solicitado, entre otras cosas, que se declarase ilegal el sistema de control de acceso implantado en la urbanización o, en la alternativa, que la Ley Núm. 21, *supra*, según alegadamente aplicada por la referida asociación, se declarase inconstitucional.

Por tratarse de controversias novedosas, expedimos los autos y consolidamos los recursos. Mediante una interpretación estatutaria confirmamos la sentencia recurrida en *Caquías etc. v. Asoc.* y ordenamos a la Asociación entregar gratuitamente a los residentes opositores, tanto los controles remotos como las llaves del paseo peatonal.

Simultáneamente, confirmamos parcialmente la resolución recurrida en *Asoc. v. Báez y otros*. Fieles a los principios tradicionales de revisión judicial, nos abstenemos de resolver los señalamientos constitucionales presentes en este caso por entender que existen controversias de hecho que impiden su resolución por la vía sumaria. Devolvemos el caso al tribunal a quo para conceder a las partes amplia oportunidad de presentar prueba sobre la manera en la que la Asociación opera el sistema y sobre las alegadas violaciones a derechos constitucionales resultantes de tal operación.

■ Al así proceder, no hacemos mas que cumplir nuestra obligación de no adjudicar la constitucionalidad de una ley antes de que sea necesario y, con más razón, cuando los autos son inadecuados para tal adjudicación. *Vélez Ramírez v. Romero Barceló*, 112 D.P.R. 716, 728 (1982); *Vives Vázquez v. Tribunal Superior*, 101 D.P.R. 139 (1973). Este Tribunal tiene el deber, reiterado y cumplido en repetidas ocasiones, de no decidir a destiempo cuestiones constitucionales y así evitar pronunciamientos de índole consultiva, sin proporción a los hechos. Véanse, *e.g.*: *Hernández Agosto v. Betancourt*, 118 D.P.R. 79, 86–87 (1986); *Molina v. C.R.U.V.*, 114 D.P.R. 295, 297 (1983); *Cerame-Vivas v. Srio. de Salud*, 99 D.P.R. 45, 51 (1970); *Esso Standard Oil v. A.P.P.R.*, 95 D.P.R. 772, 783 (1968).

▅▅▅▅ Al remitir el caso al foro de instancia, reiteramos la norma tradicional de que las leyes son y se presumen constitucionales hasta tanto un tribunal competente declare lo contrario. Enfatizamos, además, que al examinar las cuestiones constitucionales, los tribunales deberán siempre tener presente su deber de interpretar la Constitución de manera que puedan garantizar su vigor y relevancia ante las realidades de nuestros tiempos. *Ceramé-Vivas v. Srio. de Salud*, supra, pág. 51; *López Vives v. Policía de P.R.*, 118 D.P.R. 219, 227 (1987); *P.R. Tel. Co. v. Martínez*, 114 D.P.R. 328, 349–350 (1983). Después de todo, la vitalidad de nuestra Constitución depende, en última instancia, de su capacidad para responder con acierto a los distintos problemas sociales, políticos y económicos que de tiempo en tiempo aquejen al país, y al aplicarla debemos recordar que "[i]nterpretamos una Constitución, no los Rollos del Mar Muerto". *P.R. Tel. Co. v. Martínez*, supra, pág. 350.

## I

De los autos originales se desprenden los siguientes hechos que no están en controversia.

Mansiones de Río Piedras (en adelante Mansiones) es una urbanización de unas ciento ochenta y una (181) residencias, localizada en el Municipio de San Juan (en adelante el Municipio). Sus únicas dos (2) vías de acceso son las calles Begonia y Gardenia, ambas vías municipales.

Allá para 1985 los residentes de Mansiones comenzaron a explorar alternativas para velar por su propia seguridad mediante el cierre permanente de una (1) de las dos (2) calles, según el Art. 12.07 de la Ley Núm. 146 de 18 de junio de 1980, conocida como la Ley Orgánica de los Municipios de Puerto Rico, 21 L.P.R.A. ant. sec. 3457).[1]

---

[1] El Art. 12.07 de la Ley Núm. 146 de 18 de junio de 1980 disponía, en la parte pertinente, que:

Organizados en una asociación no incorporada, una mayoría de los residentes autorizó por escrito a sus directores a representar "los intereses comunitarios a los efectos de solicitar a la Asamblea Municipal de San Juan la autorización para controlar la entrada y sal[i]da de personas extrañas a nuestra comunidad".([2]) (Énfasis en el original suprimido.) Caso Núm. RE-91-139, Solicitud de revisión, pág. 14. El boletín mensual de Mansiones, *El Timonel*, informó a los residentes "que nada se pierde ni se compromete con esta petición". La gestión, sin embargo, resultó infructuosa. A pesar de las autorizaciones concedidas, los residentes no pudieron llegar a un acuerdo sobre la calle que sería cerrada de forma permanente. Unos y otros se oponían al cierre de la entrada más próxima a sus respectivas residencias.

▊ Así las cosas, el 20 de mayo de 1987, la Asamblea Legislativa aprobó la Ley Núm. 21, *supra*, la cual autorizó a la Junta de Planificación de Puerto Rico (en adelante la Junta) a conceder permisos para el control del tráfico de vehículos de motor y el uso público de las calles en urbanizaciones residenciales, públicas o privadas, con un solo acceso de entrada y salida o con más de un acceso,

---

"El municipio podrá ordenar y efectuar el cierre permanente de cualquier calle o camino dentro de sus límites territoriales, previa celebración de vista pública que deberá notificarse mediante avisos escritos fijados en sitios prominentes en la Casa Alcaldía y en [la] calle o camino a cerrarse y se enviará copia del mismo al Secretario de Transportación y Obras Públicas y a cada uno de los residentes y colidantes de la calle o camino." 21 L.P.R.A. sec. 3457 (Sup.1981).

([2]) El texto completo de la autorización es el siguiente:

"Yo [nombre del suscribiente], mayor de edad, [estado civil], [profesión], residente de la Calle [nombre de la calle y núm. de lote] de la Urbanización Mansiones de Río Piedras, en representación de los residentes de la vivienda de referencia, autorizo a la Asociación de Residentes de Mansiones de Río Piedras para que represente los intereses comunitarios a los efectos de solicitar a la Asamblea Municipal de San Juan la autorización para controlar la entrada y sal[i]da de personas extrañas a nuestra comunidad.

"Hoy _____ de _____ de __.

FIRMA DEL RESIDENTE"

(Énfasis en el original suprimido.) Caso Núm. RE-91-139, Solicitud de revisión, págs. 14–15.

siempre que ninguna de sus calles o caminos se usara como vía de entrada o salida de otra comunidad. 23 L.P.R.A. sec. 64. Según esta ley, para poder obtener un permiso, la urbanización interesada debía tener un consejo o asociación de residentes y presentar una solicitud adoptada por tres cuartas (3/4) partes de los residentes, acompañada de garantías de que la comunidad sufragaría los gastos de instalación, operación y mantenimiento del sistema de control. 23 L.P.R.A. sec. 64a(b).([3]) Cumplidos todos los requisitos estatutarios y aquellos que se estableciesen mediante reglamento, la Junta podía proceder a expedir el permiso solicitado, previa celebración de vistas públicas debidamente notificadas.([4]) Esta ley nada dispuso sobre los derechos u obligaciones de aquellos residentes que no favorecieran la implantación del sistema de control.

Poco más de un (1) año después, el 10 de agosto de 1988, la Asamblea Legislativa aprobó la Ley Núm. 156 (23 L.P.R.A. secs. 64–64b-1, 64c–64g) y enmendó sustancialmente la Ley Núm. 21, *supra*. En particular, traspasó la facultad de expedir los permisos de la Junta a los municipios y estableció un procedimiento específico para su expedición. 23 L.P.R.A. secs. 64 y 64b. Los requisitos estatutarios para la solicitud quedaron, en esencia, intactos.([5]) Con respecto a los residentes que no favo-

---

([3]) El cuarto requisito estatutario establecía que en la urbanización "no exista ningún edificio o facilidad propiedad del Gobierno del Estado Libre Asociado de Puerto Rico o de los municipios para uso y disfrute del público en general a excepción de aquéllos dedicados a escuelas, parques recreativos o centros comunales". 23 L.P.R.A. sec. 64a.

([4]) La Sec. 3 de la Ley Núm. 21 de 20 de mayo de 1987 (23 L.P.R .A. sec. 64b, Sup.1988) disponía que:

"Toda petición o autorización de control de acceso deberá notificarse al municipio y ser sometida a vistas públicas, luego de dar aviso al público de la fecha, sitio y naturaleza de la vista mediante notificación escrita a los residentes de las urbanizaciones, calles y comunidades residenciales, públicas o privadas y publicación de un aviso en uno de los periódicos de circulación general en Puerto Rico, con no menos de cinco (5) días de anticipación a la fecha de la vista."

([5]) La Ley Núm. 156 de 10 de agosto de 1988 (23 L.P.R.A. secs. 64–64b-1, 64c–64g) dispuso que cuando el desarrollador o urbanizador solicite el permiso no es necesario cumplir con el requisito de tener una asociación o consejo de residentes

recieron el sistema, la Ley Núm. 156, *supra*, dispuso que éstos no estarán obligados al pago de las cuotas para la implantación, la operación y el mantenimiento del sistema, excepto cuando así se comprometan mediante contrato escrito. 23 L.P.R.A. sec. 64g.

A raíz de estos desarrollos, la Asociación, una corporación privada sin fines de lucro, realizó gestiones para obtener un permiso para establecer un sistema de control de acceso conforme a la Ley Núm. 21, según enmendada por la Ley Núm. 156, *supra*. El 16 de agosto de 1988 la Asociación presentó su solicitud ante el Municipio acompañada de, entre otras cosas, copias de aquellas autorizaciones suscritas durante 1986 y principios de 1987 para que su predecesora iniciara las gestiones con el Municipio para controlar "la entrada y la salida de personas extrañas".([6]) Incluyó, además, copia de los contratos de mantenimiento suscritos por poco más de tres cuartas (3/4) partes de los residentes. Con estos contratos, los residentes suscribientes se comprometieron a financiar el sistema mediante el pago mensual de una cuota de cuarenta y cinco (45) dólares durante su residencia en la urbanización.

 Así las cosas, el 20 de enero de 1989 entró en vigencia el Reglamento de Planificación Núm. 20 de 20 de enero de 1989, Junta de Planificación de Puerto Rico (en adelante Reglamento Núm. 20), conocido como el Reglamento de Control de Tránsito y Uso Público de Calles Locales, adoptado por la Junta conforme a la Sec. 6 de la Ley Núm. 21, según enmendada, *supra*, por la Ley Núm. 156,

---

debidamente organizado y en funciones. Aclaró, además, que para fines de la adopción de la solicitud por tres cuartas (3/4) partes de los residentes, la participación está limitada a un (1) residente por vivienda. 23 L.P.R.A. sec. 64a.

([6]) La Asociación de Residentes de Mansiones de Río Piedras, Inc. (en adelante la Asociación) había presentado esta solicitud ante la Junta de Planificación de Puerto Rico el 26 de abril de 1988, según requería la Ley Núm. 21 de 20 de mayo de 1987 (23 L.P.R.A. sec. 64 *et seq.*). Aprobadas las enmiendas de la Ley Núm. 156 de 10 de agosto de 1988, *supra*, la Asociación retiró la solicitud de la Junta y el 16 de agosto la presentó ante el Municipio de San Juan (en adelante el Municipio).

*supra.*([7]) Conforme a la Sec. 5.03(8) de este reglamento, la urbanización solicitante tiene que proveer una garantía de que brindará acceso por igual y en todo momento a todos los residentes, incluso a los que no favorecieron el establecimiento del sistema.([8])

Meses más tarde se celebró una vista pública ante el Municipio para considerar la solicitud de la Asociación.([9]) Ningún residente compareció a manifestar oposición. Acto seguido, el 13 de noviembre de 1989, la Asamblea Municipal aprobó la Ordenanza Municipal Núm. 40 de 13 de noviembre de 1989, Serie 1989–1990 (en adelante la Ordenanza), mediante la cual autorizó a los residentes de Mansiones a "cerrar, mediante la instalación de [un] portón electrónicamente activado [con] tarjeta y [la] construcción de [una] caseta con vigilante, la intersecció[n] de las calles Lirio y Begonia". Autorizó, además, "el cierre controlado mediante la instalación de [un] portón electrónicamente controlado con 'beeper' [control remoto] de la intersección de las calles Lirio y Gardenia". Ordenanza, Sec. 1ra. En particular, la Asamblea Municipal de San Juan estableció como condición sine qua non de la autorización que:

> ... aún [sic] aquellos residentes que no estén de acuerdo con los mencionados cierres de calles y que no participen con la

---

([7]) Luego de un proceso de vistas públicas, la Junta de Planificación de Puerto Rico adoptó el Reglamento Núm. 20 de 20 de enero de 1989 (en adelante Reglamento Núm. 20) el 3 de octubre de 1988. El Gobernador de Puerto Rico lo aprobó mediante Orden Ejecutiva de 5 de enero de 1989. Orden Ejecutiva para aprobar el Reglamento de Control de Tránsito y Uso Público de Calles Locales, Boletín Administrativo Núm. 5260D, 5 de enero de 1989. Por virtud de esta orden, el Reglamento Núm. 20 entró en vigor el 20 de enero de 1989.

([8]) La Asociación certificó en Reunión Extraordinaria de 16 de enero de 1988 una garantía de que "se le proveerá acceso por igual y en todo momento a todos los residentes de la comunidad, incluyendo a los que no favorezcan el establecimiento de los controles propuestos".

([9]) La vista pública se celebró el 28 de junio de 1989 ante la comisión pertinente del Municipio.

aportación de cuotas, se les reconocerá el derecho a la partici-
pación de todos los beneficios. Ordenanza, Sec. 2da.[10]

El Municipio no solicitó a los residentes de Mansiones
que demostraran su conformidad con esta ordenanza. Ésta
constituyó el primer y último pronunciamiento del Munici-
pio sobre la solicitud de la Asociación.

Acto seguido, la Asociación procedió a instalar un portón
en la intersección de la calles Gardenia y Lirio que se opera
mediante control remoto. Adyacente a este portón no hay
caseta de vigilancia alguna, por lo que el uso de un control
remoto es la única forma de obtener acceso. Instaló, ade-
más, un portón operado por llave que controla el acceso
peatonal. En la intersección de la calles Begonia y Lirio, la
Asociación construyó una caseta de vigilancia e instaló un
portón que opera no sólo mediante control remoto, sino
también mediante un mecanismo colocado dentro de la ca-
seta, la cual es a todas horas atendida por un guardián.

El sistema de control de acceso comenzó a operar el 30
de junio de 1990. Por razones de seguridad, la Asociación
decidió cerrar el portón de la intersección de las calles Gar-
denia y Lirio de 10:00 P.M. a 6:00 A.M. Distribuyó, además,
unas calcomanías para facilitar la identificación de los au-
tomóviles de los residentes y así agilizar el tránsito por el
portón atendido por el guardián.

Entregó los controles remotos a aquellos residentes que
habían suscrito el contrato de mantenimiento y pagado la
cuota mensual junto con un depósito de treinta y cinco dó-
lares ($35) por control. La llave del portón del paseo pea-
tonal la puso a disposición de todos los residentes por un
precio de quince dólares ($15) por llave.

Algunos residentes se negaron a suscribir el contrato de
mantenimiento y, por lo tanto, a pagar la cuota mensual y

---

[10] La Ordenanza Municipal Núm. 40 de 13 de noviembre de 1989 (en adelante
la Ordenanza) fue presentada debidamente certificada por el Presidente y el Secre-
tario de la Asamblea Municipal de San Juan al Honorable Alcalde y éste la firmó e
impartió su aprobación el 4 de diciembre de 1989.

el depósito por cada control. La Asociación, por su parte, rehusó entregarles los controles remotos o las claves de estos. En consecuencia, dichos residentes se quedaron sin acceso por el portón que no tiene guardián en la intersección de las calles Gardenia y Lirio.

## II

El 26 de julio de 1990 la Asociación presentó una demanda contra varios residentes en la que alegó que éstos eran miembros de la Asociación, que habían autorizado el sistema de control de acceso con el compromiso de financiarlo y que, no obstante, se habían negado a pagar la cuota mensual para su mantenimiento.[11] Caso Civil Núm. KAC-90-1233, Tribunal Superior, Sala de San Juan, *Asoc. v. Báez y otros*.[12] A manera de remedio, solicitó que se les ordenara pagar dicha cuota y que se resolviera que éstos no tenían derecho alguno a los controles remotos que activan los portones del sistema hasta tanto no pagaran la cuota. Demanda, Caso Civil Núm. KAC-90-1233, pág. 4. Solicitó, además, que se les condenara a indemnizar los daños y perjuicios alegadamente causados por sus actuaciones. Íd., pág. 4.[13]

Varios de los demandados y otros residentes adicionales respondieron, a su vez, con la presentación el 17 de agosto del mismo año de una demanda sobre sentencia declaratoria e interdicto preliminar y permanente contra la Asocia-

---

[11] Los demandados en este caso fueron los residentes siguientes: Wilfredo Báez, Anastacio Báez, María Antonia Sierra, Rafael Muñoz, Beatriz Ávila de Muñoz, Juan A. Molina, Ernesto Rodríguez, Arquímedes Ramírez, William Varas.

[12] Dos (2) días antes, el 24 de julio de 1990, la Asociación había presentado una demanda contra un solo residente, el Sr. José R. Caquías Mendoza. Las alegaciones y los remedios solicitados fueron, en esencia, los mismos. Caso Civil Núm. KAC-90-1221, Tribunal Superior, Sala de San Juan, *Asoc. de Residentes de Mansiones de Río Piedras, Inc. v. José R. Caquías*. Este caso no se encuentra ante nuestra consideración.

[13] El 1ro de abril de 1991 el Tribunal Superior, en ánimo de evitar determinaciones conflictivas y con la conformidad de las partes, consolidó este caso con el que la Asociación presentó contra el señor Caquías Mendoza.

ción y el Municipio. Caso Civil Núm. KPE-90-1382, Tribunal Superior, *Caquías etc. v. Asoc.*([14]) Aunque éste fue el segundo caso presentado, comenzaremos por exponer su cauce procesal, ya que el Tribunal Superior dictó sentencia en él antes de que se dictara la resolución recurrida en el caso iniciado por la Asociación.

## A. *Caquías etc. v. Asoc.*

Los residentes demandantes en *Caquías etc. v. Asoc.* alegaron, en síntesis, que no habían autorizado la gestión de la Asociación para establecer el control de acceso según la Ley Núm. 21, *supra*, ni firmado contrato alguno de mantenimiento y que, no obstante, la Asociación les había negado los controles remotos para operar los portones hasta tanto pagaran la cuota a la Asociación. Demanda, Caso Civil Núm. KPE-90-1382, párrafos 21–26.([15]) Por otro lado, alegaron que la Asociación no tenía autorización en ley para cerrar el portón de la calle Gardenia durante horas de la noche ni para requerirles el pago de quince dólares ($15) por la llave del paseo peatonal. Demanda, Caso Civil Núm. KPE-90-1382, párrafos 26 y 27.([16])

---

([14]) Entre los demandantes en *Caquías etc. v. Asoc.* están todos menos tres (3) de los residentes demandados con sus cónyuges en los dos (2) casos iniciados por la Asociación: José R. Caquías Mendoza e Inés Mejías Paradís, Anastacio Báez Colón y Aidé García Rodríguez, Rafael Kercado Salgado y María Antonia Sierra Díaz, Juan A. Molina Robles y Carmen L. Hernández Santos, Ernesto Rodríguez Rivera y Carmen L. Borgos Bou, Arquímedes Ramírez Rivera y Edelmira Rivera Cruz, William Varas Bas y Lackmee Delgado Mena.

Los otros tres (3) demandantes, Edwin Jiménez Irizarry y Margarita Martínez Pérez, y Luz M. Ríos Rosario, no habían sido demandados por la Asociación en *Asoc. v. Báez y otros.*

Wilfredo Báez, Rafael Muñoz y Beatriz Ávila de Muñoz, a pesar de haber sido demandados en *Asoc. v. Báez y otros*, no comparecieron en la demanda. Wilfredo Baéz, sin embargo, es hijo de Anastacio Báez Colón y Aidé García Rodríguez, quienes sí comparecieron.

([15]) De acuerdo con la demanda, solamente uno (1) de los residentes demandantes, el Sr. Arquímedes Ramírez Rivera, había autorizado a la Asociación a hacer gestiones ante el Municipio después de la aprobación de la citada Ley Núm. 21 el 20 de mayo de 1987. Demanda, Caso Civil Núm. KPE-90-1382, párrafo 21.

([16]) En la demanda también se alegó que la Asociación requiere a los residentes anunciar con, por lo menos, un (1) día de anticipación toda actividad a la cual pudieran asistir diez (10) o más personas y que publica sus nombres en las listas de

En la súplica solicitaron que las actuaciones de la Asociación se declarasen contrarias a la Ley Núm. 21, según enmendada por la Ley Núm. 156, *supra*, y al Reglamento Núm. 20 y la Ordenanza o, en la alternativa, que se declarasen inconstitucionales; que se ordenara a la Asociación desistir de sus gestiones de cobro y proveer lós controles remotos o sus códigos sin requerir el pago de aportación alguna o su ingreso a la Asociación, y que se ordenara permitir el paso a todas horas por el portón de la calle Gardenia y entregar, libre de costo, la llave del portón del paseo peatonal. Demanda, Caso Civil Núm. KPE-90-1382, párrafos A–J.[17]

La Asociación contestó la demanda y admitió que el uso de los controles remotos era exclusivo para aquellos residentes que habían pagado la cuota de mantenimiento y para aquellos "que desde un principio se opusieron a que se estableciese el Sistema de Control de Acceso". (Contestación a Demanda, Caso Civil Núm. KPE-90-1382, párrafo 17.) Caso Núm. RE-91-139, *exhibit* IV, pág. 19. Según la Asociación, los demandantes residentes no tienen derecho a estos controles porque alegadamente "autorizaron y estuvieron de acuerdo con la implantación" del sistema. Íd. Admitió, además, que no había restricción alguna sobre las calles de la urbanización que constase en el Registro de la Propiedad y que "por razones de seguridad" había ordenado el cierre nocturno del portón de la intersección de las calles Gardenia y Lirio. Íd., págs. 18 y 20. Negó el resto de las alegaciones principales de la demanda.

Luego de varios incidentes procesales, los residentes demandantes presentaron una moción de sentencia sumaria debidamente acompañada de documentos y declaraciones

---

aquellos que no pagan la cuota de mantenimiento. Los residentes demandantes plantearon que estas alegadas actuaciones violan su derecho constitucionalmente reconocido a la intimidad.

[17] Los demandantes también solicitaron una orden para que la Asociación desistiera del requisito de previa notificación de actividades y de la publicación de sus nombres y direcciones como residentes que no pagan la cuota de mantenimiento.

juradas.[18] La Asociación se opuso oportunamente. Con excepción del planteamiento constitucional en la alternativa, la referida moción incluyó las mismas alegaciones y solicitó los mismos remedios que la demanda.[19] Además, los residentes demandantes alegaron que el sistema fue implantado ilegalmente, toda vez que la Ordenanza no fue adoptada por tres cuartas (3/4) partes de los residentes de conformidad con la Ley Núm. 21, según enmendada por la Ley Núm. 156, *supra*, y el Reglamento Núm. 20, y solicitaron, por lo tanto, la detención y remoción del sistema. Véase Réplica a memorando parte demandada y solicitud de sentencia sumaria, Caso Civil Núm. KPE-90-1382, págs. 15–17, 20–21. Caso Núm. RE-91-139, *exhibit* VI, págs. 255–257, 260–261.

El 8 de febrero de 1991 el Tribunal Superior (Hon. Arnaldo López Rodríguez, Juez) dictó sentencia en la que resolvió como cuestión de hecho que ninguno de los demandantes había firmado el contrato de mantenimiento y que, con dos (2) excepciones, todos habían suscrito las autorizaciones iniciales antes de la aprobación de la Ley Núm. 21, *supra*, para que la predecesora de la Asociación comenzara gestiones con el Municipio.[20] Como cuestión de derecho, entendió que no era necesaria la adopción de la Ordenanza por tres cuartas (3/4) partes de los residentes por entender que la Ley Núm. 21, según enmendada por la Ley Núm. 156, *supra*, y el Reglamento Núm. 20 no la requerían

---

[18] Entre los incidentes procesales cabe destacar una orden de interdicto preliminar mediante la cual el tribunal de instancia ordenó que la Asociación entregara a los residentes demandantes los controles remotos por un precio de treinta y cinco dólares ($35) por unidad o sus claves sin costo alguno.

[19] Los residentes demandantes no presentaron ningún planteamiento de índole constitucional en esta moción de sentencia sumaria. En particular, no solicitaron al tribunal de instancia que resolviera sus planteamientos sobre el alegado requisito de notificación previa de actividades de diez (10) o más invitados o sobre la alegada publicación de sus nombres y direcciones en las listas de los residentes que no pagan la cuota de mantenimiento.

[20] El tribunal de instancia determinó que el Sr. Edwin Jiménez Irizarry y el Sr. Juan A. Molina Robles nunca suscribieron la referida autorización.

cuando, como en este caso, el Municipio no modifica la propuesta que le somete la urbanización solicitante.

Sobre la obligación de los residentes demandantes de pagar la cuota determinó que, de acuerdo con la Ley Núm. 21, según enmendada por la Ley Núm. 156, *supra*, y al Reglamento Núm. 20, sólo había dos (2) formas de obligar a un residente a pagar la cuota para el mantenimiento del sistema de control de acceso, a saber, que dicho sistema constara debidamente inscrito en el Registro de la Propiedad (en adelante el Registro) o que el residente se hubiera comprometido a su pago mediante contrato escrito. Como en este caso ni el sistema constaba inscrito en el Registro ni los residentes demandantes habían suscrito los contratos de mantenimiento, el tribunal a quo resolvió que las autorizaciones suscritas por algunos de los residentes demandantes para hacer gestiones ante el Municipio no eran determinantes ni obligaban al pago de cuota alguna.

Finalmente, sobre el derecho de los residentes demandantes a recibir los controles remotos para activar los portones, concluyó que tanto la Sec. 5.03 del Reglamento Núm. 20 como la Sec. 2 de la Ordenanza les concedía ese derecho. En consecuencia, el tribunal ordenó a la Asociación "proveerle a los demandantes acceso por igual en todos los beneficios del sistema de control," lo cual incluía la entrega de los controles remotos. Caso Núm. RE-91-139, *exhibit* II, pág. 9.[21]

De esta sentencia recurrió únicamente la Asociación. Sostiene que el tribunal a quo incidió al disponer del caso por la vía sumaria y al resolver que los residentes recurridos no están obligados a pagar la cuota de

---

[21] A pesar de que los residentes demandantes lo plantearon en la moción de sentencia sumaria, el tribunal a quo no se expresó directamente sobre el asunto de la llave del portón del paseo peatonal ni sobre el cierre nocturno del portón de la intersección de las calles Gardenia y Lirio o a quién corresponde la carga monetaria de los controles remotos de los residentes que no suscribieron contrato de mantenimiento.

Cabe destacar, sin embargo, que en la orden de interdicto preliminar el tribunal había ordenado la entrega de los controles a cambio del pago de treinta y cinco dólares ($35) por unidad o la entrega gratuita de la clave.

mantenimiento.(²²) En particular, aduce que las autorizaciones suscritas por todos, excepto dos, de los demandantes recurridos constituyen contratos de mandato que los comprometen a financiar el sistema de control de acceso implantado.

## B. *Asoc. v. Báez y otros*

En el otro caso, *Asoc. v. Báez y otros*, los residentes demandados contestaron la demanda y presentaron una reconvención escasamente dos (2) días después de haberse presentado la moción de sentencia sumaria en *Caquías etc. v. Asoc.* Con excepción de una reclamación de daños y perjuicios contra la Asociación, la reconvención repitió las mismas alegaciones adelantadas y solicitó los mismos remedios solicitados en la referida moción.(²³) No incluyó una impugnación constitucional de la Ley Núm. 21, según enmendada, *supra*. Luego de unos trámites procesales, el 16 de julio de 1991, unos cinco (5) meses después de dictada la sentencia en *Caquías etc. v. Asoc.*, los residentes demandados presentaron una moción de sentencia sumaria parcial

---

(²²) La solicitud de revisión contiene los señalamientos de error siguientes:

"A. Primer Error: 'Erró ... al resolver que los demandantes recurridos están protegidos por la Sección 15, de la Ley [Núm. 21 según enmendada por la] Ley número 156 ... a pesar de que éstos favorecieron el establecimiento del control de acceso, y [que] dicha sección ... sólo protege a los residentes que no favorecieron el sistema.'

"B. Segundo Error: 'Erró ... al resolver que un sistema de control de tráfico de vehículos implantado a tenor con la Ley núm. 21 ... y la Ley núm. 156 ... tiene que estar inscrito en el Registro ... como grav[a]men real o existir un contrato por escrito para poder obligar a un residente a contribuir económicamente a los gastos de mantenimiento del sistema.'

"C. Tercer Error: 'Erró ... al no resolver que entre los demandantes y la Asociación ... se perfeccionó un contrato de mandato, y el mismo obligaba a los demandantes recurridos a apoyar económicamente el sistema de control de tráfico de vehículos una vez implantado el sistema.'

"D. Cuarto Error: 'Erró ... al declarar sin lugar la Moción en Oposición a Solicitud de Sentencia Sumaria y Solicitud de Vista en su Fondo.'" Solicitud de revisión, pág. 6.

(²³) Por no estar las acciones de daños y perjuicios ante nuestra consideración, no exponemos las alegaciones de la reconvención sobre los daños que la implantación del sistema de control de acceso alegadamente ha causado a los residentes demandados.

debidamente acompañada de documentos y declaraciones juradas.[24] A manera de remedio, solicitaron que se declarasen sin lugar las demandas de la Asociación por el planteamiento ya adjudicado a su favor en *Caquías etc. v. Asoc.* de que no existe contrato alguno que los obligue al pago de la cuota de mantenimiento. Moción solicitando se dicte sentencia sumaria parcial, Casos Civiles Núms. KAC-90-1221 y KAC-90-1233 (Cons.), págs. 60–61.[25]

Además, solicitaron que se declarara ilegal y se ordenara la detención y remoción del sistema de control de acceso de Mansiones bajo el argumento ya adelantado y rechazado en *Caquías etc. v. Asoc.* de que dicho sistema no fue adoptado por los residentes conforme a la Ley Núm. 21, según enmendada por la Ley Núm. 156, *supra*, y al Reglamento Núm. 20, *supra*. Moción, págs. 19–29 y 61.

Presentaron, sin embargo, un nuevo planteamiento de que el sistema es ilegal porque la Asociación alegadamente no sometió una declaración de impacto ambiental o una determinación de que ese estudio no era necesario de conformidad con la Ley Núm. 9 de 18 de junio de 1970, según enmendada, 12 L.P.R.A. sec. 1121 *et seq.*, conocida como la Ley sobre Política Pública Ambiental. Moción, págs. 29 y 30. Por último, señalaron que el sistema contraviene la Ordenanza porque ésta no autorizó que el portón de la calle Begonia operara por control remoto, sino por tarjeta, ni

---

[24] Esta moción de sentencia sumaria parcial fue suscrita por todos los residentes demandados en los dos (2) casos consolidados iniciados por la Asociación, incluso el señor Caquías Mendoza.

Ni éstos ni la Asociación intentaron utilizar la sentencia del Tribunal Superior en *Caquías etc. v. Asoc.* como impedimento colateral por sentencia en su modalidad ofensiva o defensiva.

[25] Surge de los documentos y de las declaraciones anejadas a la moción que los residentes peticionarios William Varas Bas y Anastacio Báez Colón, y María A. Sierra Díaz y Carmen Borgos Bou, esposas de los peticionarios Rafael Kercado Salgado y Ernesto Rodríguez Rivera, respectivamente, firmaron las autorizaciones en enero de 1987. El peticionario Arquímedes Ramírez Rivera la firmó el 15 de junio de 1989. Los únicos que no firmaron fueron Juan A. Molina Robles y Wilfredo Báez. El padre de este último, Anastacio Báez Colón, sin embargo, sí había suscrito la referida autorización.

que el portón de la calle Gardenia permaneciera cerrado en horas de la noche. Moción, págs. 30 y 31.

En la alternativa, y a diferencia de la moción de sentencia sumaria en el caso en *Caquías etc. v. Asoc.*, los residentes demandados solicitaron por primera vez que, de determinarse que la Ley Núm. 21, *supra*, autoriza a la Asociación a operar el sistema como alegadamente lo hace, entonces se declarara inconstitucional la Ley Núm. 21, *supra*. Moción, pág. 61.[26] Argumentaron que las calles son bienes de dominio público y que, en la medida en que dicha ley permita a la Asociación limitar, restringir o impedir el acceso a las calles de Mansiones, ésta contravendría la Sec. 9 del Art. VI de la Constitución del Estado Libre Asociado de Puerto Rico, L.P.R.A., Tomo 1 (en adelante la Constitución del E.L.A.) porque tal disposición alegadamente carece de fin público. Moción, págs. 31–35.[27]

Sostuvieron, además, que si la Ley Núm. 21, *supra*, autoriza la alegada práctica de la Asociación de requerir al visitante que se identifique e indique el nombre y la dirección del residente que va a visitar, ésta viola el derecho a la intimidad de los residentes según consagrado en la Sec. 8 del Art. II de nuestra Constitución, L.P.R.A., Tomo 1. Moción, pág. 35. Finalmente, sostuvieron que dicha ley violaría sus derechos de libertad, expresión y libertad de culto, tanto bajo la Constitución del E.L.A. como bajo la Constitución de Estados Unidos si se resolviere que permite a la Asociación limitar el acceso a grupos religiosos o de otra

---

[26] La Reconvención no contenía esta impugnación constitucional, por lo que la moción de sentencia sumaria parcial implícitamente enmendó la reconvención con respecto a este particular. Dispone la parte pertinente de la moción de la forma siguiente:

"3. Si el Honorable Tribunal entiende que el CONTROL fue implantado legalmente y que la demandante está facultada por la Ley Núm. 21 a continuar operándolo en la forma en que lo hace entonces solicitamos que se declare inconstitucional dicha ley." Moción solicitando se dicte sentencia sumaria parcial, Caso Civil Núm. KAC-90-1221; KAC-90-1233 (Cons.), pág. 61.

[27] La Sec. 9 del Art. VI de la Constitución del Estado Libre Asociado, L.P.R.A., Tomo 1, 1982, pág. 369, dispone que "[s]ólo se dispondrá de las propiedades y fondos públicos para fines públicos y para el sostenimiento y funcionamiento de las instituciones del Estado, y en todo caso por autoridad de ley".

índole que pudieran repartir hojas sueltas y otra literatura en la urbanización. Moción, pág. 36.[28]

La Asociación se opuso a esta moción. Luego de varios incidentes procesales, el 31 de octubre de 1991 el Tribunal Superior (Hon. Evaristo M. Orengo, Jr., Juez) dictó una breve resolución y orden en la cual declaró sin lugar la moción de sentencia sumaria parcial y señaló el caso para vista en su fondo.

Inconformes, los residentes demandados también recurrieron ante nos mediante petición de *certiorari* presentada el 27 de noviembre del mismo año.[29] Presentaron seis (6) señalamientos de error. Además, solicitaron que se les concedieran los mismos remedios solicitados en la moción denegada.

## III

Antes de atender los planteamientos de derecho, es menester precisar la postura procesal de los recursos. En *Caquías etc. v. Asoc.*, la Asociación recurre de una sentencia sumaria en su contra. Por otro lado, en *Asoc. v. Báez y otros* los residentes demandados y demandantes en reconvención recurren de una resolución que denegó su moción de sentencia sumaria parcial.[30] Por lo tanto, previo a resolver cada señalamiento es preciso determinar si existe alguna controversia real sobre hechos materiales que impida la adjudicación en esta etapa de los procedimientos. Regla 36.3 de Procedimiento Civil, 32 L.P.R.A. Ap. III; *Pérez v.*

---

[28] De forma supletoria solicitaron una nueva determinación de que tienen derecho a los controles remotos que activan los portones mientras el sistema continúe operando. Moción solicitando se dicte sentencia sumaria parcial, Casos Civiles Núms. KAC-90-1221 y KAC-90-1233 (Cons.), pág. 61.

[29] El señor Caquías Mendoza no recurrió ante nos de la resolución del tribunal a quo, por lo que el Caso Civil Núm. KAC-90-1221 no se encuentra ante este Foro para adjudicación.

[30] En adelante, nos referiremos a los residentes, recurridos en *Caquías etc. v. Asoc.*, y recurrentes en *Asoc. v. Báez y otros*, como los "residentes opositores".

*Advisors Mortgage Investors*, 130 D.P.R. 530 (1992); *Tello, Rivera v. Eastern Airlines*, 119 D.P.R. 83 (1987).

Un estudio de ambos recursos revela que las cuestiones de derecho ante nuestra consideración son, en síntesis, las siguientes: (1) si el sistema de control de acceso de Mansiones fue implantado en contravención de la Ley Núm. 21, según enmendada por la Ley Núm. 156, *supra*, del Reglamento Núm. 20 y de la Ordenanza; (2) si los residentes opositores tienen derecho a los controles remotos y a las llaves del paseo peatonal, libre de costo, sin que se les pueda obligar a pagar la cuota de mantenimiento o a ser miembros de la Asociación, y (3) en la alternativa, si la manera en que la Asociación opera el sistema viola los derechos constitucionalmente protegidos a la intimidad, libertad de expresión y libertad de culto de los residentes, y contraviene la limitación constitucional de que sólo se dispondrá de los bienes públicos para fines públicos, y en esa medida, si la Ley Núm. 21, según enmendada, *supra*, es inconstitucional por autorizar las alegadas prácticas de la Asociación.[31] Procedemos a atender cada uno de estos planteamientos en el orden aquí expuesto.[32]

## IV

Atendemos, en primer lugar, el planteamiento de los residentes opositores de que el sistema de control de acceso de Mansiones fue implantado en violación de la Ley Núm. 21, según enmendada por la Ley Núm. 156, porque la Ordenanza no fue adoptada por tres cuartas (3/4) partes de

---

[31] Los residentes opositores también señalaron que el sistema fue implantado en violación de la Ley sobre Política Pública Ambiental y el reglamento que la implanta, porque alegadamente no se precedió de una declaración sobre el impacto ambiental del sistema o, en la alternativa, de una determinación de que tal declaración no era necesaria.

[32] Debido a los planteamientos constitucionales en la alternativa, el 19 de junio de 1992 expedimos una resolución en la que concedimos término al Procurador General para que se expresara sobre éstos. Este presentó su informe el 6 de noviembre de 1992.

los residentes. Es preciso aclarar que, para fines de esta controversia, debemos circunscribirnos a la Ley Núm. 21, según enmendada por la Ley Núm. 156, *supra*, ley que estaba vigente al momento de la aprobación de la Ordenanza y de la implantación del sistema. No es hasta el 16 de julio de 1992 que la Asamblea Legislativa aprueba las enmiendas de la Ley Núm. 22 (23 L.P.R.A. secs. 64–64b-2, 64d-3–64d-4, 64e, 64g–64h).

La Sec. 3 de la ley entonces vigente disponía, en la parte pertinente:

... De ser favorable la decisión del municipio correspondiente para los controles propuestos emitirá un dictamen preliminar que contendrá las condiciones, cambios o modificaciones bajo los cuales deberá desarrollarse el proyecto teniendo que obtener dicho dictamen preliminar la autorización de los residentes de por lo menos tres cuartas (3/4) partes de las viviendas allí establecidas para su adopción final e implantación. Dicha participación estará limitada a un representante por vivienda. Sec. 3 de la Ley Núm. 21, según enmendada por la Ley Núm. 156, *supra*, 23 L.P.R.A. sec. 64b (Sup.1989).

En el caso de Mansiones, el Municipio emitió la Ordenanza el 13 de noviembre de 1989. Surge del expediente que este dictamen nunca fue remitido para la aprobación por escrito y bajo juramento dentro del término de treinta (30) días, por tres cuartas (3/4) partes de los residentes de Mansiones. Las partes están de acuerdo en que la Ordenanza no varió o modificó en forma alguna la propuesta sometida por la Asociación. En ausencia de controversia sobre hechos materiales, procede disponer de este asunto por la vía sumaria.

La Asociación alega que la notificación del dictamen solamente es necesaria cuando el Municipio aprueba un dictamen preliminar favorable en el cual impone nuevas condiciones, cambios o modificaciones a la propuesta original de control de acceso. Caso Núm. CE-91-786, Parte III, Alegato de los demandantes recurridos, pág. 9. Señala que el tribunal de instancia había razonado de la misma forma

cuando resolvió el caso de *Caquías etc. v. Asoc.* (consolidado con este recurso) al concluir que el dictamen preliminar sólo se emite en aquellos casos en que el municipio imponga modificaciones. Los residentes opositores, por su parte, sostienen que la letra de la ley era clara y que ésta requería la remisión de la Ordenanza, aún cuando el Municipio no hubiese cambiado o modificado la propuesta original de la Asociación.

A nuestro juicio, la Sec. 3 de la Ley Núm. 21, según enmendada por la Ley Núm. 156, *supra*, no requería la remisión de la Ordenanza para la aprobación por tres cuartas (3/4) partes de los residentes de Mansiones. El propósito de este requisito de remisión era evitar la implantación de un sistema de control de acceso distinto al propuesto inicialmente por la urbanización solicitante sin obtener el previo consentimiento de los residentes afectados. Por lo tanto, el dictamen del municipio autorizador era de carácter preliminar únicamente cuando éste cambiaba o modificaba el sistema propuesto. En este caso, la ley requería la remisión para dar oportunidad a los residentes de examinar el sistema aprobado preliminarmente y expresar su conformidad o desacuerdo. En el caso contrario, cuando el municipio no alteraba la propuesta original, no era necesario remitir el dictamen para que los residentes aprobasen por segunda vez el mismo sistema inicialmente apoyado.

De hecho, mediante la Ley Núm. 22, *supra*, la Asamblea Legislativa enmendó la Sec. 3 de la Ley Núm. 21, *supra*, precisamente para aclarar este particular. Según enmendada, la Sec. 3, *supra*, dispone ahora claramente que si la determinación del municipio no enmienda los controles propuestos, ésta será final, pero que si los enmienda, entonces tendrá que remitirlos para aprobación por tres cuartas (3/4) partes de los residentes.[33] Sec. 3(d)

_____

[33] Dispone la referida sección:

de la Ley Núm. 21, según enmendada, *supra*, 23 L.P.R.A. sec. 64b(d).

En el caso de Mansiones, la Ordenanza no tuvo el efecto de variar o modificar la solicitud de la Asociación, por lo que no constituyó un dictamen preliminar, sino final. No era necesario, por lo tanto, remitir la Ordenanza para la adopción de los residentes como sostienen los residentes opositores.

## V

Como hemos resuelto que el procedimiento mediante el cual se autorizó el sistema de control de acceso no estuvo viciado, tenemos que resolver si la Asociación de algún otro modo lo implantó de forma contraria a la ley. Atendemos primeramente el reclamo de los residentes opositores de que el sistema se implantó en violación a la Ordenanza.

En apoyo de su contención aducen que la Asociación hizo cerrar el portón de la calle Gardenia de 10:00 P.M. a 6:00 A.M. La Asociación recurrida admite que dicha alegación es veraz, pero sostiene que razones de seguridad la llevaron a autorizar el referido cierre. Los residentes opositores señalan también que el portón de la calle Begonia se opera por control remoto en lugar de tarjeta, como disponía la Ordenanza. No hay controversia en cuanto a este hecho.

Apuntamos primeramente que, de ordinario, el permiso que otorga un municipio a una asociación de resi-

---

Si la determinación del municipio favorece los controles propuestos por la Junta, Consejo o Asociación de Residentes, emitirá un dictamen final y autorizará la implantación. Dicho dictamen será firme desde la fecha del archivo en el municipio de copia de su notificación. Si la autorización del municipio modifica o establece restricciones a los controles propuestos por la Junta, emitirá un dictamen preliminar que contendrá las condiciones, cambios o modificaciones bajo los cuales deberá desarrollarse el proyecto teniendo que adoptarse dicho dictamen preliminar mediante declaración firmada por no menos de tres cuartas (3/4) partes de los propietarios, dentro de los quince (15) días siguientes a la fecha de archivo en el municipio de copia de su notificación. La firma de dichos propietarios estará limitada a un propietario por vivienda. 23 L.P.R.A. sec. 64b(d).

dentes para controlar el acceso a las calles residenciales de su urbanización *debe interpretarse e implantarse de conformidad con la naturaleza pública de esas vías. Por lo tanto, de acuerdo con el esquema legal aplicable, su uso generalmente no puede hacerse indebidamente oneroso. Toda norma de control de acceso debe ser razonable a la luz de las particularidades de la urbanización en que se vaya a implantar.*

■ Bajo el esquema vigente, recae sobre cada municipio la responsabilidad de examinar cuidadosamente la propuesta de control de acceso sometida para su aprobación por una asociación o consejo de residentes. Al realizar ese examen, el municipio deberá evaluar no sólo las estructuras físicas del sistema propuesto, sino también la manera en que la entidad solicitante se propone operarlo. Su escrutinio no debe ser liviano, ya que persigue asegurar que el sistema propuesto no transgreda los derechos que nuestro ordenamiento ha conferido a todas las partes afectadas por la medida.

■ A esos fines, el municipio tiene la facultad, así como el deber, de establecer las condiciones y restricciones que estime necesarias para armonizar los intereses en cuestión. Sec. 3, Ley Núm. 21, según enmendada, *supra.* Concedido el permiso, recae sobre la asociación de residentes la obligación de utilizar el privilegio concedido conforme a las exigencias legales aplicables.

En cuanto al cierre nocturno del portón de la calle Gardenia, reconocemos que la Ordenanza guardó silencio sobre la posibilidad de cerrar algunas de las calles durante horas de la noche. Meramente autorizó la instalación de unos portones operados mediante tarjeta y una caseta de vigilancia en la calle Begonia, y la instalación de un portón operado mediante control remoto en la calle Gardenia.

No obstante, la Asociación sostiene que ha tenido que recurrir al cierre nocturno del portón de la calle Gardenia por razones de seguridad compatibles con los fines del sis-

tema de control de acceso autorizado. Ninguna de las partes presentó documentos o declaraciones juradas en torno a estas alegadas razones de seguridad. Existe, pues, una controversia sobre hechos materiales que impiden la adjudicación de este asunto por la vía sumaria.

Ahora bien, los residentes opositores no tienen razón al impugnar el método escogido para la operación automatizada de los portones. Bajo los hechos específicos de este caso, el que operen mediante control remoto en lugar de tarjeta es irrelevante. Lo esencial es que el residente pueda abrir el portón desde su vehículo.[34]

## VI

Como hemos resuelto que con la posible excepción del cierre nocturno de la calle Gardenia el sistema de control de acceso se implantó conforme a la Ley Núm. 21, *supra*, y la Ordenanza, debemos atender ahora cuáles son los derechos que asisten a los residentes que se oponen a su implantación. Examinamos, primeramente, si la manera en que la Asociación opera el sistema contraviene la Ley Núm. 21, según enmendada, *supra*, y el Reglamento Núm. 20, en la medida en que ha negado a los residentes opositores el derecho a tener tanto los controles remotos de los portones como las llaves del acceso peatonal, hasta tanto no paguen las cuotas de mantenimiento e ingresen como miembros a la Asociación.

En cuanto a esta controversia tampoco hay hechos materiales en disputa que nos impidan resolver. La Asociación

---

[34] Nos abstenemos de resolver el planteamiento de que al aprobar e implantar el sistema de control de acceso en Mansiones no se cumplió con la Ley sobre Política Pública Ambiental, según enmendada, ni con el Reglamento sobre Declaración de Impacto Ambiental de Puerto Rico, Reglamento Núm. 3106 de 4 de junio de 1984, por entender que procede remitirlo al tribunal a quo para que determine si la Junta de Calidad Ambiental tiene jurisdicción primaria sobre el asunto. Los residentes opositores no presentaron el planteamiento ante esta junta y la Sec. 1.4 del referido reglamento dispone que ésta será la instrumentalidad responsable de reglamentar y administrar el proceso de declaraciones de impacto ambiental. Véanse, *e.g.*: Secs. 1.6.1–1.6.5, 5, Reglamento Núm. 3106.

aduce que el uso exclusivo de los controles y las llaves es para los residentes que hayan pagado la cuota de mantenimiento y para aquellos residentes que desde un principio se opusieron al control de acceso. Admitió no haber entregado ni los controles remotos ni las llaves del paseo peatonal a los residentes opositores.[35] Sostiene que al firmar la "autorización para controlar la entrada y salida de personas extrañas a nuestra comunidad", los residentes opositores apoyaron desde un principio la implantación del sistema. Por su parte, los residentes opositores argumentan que la autorización en cuestión no tuvo el alcance que le atribuye la Asociación. Por lo tanto, reclaman su derecho a obtener el control remoto y la llave del acceso peatonal sin tener que pagar nada a cambio.

La Sec. 10(a) de la Ley Núm. 21, según enmendada, *supra*, 23 L.P.R.A. sec. 64d–3(a), obliga al pago de las cuotas de instalación, operación y mantenimiento del control de acceso, a los propietarios siguientes : (1) a los dueños de fincas en que se haya inscrito en el Registro el dictamen del municipio que autorizó el control de acceso;[36] (2) a los que autorizaron la solicitud para establecer el control de acceso, *siempre y cuando el sistema implantado fuese igual en sus términos y condiciones, económicas y de otra índole, al sistema por ellos inicialmente autorizado* o (3) a aquellos que se obligaron posteriormente mediante contrato escrito, y (4) a los que hayan adquirido su finca

---

[35] En respuesta a la orden de interdicto preliminar de 25 de octubre de 1990, emitida en *Caquías etc. v. Asoc.*, la Asociación entregó las claves de los controles remotos a los residentes allí demandantes y aquí recurridos.

[36] La Sec. 8 de la Ley Núm. 21, *supra*, 23 L.P.R.A. sec. 64d–1, permite que, mediante escritura pública suscrita por los propietarios de más del 50% de las fincas, se inscriba en el registro la autorización del municipio como un gravamen real. El gravamen sólo surtirá efecto sobre las fincas cuyos titulares han consentido a la inscripción. La inscripción también puede solicitarla el urbanizador, desarrollador o constructor que antes de vender o conceder opción de compra sobre finca alguna obtenga un permiso para implantar el control de acceso. Sec. 4, Ley Núm. 21, según enmendada, *supra*, 23 L.P.R.A. sec. 64b-1.

luego de implantado el control de acceso o comenzado el trámite para obtener el consentimiento de tres cuartas (3/4) partes de los propietarios residentes para su implantación.([37]) Sec. 10(a)(3) de la Ley Núm. 21, según enmendada, *supra*, 23 L.P.R.A. sec. 64d-3(a)(3). Estos propietarios estarán obligados a contribuir proporcionalmente a los mencionados gastos mediante el pago de cuotas mensuales. Sec. 10(b) de la citada Ley Núm. 21, según enmendada, 23 L.P.R.A. sec. 64d-3(b).

Tanto la Ley Núm. 21, según enmendada, *supra*, como el Reglamento Núm. 20 consagran el derecho de los residentes a oponerse al control de acceso. Dichos residentes no están obligados a pagar las correspondientes cuotas para "el establecimiento, operación, mantenimiento o remoción" (Sec. 15 de la Ley Núm. 21, según enmendada, *supra*, 23 L.P.R.A. sec. 64g) del sistema; tampoco están obligados a pertenecer a la asociación de residentes, aunque sí tienen derecho de voz y voto en las reuniones que ésta celebre; finalmente, tienen derecho de acceso al área controlada bajo las mismas condiciones que los residentes que hayan favorecido el control de acceso.([38]) Cuando solicite al municipio el permiso para implantar el control de acceso, la ley exige que la asociación de residentes garantice este último derecho. Secs. 10(a) y 15 de la Ley Núm.

---

([37]) En ese caso, ello ha de constar en actas. Sec. 10(a)(3) de la Ley Núm. 21, según enmendada, *supra*, 23 L.P.R.A. sec. 64d-3(a)(3).

([38]) La Sec. 15 de la Ley Núm. 21, según enmendada, *supra*, 23 L.P.R.A. sec. 64g, dispone del modo siguiente:

"Los propietarios que no autorizaron expresamente el establecimiento del sistema de control de acceso *no estarán obligados al pago de cuotas para el establecimiento, operación, mantenimiento o remoción* de dicho sistema excepto en aquellos casos en que se comprometan a dichos pagos mediante contrato escrito. Cuando así se comprometan, estos propietarios estarán sujetos a las obligaciones y disposiciones de la sec. 64d–3 de esta ley. Todo propietario o residente tendrá acceso al área sujeta al control de acceso en igualdad de condiciones y todo propietario podrá participar con voz y voto en las asambleas generales que celebre el Consejo, Junta o Asociación de Residentes, independientemente de que sea o no miembro de dicho organismo." (Énfasis suplido.)

21, según enmendada, *supra*; Secs. 5.03(8), 10.01 y 10.02 del Reglamento Núm. 20.([39])

 *El efecto neto de las anteriores salvaguardas es que los vecinos que se opongan al sistema de control de acceso tendrán exactamente los mismos derechos que los vecinos que hayan apoyado el sistema y que contribuyan económicamente a su mantenimiento.* Esto puede parecer injusto para aquellos residentes que apoyan la gestión. También puede prestarse a abuso por parte de residentes que, de mala fe, se opongan a la implantación del sistema de control de acceso para no tener que contribuir económicamente a su mantenimiento pero que en realidad desean la seguridad y tranquilidad que éste ofrece. No obstante, ese es el balance que nuestro legislador estimó adecuado para proteger los intereses en conflicto.

 Para oponerse al control de acceso bajo la ley actual, basta con que el residente no preste su autorización a la asociación para gestionar el permiso con el municipio.([40]) Ahora bien, aquel residente que en un principio haya dado esa autorización, puede luego revocarla siempre que lo haga expresamente y por escrito antes de la primera vista pública que celebre el municipio en torno al control de acceso propuesto. La autorización inicial no revocada obliga al residente a cumplir con todas las responsabilidades que impone la ley, siempre y cuando el sistema se haya implantado de conformidad con los términos y las

---

([39]) La Sec. 5.03(8) del Reglamento explícitamente impone el requisito siguiente para solicitar el permiso:

"Garantía de que se le proveerá acceso por igual y en todo momento a todos los residentes de la comunidad, incluyendo a los que no favorezcan el establecimiento de los controles propuestos ."

([40]) En su parte pertinente, el inciso c de la Sec. 2 de la Ley Núm. 21, según enmendada, *supra*, 23 L.P.R.A. sec. 64a(c), dispone que "[a]quellas personas que favorezcan la implantación del sistema deberán hacerlo expresamente y por escrito ...". La Sec. 15 de la Ley Núm. 21, *supra*, también dispone que aquellos propietarios que no autorizaron expresamente la implantación del sistema no están obligados a sufragar su mantenimiento y operación a menos que se comprometan mediante contrato escrito. Sec. 15 de la Ley Núm. 21, *supra*. Por lo tanto, el silencio del residente no lo compromete.

condiciones contenidas en dicha autorización. Sec. 2(c) de la Ley Núm. 21, según enmendada, *supra*, 23 L.P.R.A. sec. 64a(c). Esto último no siempre fue así.

■ Antes de ser enmendada por la Ley Núm. 22, la Ley Núm. 21, *supra*, guardaba silencio en torno a qué sucedía si un residente se arrepentía de haber autorizado a la asociación a gestionar la instalación del sistema. Más aún, tampoco disponía que la autorización inicial obligaba a los suscribientes a sufragar los gastos del sistema ni que tenía que ser revocada expresamente para evitar ese efecto.

## VII

Procedemos a determinar si los residentes opositores tienen una obligación de sufragar los gastos de operación del sistema de control de acceso. Resolvemos que no.

No existe controversia de hechos en cuanto a que ninguno de los residentes opositores firmó el contrato de mantenimiento mediante el cual el resto de los residentes se comprometió a sufragar los gastos de operación del sistema por una mensualidad de cuarenta y cinco dólares ($45). Excepto dos (2) de ellos, que nada firmaron, los demás residentes opositores se limitaron a firmar la autorización para que la Asociación realizara gestiones para limitar la entrada y salida de personas extrañas a su comunidad. Esta autorización no tuvo el efecto de comprometerlos a sufragar el mantenimiento y la operación del sistema.

Primeramente, la autorización aludida no pasó de ser un consentimiento para que la Asociación realizara "gestiones". La propia Asociación representó mediante las publicaciones del *Timonel*, que ésta a nada les comprometía. Tampoco el documento de autorización aludió a un compromiso económico. De hecho, cuando la Asociación solicitó el permiso ante el Municipio presentó —además de las referidas autorizaciones— contratos de mantenimiento firmados por poco más de tres cuartas (3/4)

partes de los residentes como prueba del apoyo económico para el sistema propuesto. Ello implica que tanto la Asociación como el Municipio entendían que sólo aquellos residentes que hubiesen firmado el referido contrato estaban obligados a pagar las cuotas de mantenimiento.

Segundo, con excepción de uno (1) de ellos, aquellos residentes opositores que firmaron la autorización lo hicieron antes de aprobada la Ley Núm. 21, *supra*. La autorización se prestó bajo las disposiciones de la Ley de Municipios Autónomos del Estado Libre Asociado de Puerto Rico de 1991 que permitían el cierre permanente de calles, modalidad que conllevaba gastos de instalación y operación muy distintos a los del sistema de control actualmente implantado.

Tercero, aunque eventualmente la Asociación utilizó estas autorizaciones para gestionar la solicitud una vez aprobada la Ley Núm. 21, *supra,* no podemos perder de vista que, en aquel entonces, dicha ley no disponía que la autorización obligaba a sufragar los gastos de operación y mantenimiento del sistema ni exigía que el residente revocara expresamente su autorización para evitar ese efecto. Por lo tanto, y visto que el documento de autorización no contenía ningún compromiso en contrario, debemos tomar su negativa a firmar el contrato de mantenimiento como una revocación implícita de su autorización inicial.

Concluimos, por lo tanto, que los residentes opositores no tienen obligación alguna de sufragar la operación del sistema de control de acceso. Por lo tanto, al exigirles el pago de las cuotas de mantenimiento como condición para darles los controles remotos y las llaves del acceso peatonal, la Asociación actuó contrario a las disposiciones de la Ley Núm. 21, según enmendada, *supra*, y al Reglamento Núm. 20.

En consecuencia, la Asociación deberá entregar, sin costo alguno, los controles remotos y las llaves del acceso peatonal a todos los residentes que no hayan suscrito el

contrato de mantenimiento. No podrá exigirles que paguen las cuotas de mantenimiento ni obligarlos a pertenecer a la Asociación. Deberá, además, permitirles acceso a las reuniones de la Asociación con voz y voto. De ninguna manera podrá coartarles su derecho de libre acceso a la urbanización.

## VIII

Por último, habiendo resuelto en contra de los residentes opositores el planteamiento de que era ilegal la operación del control de acceso por no haberse cumplido con el procedimiento de adopción por tres cuartas (3/4) partes de los residentes, debemos pasar al planteamiento constitucional. Recordemos que los residentes opositores en *Asoc. v. Báez y otros* alegaron por primera vez y en la alternativa, en su moción de sentencia sumaria parcial, que la manera en que la Asociación opera el sistema de control de acceso contraviene varias disposiciones constitucionales. Además, impugnaron la constitucionalidad de la Ley Núm. 21, *supra*, en la medida en que autorice dichas prácticas.

Específicamente, sostienen que la Asociación pretende privatizar las calles de Mansiones en contravención de la limitación contenida en la Sec. 9 del Art. VI de nuestra Constitución, *supra*, que dispone que sólo se dispondrá de bienes públicos para fines públicos. Aducen, además, que la Asociación exige a toda persona que intenta entrar a Mansiones que se identifique por su nombre y que dé el nombre y dirección del residente que se propone visitar. Sostienen que la alegada práctica lesiona su derecho de intimidad protegido por la Sec. 8 del Art. II de nuestra Constitución, L.P.R.A., Tomo 1. Finalmente, alegan que sus derechos de libertad de expresión y libertad de culto protegidos tanto por nuestra Constitución como por la Constitución de EE.UU. se ven afectados toda vez que la Asociación alega-

damente limita el acceso a grupos religiosos o de otra índole que desean repartir hojas sueltas u otra literatura en Mansiones.([41])

▬ La Regla 36.3 de Procedimiento Civil de 1979, *supra*, dispone que se dictará sentencia sumaria cuando de las "alegaciones ... [deposiciones], contestaciones a interrogatorios y admisiones ofrecidas, en unión a las declaraciones juradas, si las hubiere, demostraren que no hay controversia real sustancial en cuanto a ningún hecho material y que como cuestión de derecho debe dictarse sentencia sumaria ...". Esto es, el tribunal debera quedar convencido de la inexistencia de controversia sobre ningún hecho material y que como cuestión de hecho nada impide dictar sentencia sumaria. Véanse: *Roig Com. Bank v. Rosario Cirino*, 126 D.P.R. 613 (1990); *McCrillis v. Aut. Navieras de P.R.*, 123 D.P.R. 113 (1989); *Tello, Rivera v. Eastern Airlines*, supra. Por el contrario, si el tribunal tuviera alguna duda sobre la existencia de un hecho material, no deberá disponer de la controversia mediante sentencia sumaria. *Corp. Presiding Bishop CJC of LDS v. Purcell*, 117 D.P.R. 714 (1986). *Valcourt Questell v. Tribunal Superior*, 89 D.P.R. 827, 832 (1964). Cualquier duda se resolverá en contra de la parte que solicita sentencia sumaria. *Méndez Arocho v. El Vocero de P.R.*, 130 D.P.R. 867 (1992); *Cuadrado Lugo v. Santiago Rodríguez*, 126 D.P.R. 272 (1990).

Evaluados los autos, los documentos que acompañan la solicitud de sentencia sumaria parcial de los residentes

---

([41]) Los residentes recurridos en *Caquías etc. v. Asoc.* se abstuvieron de abundar sobre los planteamientos constitucionales. Luego de un análisis de poco más de un párrafo, manifestaron que "[n]o nos extenderemos en el análisis constitucional ya que como hemos expuesto, los derechos de los recurridos están debida y adecuadamente garantizados por la Ley 21[,] el Reglamento 20 y la Ordenanza". Alegato de réplica de la parte recurrida, págs. 24–25. Como hemos resuelto los señalamientos de error en *Caquías etc. v. Asoc.* a favor de los residentes recurridos, este caso no presenta ninguna cuestión constitucional para nuestra adjudicación. Estas cuestiones surgen únicamente a raíz de la moción de sentencia sumaria parcial denegada en *Asoc. v. Báez y otros*.

opositores y los documentos presentados en oposición, concluimos que en *Asoc. v. Báez y otros* existen hechos materiales en controversia que nos impiden resolver estos planteamientos mediante sentencia sumaria.

Mediante la Ley Núm. 21, según enmendada, *supra*, la Asamblea Legislativa delegó a los municipios la facultad para autorizar a residentes de urbanizaciones o comunidades —debidamente organizados en asociaciones o consejos— a implantar y operar controles de accesos, conforme a los criterios de la ley y de los reglamentos que tuvieran a bien aprobar la Junta y los propios municipios. En el ejercicio de esta facultad, el Municipio autorizó a los residentes de Mansiones, por medio de su Asociación, a instalar y operar un sistema de control de acceso.

Los residentes opositores en *Asoc. v. Báez y otros* alegan que la manera en que la Asociación opera este sistema lesiona varios de sus derechos constitucionales y que la Ley Núm. 21, según enmendada, *supra*, es inconstitucional en la medida en que autoriza a la Asociación a así actuar. El único documento que anejaron a su moción de sentencia sumaria parcial para demostrar la manera en que la Asociación opera el sistema fue el Reglamento Interno de Control de Accesos adoptado allá para 1991 por una asamblea de los miembros de la Asociación. *No acompañaron, sin embargo, ningún documento o declaración jurada que avalara su contención de que la Asociación sigue las disposiciones de este reglamento en la operación del sistema. En otras palabras, los residentes opositores no demostraron si la Asociación está realmente poniendo en vigor el referido reglamento.*

En consecuencia, desconocemos la *práctica actual* de los guardianes que atienden la entrada en la intersección de las calles Begonia y Lirio, y la dinámica entre éstos y las personas que intentan entrar a Mansiones. En particular, no sabemos la información que se les solicita y si ésta se pide de manera obligatoria o voluntaria. Tampoco sabemos

si la información se solicita solamente a personas que pretendan entrar por medio de vehículos o si también a los peatones. Ignoramos, además, si los guardianes exigen algún tipo de corroboración de la información provista. Por último, desconocemos las consecuencias de la renuencia de una persona proveer la información solicitada.

Tampoco conocemos de la existencia de un alegado registro de las personas que intentan entrar, qué información contiene, quién tiene acceso a éste y qué salvaguardas existen, si algunas, para impartir confidencialidad a la información que pueda contener. Finalmente, desconocemos qué limitaciones se le imponen, si algunas, a grupos religiosos u otras organizaciones privadas que pretendan acceso a Mansiones con el propósito de llevar su mensaje a los residentes.

*Ante estas interrogantes, no podemos determinar si la Asociación ha excedido límites constitucionales, estatutarios o reglamentarios en la operación del sistema hasta tanto el tribunal a quo determine la manera precisa en que la Asociación opera el sistema de control de acceso de Mansiones.* Corresponde, pues, que se devuelva el caso para que, en vista en su fondo, se diluciden todas estas cuestiones de hechos a tenor con lo dispuesto por las Reglas de Procedimiento Civil.

Este curso de acción responde no sólo a las exigencias de la Regla 36.3 de Procedimiento Civil, *supra,* sino a la doctrina reconocida tanto por el Tribunal Supremo de Estados Unidos como por esta Curia de que la validez de las leyes se presume y que los tribunales no se anticiparán a decidir una cuestión de derecho constitucional antes de que sea necesario hacerlo ni cuando los autos sean inadecuados para hacer una determinación de esa índole. *Vélez Ramírez v. Romero Barceló,* supra; *Vives Vázquez v. Tribunal Superior,* supra; *Esso Standard Oil v. A.P.P.R.,* supra; *Suárez Sánchez v. Tribunal Superior,* 92 D.P.R. 507 (1965); *E.L.A. v. Aguayo,* 80 D.P.R. 552, 596 (1958).

■ Debemos recordar, además, que desde la década de 1950 hemos declinado resolver asuntos constitucionales a menos que sea imprescindible para adjudicar las controversias ante nuestra consideración. Véanse: *Fac. C. Soc. Aplicadas, Inc. v. C.E.S.*, 133 D.P.R. 521 (1993); *Vélez Ramírez v. Romero Barceló*, supra; *P.P.D. v. Admor. Gen. de Elecciones*, 111 D.P.R. 199 (1981); *Galarza Soto v. E.L.A.*, 109 D.P.R. 179 (1979); *Pacheco v. Srio. Instrucción Pública*, 108 D.P.R. 592 (1979); *Mari Bras v. Alcaide*, 100 D.P.R. 506 (1972); *Pueblo ex rel. M.G.G.*, 99 D.P.R. 925 (1971); *Suárez Sánchez v. Tribunal Superior*, supra; *Esso Standard Oil v. A.P.P.R.*, supra; *Bordas & Co. v. Srio. de Agricultura*, 87 D.P.R. 534 (1963); *E.L.A. v. Aguayo*, supra; *Tesorero v. Tribl. de Contribuciones y Kemper*, 71 D.P.R. 298 (1950); *Spanish Am. Tobacco Co. v. Buscaglia*, 71 D.P.R. 991 (1950); *Pueblo v. Marrero*, 79 D.P.R. 649 (1956).

De conformidad con estas normas, ahora debemos abstenernos de adjudicar la constitucionalidad de la Ley Núm. 21, *supra*, según aplicada, hasta tanto los hechos que alegadamente dan lugar a las cuestiones constitucionales sean plenamente dilucidados en una vista en su fondo. De esta manera evitamos, desde este estrado apelativo y sin el beneficio de una adjudicación previa de los hechos, formular innecesariamente unos pronunciamientos constitucionales e imponer unas medidas adicionales que puedan afectar la viabilidad de los sistemas de control de acceso implantados en muchas de nuestras urbanizaciones.

## IX

En resumen, confirmamos la sentencia recurrida en *Caquías etc. v. Asoc.* y revocamos en parte la resolución recurrida en *Asoc. v. Báez y otros* por entender:

(1) que la Ley Núm. 21, según enmendada por la Ley Núm. 156, *supra*, no requería la remisión de la Ordenanza para su adop-

ción por tres cuartas (3/4) partes de los residentes de Mansiones;

(2) que la operación del portón de la intersección de las calles Begonia y Lirio por control remoto, y no por tarjeta, no acarrea la ilegalidad del sistema;

(3) que los residentes opositores no están obligados por contrato o inscripción registral a pagar las cuotas para el mantenimiento del sistema.

Ordenamos, por lo tanto, a la Asociación (1) entregar a los residentes opositores, libre de costo, tantos controles remotos como llaves del paseo peatonal que se pongan a disposición de los residentes con contrato de mantenimiento, y (2) desistir de sus gestiones para el cobro de la cuota de mantenimiento a los residentes opositores.

Por último, confirmamos en parte la resolución recurrida en *Asoc. v. Báez y otros* en cuanto a los planteamientos constitucionales, por entender que existen controversias sobre hechos materiales que impiden su disposición por la vía sumaria. Por lo tanto, devolvemos este caso al tribunal de instancia para que las partes ventilen estas controversias en juicio plenario y además para que se dilucide la controversia sobre el cierre nocturno del portón en la intersección de las calles Gardenia y Lirio y se determine si la Junta de Calidad Ambiental tiene jurisdicción primaria para atender el planteamiento sobre el alegado requisito incumplido de una declaración de impacto ambiental.

*Se dictará la sentencia correspondiente.*

El Juez Asociado Señor Rebollo López emitió una opinión de conformidad. El Juez Asociado Señor Fuster Berlingeri emitió una opinión de conformidad. El Juez Asociado Señor Negrón García emitió una opinión disidente. Todos los Señores Jueces participaron conforme a la Regla de Necesidad.

– O –

## Opinión disidente del Juez Asociado Señor Negrón García

### I

Desde los albores de este siglo reconocimos que las calles, aceras y plazas "han sido destinadas al uso de los habitantes de la ciudad, y todos y cada uno de ellos desde el Gobernador, en su palacio, hasta el limosnero en su choza, tienen derecho al uso [pacífico] libre y continuado de las mismas". *Saldaña v. Concejo Municipal de San Juan*, 15 D.P.R. 37, 51 (1909). Décadas después, arropa a nuestra isla[1] el fenómeno explosivo de una dinámica criminosa[2] que ha convertido el automóvil hurtado o robado en el instrumento codiciado y favorito de la delincuencia,[3] por la

---

[1] "Sería de suponerse que por vivir en una isla estemos protegidos, aislados de las corrientes malsanas que contaminan el mundo de hoy: la violencia, las drogas heróicas, los asaltos, el crimen, la pornografía epidémica, las convulsiones sociales epilépticas. En tierra firme se suele pensar en las islas como refugio de paz. Pues no. Por los milagros de la tecnología, las islas perdieron su tranquilidad. Y por las maromas de la geopolítica, la nuestra es además una frontera." S. Tió, *Un Fracatán de Tirabuzones*, Graf. M. Parejo, España, 1975, San Juan, Puerto Rico, pág. 9, "Botellón".

[2] Existen numerosas teorías sobre las raíces del crimen: la económica, la política, la psicológica y la social-aprendizaje. *Encyclopedia of Crime and Justice*, Nueva York, The Free Press, 1983, T. I, págs. 316–341. Manuel López-Rey y Arroyo analiza comprensivamente la etiología del delito desde la tesis de desorganización social, fenómenos sociopatológicos, conflictos de culturas, cambio social, biopsicológico, psicológico, biológico y otros. M. López-Rey y Arroyo, *La Criminalidad*, Madrid, Ed. Tecnos, 1976, págs. 160–226.

"Las causas generales de la criminalidad son bien conocidas. Aparte de los casos psiquiátricos, nace de la pobreza, de las grandes diferencias económicas entre los grupos sociales, la mala educación, la competición extrema por los bienes materiales, el desempleo, las familias rotas, la influencia dañina de la televisión y el cine, el pésimo ejemplo de las clases dirigentes, la epidemia del narcotráfico, etc." R. Serrano Geyls, *Comunicación a Oficina de Servicios Legales del Municipio de San Juan*, 10 de junio de 1992, págs. 5–6, Apéndice.

[3] El hurto o robo armado y violento relacionado con los vehículos de motor ha alcanzado cifras inimaginables. La situación no es de nuestra exclusividad. En Estados Unidos causó que el Congreso aprobara la Ley Antirobo Automóvil de 1992 (*Anti Car Theft Act of 1992*, 18 U.S.C. sec. 2119 *et seq.*).

En Puerto Rico ha exigido la aprobación de disposiciones legales encaminadas a reducir su uso delictivo y venta ilegal lucrativa. A tal efecto, la Ley de Vehículos y Tránsito de Puerto Rey, Ley Núm. 141 de 20 de julio de 1960, según enmendada, 9

movilidad, facilidad y rapidez en que puede desplazarse y huir por las modernas vías urbanas.

El modus operandi de estos delincuentes consiste, dentro o fuera de una urbanización, en hurtar o robar a mano armada un automóvil. Una vez en posesión de éste comienzan una serie de asaltos sucesivos a través de esa u otras urbanizaciones. Las víctimas pueden ser cualquier hombre, mujer, niño, sea visitante o residente, que se encuentre en su paso en las calles, aceras o patios frontales de las residencias. Incluso, penetran peatonalmente y esperan sigilosamente que abran los portones, las marquesinas o los hogares para sorprender y así aterrorizar al residente o a familias enteras. Como saben que el dueño del vehículo hurtado o robado lo habrá notificado a la Policía, para evitar ser aprehendidos durante esas fechorías, constantemente se apropian de otros vehículos, a la par que descartan el anterior. En ocasiones hieren o asesinan al dueño u otra persona. A veces la resistencia ciudadana, a grandes riesgos y por excepción, frustra el delito. A menudo estos vehículos son conducidos a "talleres" o son abandonados en sitios deshabitados donde son desmantelados por otros individuos dedicados a esas actividades ilegales.

Es obvio que, en estas rápidas incursiones y giras delictivas, *el uso peatonal y vehicular* irrestricto de las entradas, salidas, calles y aceras no controladas de las urbanizaciones residenciales, *representan el factor más*

---

L.P.R.A. sec. 1134, reglamenta el uso de cristales de visión unidireccional y de tinte en los parabrisas o cristales que permiten la comisión fácil de delitos y dificultan la identificación de sus autores.

Por otro lado, la Ley Núm. 8 de 5 de agosto de 1987 (9 L.P.R.A. sec. 3201 *et seq.*) sobre protección de la propiedad vehicular reconoce lo lucrativo de la actividad de vehículos ilegalmente apropiados, estimado anualmente en varios millones de dólares. "Se trata de un negocio ilícito que involucra distintos sectores: el roba carro profesional, el hojalatero que le da una nueva apariencia a la unidad, el funcionario venal que le da la identidad registral, el vendedor y exportador con conexiones internacionales que dirige sus esfuerzos al mercadeo de las unidades, el empresario indiferente que no toma precauciones para asegurarse de la identidad del adquirente que financia o asegura, y finalmente el comprador insensible que sólo considera sus ventajas personales." Exposición de Motivos de la Ley Núm. 8 de 5 de agosto de 1987, Leyes de Puerto Rico, págs. 654–655.

*importante que les permite fácilmente transitar, consumar el delito y escapar impunemente.* "Es de conocimiento común que el vehículo ilegalmente apropiado es utilizado por los delincuentes para llevar a cabo fechorías tales como robos, asaltos, escalamientos y asesinatos como un medio para impedir su identificación por la policía." Exposición de Motivos de la Ley Núm. 8 de 5 de agosto de 1987, Leyes de Puerto Rico, pág. 655. Diversos estudios tienden a confirmar la interacción sustancial que existe entre el incremento de *esos delitos* y el consumo y tráfico del alcohol, sustancias controladas o estupefacientes.[4]

Más que frías estadísticas, consideramos los efectos del crimen sobre las personas de carne y hueso, esto es, el impacto a corto y largo plazo que experimentan la mayoría de las víctimas. Nos referimos no sólo a las lesiones corporales, sino a aquellos daños invisibles severos, de carácter psicológico, tales como el miedo, la ansiedad, la paranoia, la depresión, la confusión, la sensibilidad interpersonal, la autoestima y el ajuste social. *Para esas víctimas y sus familiares, la dignidad del ser humano proclamada en nuestra Constitución es simple ficción.* Nos preocupa sobremanera el costo espiritual del crimen y de lo que aparenta ser el desarrollo de un síndrome o estado de ánimo de miedo colectivo por "la impresión progresiva de inseguridad, amenaza, impotencia o sensación de pérdida del dominio individual". A. Alonso Arias, *El miedo insuperable y la fuerza o violencia moral e irresistible*, [S.P.] Ed. Ediar-Conosur Ltda., 1985, pág. 8.

No es para menos este malestar y estado de impotencia

---

[4] Véanse: *Víctimas de asesinatos-homicidios y su posible relación con el problema de las drogas*, Año fiscal 1989–1990 y enero a mayo de 1988 y 1990, Ofic. de Información de Justicia Criminal, Depto. de Justicia, noviembre 1990; G. Speckart y M. Douglas Anglin, *Narcotics Use and Crime: An Overview of Recent Research Advances*, 13 Contemporary Drug Problems (1986); J.K. Watters, C. Reinarman y J. Fagan, *Causality, Context, and Contingency: Relationships Between Drug Abuse and Delinquency*, 12 Contemporary Drug Problems 351 (1985); P. Gómez Pavón, *El delito de conducción bajo la influencia de bebidas alcohólicas, drogas tóxicas o estupefacientes*, Barcelona, Ed. Bosch, 1985, págs. 1–68; M. Alfonso Sanjuan y P. Ibáñez López, *Drogas y Toxicomanías*, Madrid, Imp. Pablo López, 1979.

comunitario. En el asesinato u homicidio, "el bien jurídico protegido es la vida humana, que es el bien más importante, no sólo porque el atentado contra la misma es irreparable, sino también porque la vida es la condición necesaria para sentir su grandeza y disfrutar de los restantes bienes". R. Levene, *El Delito de Homicidio*, Buenos Aires, Ed. Perrot, 1955, pág. 15.

Más allá del asesinato u homicidio —como ataque al máximo valor, la vida humana— los delitos de asalto y robo son también graves y extremadamente peligrosos. "El sentido común nos dice que al efectuarse un robo, en que de ordinario los asaltantes utilizan armas de fuego o letales para producir la intimidación, es de esperarse que debido a lo desprevenido de las víctimas y la fluidez situacional éstas puedan resultar lastimadas. Si por el contrario se hace uso de la fuerza física para consumarlo, la situación empeora. No es necesario mucho esfuerzo mental para comprender que al efectuarse un robo —debido al interés natural de la víctima de proteger su persona y bienes— el asaltante razonablemente ha previsto o puede prever que la consecuencia natural o probable de su acción puede desembocar en la muerte de alguna persona." *Pueblo v. Lucret Quiñones*, 111 D.P.R. 716, 739–740 (1981).

Finalmente, el delito de violación, en el que se somete a la víctima a un abusivo ataque físico sexual y a "una experiencia ... avasalladora cuyos efectos pueden durar indefinidamente". *Elba A.B.M. v. U.P.R.*, 125 D.P.R. 294,

321 (1990).([5]) Véanse: *Pueblo v. Rivera Robles*, 121 D.P.R. 858 (1988); *Pueblo v. Mattei Torres*, 121 D.P.R. 600 (1988).

Ante estos peligros,([6]) en protección del derecho a la vida y a la integridad física, examinamos formas de defensa comunitaria tales como el cierre de calles y control de accesos para prevenir y combatir el crimen. *Naturalmente, su establecimiento genera legítimos reparos fundamentados en divergencias de criterios, incluso los jurídicos-*

([5]) Experiencia descrita así en la opinión concurrente y de conformidad:

"La experiencia vital puede a veces rebasar la más enfermiza de las imaginaciones humanas. La dura realidad excede en ocasiones —por anchísimo margen— lo que el morboso delirio de un demente puede concebir. Tal es el caso de la aterradora noche que le tocó en desdicha a esta joven universitaria. En definitiva, nada, absolutamente nada, borrará de su cuerpo y de su alma el estrago indescriptible que le deparó la vida. No es necesaria la condición de perito ni de experimentado en la condición humana para comprender el espanto de una experiencia que sobrecoge profundamente al más insensible.

"Temor, angustia, vergüenza, consternación, dolor implacable: todo debe haberse apoderado de esta joven mujer en esa hora pavorosa. La intimidad de su cuerpo, hecha para la caricia consentida, para el disfrute del amor en su expresión más tierna, fue violada brutalmente sin que hubiese para ella el más leve resquicio de respeto. Por el contrario, el furor más salvaje dañó para siempre lo que para ella era inviolable, excepto por la voluntad del amor.

"Y al final, para salvarse, para no morir por la injuria física y moral, o lo que es igual, para no perecer de asco, una salida igualmente aterradora. Tiene que echar mano del arma blanca usada por el violador para, a su vez, liberarse siquiera por un instante del estigma indeleble que —a fin de cuentas— ya nunca podría borrarse del espíritu. Salvó su vida precariamente, pero el daño quedó y permanecerá para siempre como una huella que jamás podrá desvanecerse." (Escolio omitido.) *Elba A.B.M. v. U.P.R.*, 125 D.P.R. 294, 331–332 (1990), opinión concurrente y de conformidad.

([6]) "El *peligro* puede definirse como la probabilidad de verificación de un daño o como la probabilidad de un resultado temido. El concepto de peligro es meramente objetivo, por cuanto este está constituido por el conjunto de las condiciones objetivas existentes en el mundo externo, de las cuales se puede deducir la probabilidad de verificación de un resultado que se teme y que no se desea. El peligro, dice Antolisei, no consiste en un estado de incertidumbre de la naturaleza, sino de una situación que lleva consigo la *probabilidad* de determinado efecto. *Esta probabilidad consiste en una conjetura fundamentada en la experiencia de los casos similares. La experiencia nos enseña que de determinadas causas se derivan determinados efectos y enseña, además, que existe una uniformidad constante en el proceder de la naturaleza.* Junto a la ley de causalidad que rige todos los fenómenos, existen leyes de causalidad por separado o particulares que rigen determinados fenómenos. De ahí la posibilidad de *generalizar un hecho* y establecer los efectos que se pueden derivar de él y la posibilidad de establecer la aptitud, la capacidad, la idoneidad general de un hecho para causar otro hecho. Precisamente por estas características se puede hablar de probabilidad, la cual existe a pesar de no haberse verificado el hecho." (Énfasis suplido.) S. Tulio Ruiz, *La Estructura del Delito*, Bogotá, Ed. Tecnos, 1978, pág. 42.

*tradicionales, y pone a prueba la vitalidad y eficacia de nuestra Constitución como pacto social.*

La triste realidad delictiva aquí expuesta forma parte del trasfondo cotidiano que como juristas insertos en la sociedad *no podemos ignorar. No existen soluciones mágicas para prevenir y disminuir el crimen. Estamos conscientes de que el sistema de cierre y control de calles ha suscitado —y continuará suscitando— múltiples debates de índole social, moral, cultural y legal. Como mecanismo nuevo que abarca y afecta numerosas personas, su uso causará fricciones que requerirán —sobre la marcha— ulterior intervención de los tribunales y la legislatura.* "La democracia es una forma de vida, en la cual —a modo de experimento diario— se pone a prueba toda la gama de ideas, opiniones, conclusiones y demás percepciones que el ser humano genera en una sociedad pluralista. En la zona intelectual y afectiva, el individuo se presenta empapado de conflictos y diferencias ... con un juicio crítico a veces sano, elevado y constructivo —y en ocasiones— producto de la mala fe, el fanatismo, la intolerancia, la ignorancia, el prejuicio, etc. Basta reflexionar nuestras experiencias cotidianas —interfamiliares, con los vecinos, e incluso aquellos a quienes no conocemos directamente— para darnos cuenta del cúmulo de sentimientos y actitudes positivas y negativas involucradas." *Noriega v. Gobernador*, 130 D.P.R. 919 (1992). *En particular, sabemos que pautar unas normas que satisfagan y armonicen todos esos diferentes puntos de vista, por lo pronto, es judicialmente imposible.*

## II

La prevención del delito mediante el concepto de diseño arquitectónico está "íntimamente relacionado con los pro-

blemas de las áreas metropolitanas, consecuencias de la incesante tendencia a la concentración urbana".([7])

Si bien el diseño y la técnica son modernos,([8]) históricamente el concepto no. *Encyclopedia of Crime and Justice*, Nueva York, The Free Press, 1983, T. I, págs. 362–365.

En las edades antiguas, las civilizaciones mediterráneas construían las viviendas con atrios interiores, no sólo por razones climatológicas, sino por razones de seguridad. Durante las edades medias, la ciudad murada y el castillo feudal fueron los bastiones de la seguridad. Con el surgimiento del concepto moderno de las naciones, el énfasis se transfiere a las fronteras de éstas. En épocas recientes, el problema de la defensa de nuestros hogares se ha agravado al reconocer que el enemigo no viene de afuera, sino que está presente dentro de nuestros pueblos y ciudades. Existen tres modelos conceptuales recientes que atienden el problema de diseñar ambientes residenciales seguros: la aldea urbana, el fortín urbano y espacio defendible. El concepto de la aldea urbana asume una población relativamente homogénea y la existencia de usos diversos en las calles que permitan la vigilancia constante de las mismas. El concepto del fortín urbano postula la necesidad de aislar los residentes del ambiente urbano .... El concepto de *espacio defendible* se centra en identificar aquellos elementos de diseño que facilitan la percepción de territorios sobre los cuales grupos de residentes se sientan responsables y dentro de los cuales los extraños sean fácilmente identificables. *De más reciente formulación está el concepto de planificación de seguridad ambiental que recoge algunos de los señalamientos del concepto de espacio defendible, pero los amplía para considerar el efecto de los usos circundantes a las áreas residenciales como generadores de oportunidades para actos delictivos.* (Énfasis suplido.) Memorial sobre el P. del S. 814 de 26 de noviembre de 1986.

---

([7]) Informe de la Comisión para el Estudio de la Policía sometido al Consejo sobre la Reforma de la Justicia en Puerto Rico, 19 de diciembre de 1973, pág. 205.

([8]) Con algunas modificaciones, básicamente trata de la instalación de portones eléctricos con sistemas de control remoto (*beepers*); sistema de intercomunicación para acceso y control de visitantes, y sistema especial para acceso de los servicios gubernamentales. Incluye una caseta con guardián, y todas las facilidades requeridas, y dos (2) o tres (3) brazos mecánicos para controlar el acceso de entrada a la urbanización, uno para residentes y otro para visitantes. Pueden ser operados por tarjetas o control remoto (*beepers*) y por un guardián desde la caseta las veinticuatro (24) horas del día.

Un estudioso de este reciente tipo de planificación urbana describe así el concepto:

> En términos teóricos los nuevos proyectos urbanos de acceso controlado se erigen sobre un modelo de intervención preventiva en favor del medio ambiente residencial cuyo objetivo es disuadir al criminal de su intención delictiva a través de la creación de barreras físicas y simbólicas. Lo que conduce a preponderar los conceptos de territorialidad, imagen, jerarquía y seguridad. La manipulación y conju[n]ción de [e]stos componentes supone un efecto minimizador de los niveles delictivos sobre el escenario urbano.
>
> La configuración preventiva se alcanza mediante un cuidadoso tratamiento fisionómico de factores contexturales. Lo que sugiere que el diseño ambiental y su articulación con la posición espacial de la edificación generen los elementos estructurales necesarios para constituirle en un "espacio defendible". De este modo queda planteado que mediante el diseño físico es posible crear zonas percibiblemente territoriales, o sea áreas de marcada influencia vecinal.
>
> Desde esta vertiente el criminal pasa a ser entendido y definido como una suerte de ente foráneo, exógeno al área residencial. O. De la Rosa Tirado, *Ciudad, Morfología y Alienación Social*, ponencia dictada por encomienda del Greater San Juan Committee, Inc., noviembre de 1990, págs. 179–180. Caso Núm. CE-91-786, Parte I, Petición de *certiorari*, págs. 249–250. Véase *Criminalidad, nuevo habitat y estructura urbana*, Tesis de maestría, Escuela de Planificación, Universidad de Puerto Rico, 1988.

*Con sujeción a ciertos pronunciamientos, sostenemos hoy la validez constitucional de la legislación que autoriza el cierre de calles y control de acceso, a la par que pautamos normas para remediar sus abusos y excesos.*

## III

La alta incidencia del crimen en Cupey movió en 1985 a los residentes de la urbanización Mansiones de Río Piedras a explorar alternativas para intentar prevenirlo mediante el control de entrada de vehículos de motor y personas extrañas. Para esa época, la Ley Orgánica de los Munici-

pios de Puerto Rico, Ley Núm. 146 de 18 de junio de 1980 (21 L.P.R.A. ant. sec. 2001 *et seq.*) en su Art. 12.07 (21 L.P.R.A. sec. 345), *únicamente* facultaba a "ordenar y efectuar el *cierre permanente* de cualquier calle o camino dentro de sus límites territoriales, previa celebración de vista pública que deberá notificarse mediante avisos escritos fijados en sitios prominentes en la Casa Alcaldía y en calle o camino a cerrarse ...". (Énfasis suplido.) Se observa, pues, que la ley trataba de unos cierres distintos, no el control de acceso como se conoce hoy. Una vez realizado el cierre previsto en esa ley, el carácter fijo e inamovible de esa obra no requería el continuo y permanente pago de cuotas de operación y mantenimiento.

Con ese propósito, una mayoría de los dueños y residentes de las ciento ochenta y una (181) viviendas de la urbanización, organizados en una asociación no incorporada, autorizaron por escrito[9] a sus directores a gestionar y solicitar el *cierre permanente* de *una* (1) de las dos (2) calles por las cuales había acceso. El proceso fue lento, complicado y azaroso. Posteriormente, por falta de consenso, se abandonó la idea del cierre permanente.

El 20 de mayo de 1987 la Asamblea Legislativa aprobó la Ley Núm. 21 (23 L.P.R.A. sec. 64 *et seq.*) con el objetivo de permitirle a la ciudadanía "participar de la lucha contra el crimen al establecer mecanismos que controlen los accesos y al mismo tiempo disminuye la labor de vigilancia, ya sobrecargada, que presta la Policía de Puerto Rico". Exposición de Motivos de la Ley Núm. 21 de 20 de mayo de

---

[9] En el documento que suscribían los residentes se estipulaba:

"Yo _____, mayor de edad, _____, residente de la calle _____ de la Urbanización Mansiones de Río Piedras, en representación de los residentes de la vivienda de referencia, autorizo a la Asociación de Residentes de Mansiones de Río Piedras para que represente los intereses comunitarios *a los efectos de solicitar a la Asamblea Municipal de San Juan la autorización para controlar la entrada y sal[i]da* de personas extrañas a nuestra comunidad.

"Hoy ____ de _____ de _____." (Énfasis suprimido y en el original.) Caso Núm. RE-91-139, Solicitud de revisión, pág. 14.

Se advierte la *total omisión* al aspecto económico para la instalación inicial o gastos de operación, reparación o mantenimiento fijos.

1987, Leyes de Puerto Rico, pág. 67. La hipótesis central que animó este estatuto es que el Gobierno compartiese con los residentes la responsabilidad([10]) por la vigilancia y el mantenimiento del orden y, por ende, el control de la conducta delictiva.([11]) Al restringirse la libre entrada y el paso de personas y vehículos en las diferentes urbanizaciones, se limita el área de acción de los delincuentes y se les impide o dificulta escapar y salir airosos una vez cometido el delito.

Esta ley autorizó a la Junta de Planificación a adoptar los reglamentos necesarios y a conceder permisos en comunidades residenciales públicas y privadas con un solo acceso de entrada y salida o que, teniendo más, sus calles o caminos no fueran vías de entrada o salida a otras comunidades. Podía concederse cuando cumplieran los requisitos siguientes: (1) tener una asociación de residentes debidamente organizada; (2) que en la urbanización o comunidad no existiera ninguna facilidad estatal o municipal destinada a uso público, excepto escuelas, parques recreativos o centros comunales; (3) que tres cuartas (3/4) partes de los residentes de las viviendas establecidas en la comunidad prestaran su consentimiento para controlar el acceso, y (4) que la comunidad "se comprometa y presente garantías de que ha de asumir los gastos de instalación, operación y mantenimiento de las facilidades necesarias para el control del acceso a la urbanización o comunidad". Sec. 2 (23 L.P.R.A. sec. 64a). Cumplidos estos requisitos y celebrada una vista pública ante el Municipio de San Juan

---

([10]) Lo que nos hace recordar que "[a]costúmbrase entre nosotros confiar a la acción gubernativa el desenvolvimiento de las más insignificantes cuestiones de interés social. Encuéntrase agradable al parecer, que la Autoridad Superior lo prepare y metodice todo .... El principal elemento de progreso de nuestro país ha de brotar al calor de la iniciativa individual ...". Las clases jornaleras en Puerto Rico, 1882, en S. Brau, *Ensayos (Disquisiciones Sociológicas)*, Río Piedras, Ed. Edil Inc., 1972, págs. 58–59.

([11]) Igual enfoque inspiró la Ley Núm. 14 de 7 de diciembre de 1989, creadora del Consejo de Seguridad Vecinal. 25 L.P.R.A. sec. 1030.

(en adelante Municipio), la Junta de Planificación (después el Municipio) quedaba facultada para conceder el permiso.

Fundamentada en esta nueva legislación, la asociación, a la sazón incorporada como la Asociación de Residentes de Mansiones de Río Piedras, Inc. (en adelante la Asociación), continuó sus gestiones para controlar el acceso a la urbanización y tras varios trámites —incluso una vista pública— el 4 de diciembre de 1989, mediante la Ordenanza Municipal Núm. 40 de 13 de noviembre de 1989, obtuvo del Municipio la autorización. En su sección segunda, la Ordenanza, *supra*, impuso como "condición 'sine qua non' que aún aquellos residentes que no estén de acuerdo con los mencionados cierres de calles y que no participen con la aportación de cuotas, se les reconocerá el derecho a la participación de todos los beneficios". Ordenanza, *supra*, Sec. 2da.

La Asociación instaló en la calle Gardenia un portón que se activa con control remoto *(beeper)* y otro en la calle Begonia, activado de igual modo y por dispositivos dentro de una caseta, atendida y vigilada constantemente por un guardián. Los automóviles de los residentes tienen una calcomanía que los identifica y todos, sin restricción, podían y pueden usar la salida y entrada custodiada por el guardián. El sistema comenzó a funcionar el 30 de junio de 1990 y produjo una reducción sustancial en la comisión de delitos contra la persona y propiedad dentro de la urbanización.

Para el mantenimiento del sistema, la Asociación redactó un contrato en el cual los residentes se obligaban a pagar cuarenta y cinco dólares ($45) mensuales. Una vez lo firmaban se les entregaba el control remoto *(beeper)*. Algunos residentes no lo suscribieron y la Asociación les negó el *beeper* y, por ende, el acceso vehicular por el portón automático. Subsiguientemente, el 26 de julio de 1990 la

Asociación los demandó([12]) en cobro de la cuota y los daños y perjuicios ascendentes a mil dólares ($1,000), invocando la existencia de un contrato de mantenimiento y alegando que ellos habían autorizado a gestionar el control. En contra, los residentes negaron responsabilidad, formularon una reconvención en la cual solicitaron que se decretara ilegal la Ordenanza y se ordenara la remoción del sistema. Además, reclamaron daños por angustias y sufrimientos mentales y solicitaron en la alternativa unas modificaciones al diseño y varios remedios más. Alegaron, además, que era ilegal la orden de la Asociación que disponía el cierre del portón de la calle Gardenia desde las 10:00 de la noche hasta las 6:00 de la mañana y el cobro de quince dólares ($15) como condición para entregarles copia de una llave del portón peatonal de esa calle. Con posterioridad solicitaron sentencia sumaria aduciendo que nunca favorecieron el sistema.

Pendiente dicho pleito, los residentes demandados([13]) presentaron demanda sobre sentencia declaratoria y entredicho permanente (KPE-90-1382)([14]) en que pidieron se les proveyera gratuitamente acceso en iguales condiciones de los que satisfacían la cuota de mantenimiento.

El tribunal (Hon. Arnaldo López Rodríguez, Juez) ordenó a la Asociación "entregar a los demandantes el control remoto *(beeper)* sin que éstos estén obligados a pagar cuota para sufragar los gastos de mantenimiento del sistema". Caso Núm. RE-91-139, Solicitud de revisión, Apéndice II,

---

([12]) La Asociación de Residentes de Mansiones de Río Piedras, Inc. (en adelante la Asociación) presentó dos (2) demandas: La KAC-90-1233 contra Wilfredo Báez, Anastacio Báez, María Antonia Sierra, Rafael Muñoz, Beatriz Ávila de Muñoz, Juan A. Molina, Ernesto Rodríguez, Arquímedes Ramírez y William Varas; y la KAC-90-1221 contra José R. Caquías, quienes también formularon reconvención. Fueron consolidados.

([13]) Excepto Wilfredo Báez, Rafael Muñoz y Beatriz Ávila de Muñoz.

([14]) Figuran como demandantes los esposos Rafael Kercado Salgado y María Antonia Sierra Díaz, Edwin Jiménez Irizarry y Margarita Martínez Pérez y sus respectivas sociedades legales gananciales, y Luz M. Ríos Rosario.

pág. 9. Como cuestión de derecho, la ilustrada sala senten-
ciadora concluyó que en virtud de la Ley Núm. 21, según
enmendada, *supra*, los residentes sólo tenían que pagar
cuando la autorización para controlar el acceso a la urba-
nización constaba inscrita en el Registro de la Propiedad,
como un gravamen real sobre la finca, o cuando de otro
modo se comprometían mediante contrato escrito. Ausen-
tes esas circunstancias, eran acreedores al control remoto
*(beeper)*, pues la referida Ley Núm. 21, *supra*, expresa-
mente disponía acceso igual a los residentes que no lo
favorecieran.

Contra ese dictamen, a solicitud de la Asociación acor-
damos revisar. En el ínterin, el foro de instancia (Hon.
Evaristo M. Orengo, Jr., Juez) en los casos Núms. KAC-90-
1221 y KAC-90-1233, denegó la sentencia sumaria pedida
por los residentes. No conformes, acudieron ante nos. Ex-
pedimos y consolidamos ambos recursos.

Con el beneficio de los alegatos de las partes, la compa-
recencia del Secretario de Justicia por conducto de la Ofi-
cina del Procurador General y la réplica de los residentes
opositores presentada el 4 de diciembre de 1992, resolve-
mos si es válido o no el sistema de control fundamentado
en la Ordenanza, *supra*; si los residentes opositores tienen
que pagar las cuotas de mantenimiento, y si la Ley Núm.
21, según enmendada, *supra*, por la Ley Núm. 156 de 10 de
agosto de 1988 (23 L.P.R.A. secs. 64–64b-1, 64c–64g) es
constitucional.([15])

---

([15]) En *José R. Caquías Mendoza, etc. v. Asociación de Residentes de Mansiones de Río Piedras*, KPL-90-1382 no se planteó en instancia la cuestión constitucional, pero sí ante este Foro. Por otra parte, la validez constitucional de la Ley Núm. 21, *supra*, fue cuestionada en el tribunal de instancia en *Asoc. de Residentes de Mansiones de Río Piedras, Inc. v. José R. Caquías*, KAC-90-1233.

Los hechos esenciales para resolver los recursos están fundamentados en prueba documental o en las posiciones fácticas coincidentes expuestas por las partes en sus diversos escritos.

# IV

La tarea exige ampliar, aunque someramente, algunas disposiciones de la legislación sobre el cierre de calles y urbanizaciones.

Según lo expuesto, con la Ley Núm. 21, *supra*, la Legislatura estableció claramente un procedimiento para obtener el permiso de control de acceso de calles. Sin embargo, no visualizó ni fijó un mecanismo para sostenerlo económicamente. Con la Ley Núm. 156, *supra*, aprobó "un método de financiamiento para que sea factible establecer el control de acceso y mantenerlo funcionando". Exposición de Motivos de la Ley Núm. 156 de 10 de agosto de 1988, Leyes de Puerto Rico, pág. 723. Dicha ley, además de diseñar un sistema de cuotas, trasladó a los municipios la prerrogativa para concederlos.

Para la eficacia del sistema de financiamiento se autorizó, mediante escritura pública, su inscripción en el Registro de la Propiedad como un gravamen real sobre la finca de los residentes cuyos titulares hubiesen consentido a la inscripción, en caso de que el urbanizador no lo hubiese inscrito previamente. Secs. 4 y 8(b), 23 L.P.R.A. secs. 64b–1 y 64d–1(b). La inscripción obliga al propietario a contribuir proporcionalmente con los gastos de instalación, reparación y mantenimiento del control de acceso, lo cual constituirá un gravamen sobre su "inmueble cuando éste se haya constituido conforme a lo establecido en la sec. 64d–1 de este título". Sec. 12 (23 L.P.R.A. sec. 64d–5). Ningún propietario podrá librarse del pago de cuotas aun cuando abandone el inmueble gravado o entienda que no recibe beneficio alguno. Sec. 10 (23 L.P.R.A. sec. 64d–3).

Cuando el desarrollador o constructor no inscribe la autorización en el Registro de la Propiedad, esa inscripción sólo puede hacerse después sobre *fundamentos voluntarios*; no es susceptible de imponerse compulsoriamente. La

solicitud al municipio debe ser adoptada por tres cuartas (3/4) partes de los residentes de las viviendas en la comunidad. Sec. 2, *supra*. Además, es requisito que la comunidad "se comprometa y presente garantías de que ha de asumir los gastos de instalación, operación y mantenimiento de las facilidades necesarias para el control del acceso a la urbanización o comunidad". Sec. 2(d), 23 L.P.R.A. sec. 64a(d).

Es obvio que la viabilidad económica de control de acceso debe ser garantizada por los residentes que consintieron a su establecimiento. Los residentes que no lo favorecieron "*no* estarán obligados al pago de cuotas para el establecimiento, operación, mantenimiento o remoción de dicho sistema excepto en aquellos casos en que se comprometan a dichos pagos mediante contrato escrito". (Énfasis suplido.) Sec. 15 (23 L.P.R.A. sec. 64g).

En resumen esta obligación puede surgir de tres (3) fuentes distintas: (1) inscripción en el Registro —por el urbanizador— del permiso en el cual el pago de cuotas consta como un gravamen sobre la finca; (2) autorización o consentimiento inicial que brindan los residentes a su asociación para que gestione el permiso municipal, que recoja expresamente el compromiso voluntario de sufragar los gastos, y (3) contrato suscrito posteriormente por los residentes que originalmente no lo favorecieron.

Evaluemos los distintos reclamos de los residentes opositores y la Asociación.([16])

---

([16]) Distinto a la contención de los residentes opositores, no consideramos que la variante entre activar el portón con un control *(beeper)*, en lugar de una tarjeta, según originalmente fue autorizado por el municipio, lo mismo que el cierre del portón de la calle Gardenia entre las 10:00 P.M. y 6:00 A.M. (noche), tengan la consecuencia de afectar la legalidad del sistema. Ambos puntos no ameritan mayor análisis.

Tampoco encontramos persuasivo el planteamiento de que el Municipio debió gestionar un estudio sobre impacto ambiental.

# V

Ciertamente, la Sec. 3 de la Ley Núm. 21 (23 L.P.R.A. sec. 64b), y los Arts. 5.05 y 5.06 del Reglamento de Planificación Núm. 20 de 20 de enero de 1989 sobre Control de Tránsito y Uso Público de Calles Locales, requiere que el municipio celebre vistas públicas y de ser favorable la decisión, "un dictamen preliminar que contendrá las condiciones, cambios o modificaciones bajo los cuales deberá desarrollarse el proyecto teniendo que obtener dicho dictamen preliminar la autorización de los residentes de por lo menos tres cuartas (3/4) partes de las viviendas allí establecidas para su adopción final e implantación. Dicha participación estará limitada a un representante por vivienda". 23 L.P.R.A. sec. 64b (Sup. 1989).

Sin embargo, como sentenció el ilustrado foro de instancia, en recta lógica, el dictamen preliminar sólo tiene que emitirse cuando el municipio establece "condiciones, cambio o modificaciones bajo las cuales deberá desarrollarse el proyecto", distinto al propuesto por la Asociación. De la transcripción de las vistas públicas y de la propia Ordenanza, de vigencia inmediata, se desprende que el municipio no impuso ningún tipo de condición, cambio o condición. No era necesario un dictamen preliminar.

# VI

De la sentencia surge que los residentes opositores —excepto las familias de Juan A. Molina y Edwin Jiménez quienes *nunca* consintieron— suscribieron inicialmente el documento y autorizaron a la Asociación para que realizara gestiones con el municipio. Véase esc. 9. No obstante, excepto Arquímedes Ramírez Rivera, sostienen que lo hicieron en enero de 1987 —cuando todavía *no* estaba en vigor la Ley Núm. 21, *supra*— y ello con la sola intención de cerrar permanentemente *una* (1) de las dos (2) calles de

acceso a la urbanización, a tenor con la Ley Orgánica de los Municipios de Puerto Rico *entonces vigente.* Arguyen que no favorecieron el sistema de control de acceso que a la postre *autorizó* el municipio bajo la posterior Ley Núm. 21, *supra.* Tienen razón.

A finales de 1985 la Asociación intimó en su Boletín Informativo, *El Timonel,* Año I, Núm. 3, que una de las alternativas para combatir la criminalidad era cerrar *una* (1) de las dos (2) vías. Subsiguientemente, en *El Timonel* de enero de 1987, Año 2, Núm. 7, la Asociación en su editorial aseveró: "Que no seas *tú* el que detiene la única oportunidad de ganar derecho a controlar nuestros accesos a la urbanización. Mucho podemos ganar, nada se pierde *ni se compromete con esta petición.*" (Énfasis suplido y en el original.) Caso Núm. CE-91-786, Parte I, Petición de *certiorari,* Apéndice IV, Anejo IV.

Los residentes aquí involucrados suscribieron el documento antes aludido que, en lo pertinente, autorizaba "a la Asociación de Residentes de Mansiones de Río Piedras para que represente los intereses comunitarios a los efectos de solicitar a la Asamblea Municipal de San Juan la autorización para controlar la entrada y sal[i]da de personas extrañas a nuestra comunidad". (Énfasis suprimido.) Caso Núm. RE-91-139, Solicitud de revisión, pág. 14. Ello fue con anterioridad a la vigencia de la Ley Núm. 21, *supra.* Es incontrovertible que al firmar esas autorizaciones, el *único* mecanismo viable para controlar ese acceso bajo las disposiciones de la Ley Orgánica de los Municipios de Puerto Rico era cerrar permanentemente una de las calles, y que ello no generaba gastos fijos de operación y mantenimiento. No podemos, pues, darle el alcance que pretende la Asociación. Así ella lo reconoció en *El Timonel* y en otras gestiones.(17)

Resulta claro que los residentes opositores no consintie-

---

(17) En carta dirigida el 9 de febrero de 1988 al entonces Gobernador, Lcdo. Rafael Hernández Colón, expuso en lo pertinente:

ron al sistema de control propuesto, finalmente establecido, en virtud de la Ley Núm. 21, *supra*, consistente en *cerrar las dos (2) vías de acceso* mediante unos portones automáticos y el establecimiento de una caseta con guardián de seguridad. La tesis jurídica del mandato escrito o verbal que propone la Asociación es improcedente, ya que la contribución económica no era ni formó parte esencial del documento ni encomienda original. De ser cierta la posición de la Asociación, ¿por qué requirió a todos los residentes que suscribieran *específicamente* un contrato de mantenimiento y cuota? Un aspecto tan importante como el financiamiento *ad perpetuam* no podía dejarse en el aire y sujeto a una interpretación tan precaria.

De hecho, según certificado de 16 de enero de 1988, producto de un acuerdo adoptado en una reunión extraordinaria de la Asociación —suscrito por la Secretaria, Ivonne V. Álvarez y la Presidenta, Lcda. Mildred Diez de Muñiz— se garantizó con lenguaje de carácter prospectivo "que se le proveerá acceso por igual y en todo momento a todos los residentes de la comunidad, incluyendo a los que no favorezcan el establecimiento de los controles propuesto[s]". Caso Núm. CE-91-786, Parte II, Petición de *certiorari*, Apéndice IV, Anejo IV–54. Y en su ponencia el 28 de junio de 1989 en la vista pública municipal, la Presidenta, licenciada Diez de Muñiz, cuidadosamente desglosó en dos (2) la documentación de los números y los porcientos de auto-

---

"Antes de aprobarse la Ley #21 del Senado de P.R., que permite a las urbanizaciones controlar sus entradas, la Asociación de Residentes de Mansiones de Río Piedras obtuvo la autorización del 99% de los residentes, lo cual hac[í]a viable, a través del Municipio de San Juan, controlar nuestra urbanización.

"*Nos tomó cerca de un año el trámite de estas autorizaciones, y ya que creíamos nuestro proyecto una realidad, se aprueba la Ley #21, y lo anterior no es aplicable.* Dicha ley fu[e] aprobada por Usted como Gobernador y nos hemos enterado hay unas enmiendas que Usted desea hacerle al Reglamento. Debido a esto est[a]mos impedidos de someter nuestra petición a la Junta de Planificación.

"El motivo de esta comunicación es para, respetuosamente solicitarle, que Usted, como Gobernador, autorice un Permiso Provisional que haga factible el controlar las entradas. El esperar al proceso que conlleva el hacer enmiendas y someter las mismas a las distintas oficinas y/o Agencias que deben aprobarlas tomaría demasiado tiempo." (Énfasis suplido.) Caso Núm. CE-91-786, Parte II, Petición de *certiorari*, Apéndice IV, Anejo IV.

rizaciones de apoyo que tenía de los residentes: una, endosando la presentación del proyecto y la otra, los contratos de mantenimiento que se había firmado. T.E., Vista Municipal, pág. 27. Es ineludible concluir que con estas y otras actuaciones la Asociación representó y reconoció que la *única* forma en que los residentes se comprometían al sostenimiento económico del sistema de control de acceso era mediante la *firma* del contrato escrito sobre pago de cuota.

La Asociación señala, en la alternativa, que aún cuando esos residentes no lo favorecieron, están obligados a él, pues *no* se opusieron en la vista pública celebrada por el Municipio. La dificultad del señalamiento —consentimiento tácito— estriba en que la Ley Núm. 21, *supra*, no les imponía, como tampoco al presente les impone, el deber de actuar así. Nos negamos a aplicar el conocido aforismo de que "el que calla otorga" o que "el que calla, consiente", pues el silencio tiene máximas que se contradicen entre sí; aquí "el que calla no dice nada". J. Dualde, *Una revolución en la lógica del Derecho*, Barcelona, Ed. Bosch, 1933, pág. 10; R. Bielsa, *Los conceptos jurídicos y su terminología*, 3ra ed., Buenos Aires, Ed. DePalma, 1987, págs. 269–270.

No están, pues, compelidos estos residentes a pagar las cuotas. Todos tienen derecho a que se les brinde acceso igual, esto es, tener los controles electrónicos *(beepers)* para controlar el portón donde está ubicada la caseta del guardián, el correspondiente a la calle Gardenia, también con un portón electrónico, e incluso la llave del peatonal. La familia Molina también es beneficiaria. No es óbice para negarle su derecho el hecho de que su antecesor en título se comprometiera a pagar las cuotas por escrito. A esa fecha no existía la Ley Núm. 156, *supra*, ni la Ordenanza que autorizara el sistema, y mucho menos la posibilidad de crear un gravamen mediante la inscripción en el Registro de la Propiedad. Igual solución se impone en cuanto a la familia de Arquímedes Ramírez. El consentimiento que prestó el 15 de junio de 1989 —*en vigor las*

*Leyes Núms. 21 y 156, supra,* e iniciado el trámite por la Asociación— fue *sólo* un endoso de la presentación y obtención del permiso; *nunca suscribió el contrato de mantenimiento de cuotas.* Recuérdese que ése fue el medio legítimo que se usó para obtener el compromiso *y así se le presentó al Municipio.*

*Aclarados estos extremos, concentrémonos en los planteamientos constitucionales los cuales trascienden el problema económico de las cuotas y van a la médula existencial de esta legislación.* Aunque respetables, omitiremos pasar juicio sobre una serie de señalamientos no jurídicos que versan sobre consideraciones filosóficas y sociales, la erección de barreras sociales y los efectos negativos a corto y largo plazo de este tipo de sistema. Éstos corresponden más bien a escenarios tales como el legislativo, el político y otros.([18])

---

([18]) Al respecto los residentes opositores nos exponen que "[n]uestra sociedad ya está lo suficientemente dividida por razones políticas, religiosas, económicas, etc. y los controles contribuyen a fomentar aún más esa separación de estratas sociales; constituye un sistema elitista y clasista. Tiende además a aislarnos de otros sectores sociales y coarta la efectiva interacción de diversos grupos sociales. En cierta medida, nos hace recordar el sistema de 'apartheid' de Africa del Sur, la teoría de iguales pero separados ya superada, al menos por la jurisprudencia, en Estados Unidos, el sistema de castas de India y en otros aspectos, el sistema feudal de la Edad Media ...". Caso Núm. RE-91-139, Alegato de réplica de la parte recurrida, pág. 6.

De la ponencia presentada por De la Rosa Tirado, transcribimos:

"Si bien es cierto que en términos micro-espaciales las zonas tratadas mediante este paradigma adquieren una fehaciente estabilidad —en tanto logran un incuestionable decrecimiento de sus índices delictivos— no menos cierto resultan los desequilibrios e inestabilidades que su marcada diferenciación estructural podrían producir al entorno macro-espacial.

"Un análisis prospectivo de escenarios desprendidos de estos neo-emergentes urbanos refleja el siguiente cuadro situacional:

"1. Una paulatina segregación espacial mucho más evidente y severa que la registrada al presente. Los precios de los diversos proyectos urbanos resultan ser desmedidamente altos. Esta condición excluye a los sectores medios y bajos incapaces de sufragar estos costos por concepto de vivienda propia.

"2. Las corrientes inflacionarias seguirán haciendo de la clase media una cada vez más insolvente, pudiendo constatarse físicamente por su lugar de residencia, y sus estilos de vida que le acercaran cada día más a las bajas estratas sociales. Conduciendo a una inevitable polarización de clases.

"3. Este patrón urbano que enfatiza en los controles de sus accesos y entornos fomenta el aislamiento, la enajenación social, incrementa el escepticismo, la negación de la realidad colectiva y el hermetismo social. Las ciudades tenderán a ser mucho más cerradas y departamentalizadas por estos proyectos nuclearizados, des-

# VII

En síntesis, contra el sistema de control de acceso los residentes opositores aducen que éste viola el Art. VI, Sec. 9 de nuestra Constitución, L.P.R.A., Tomo 1, que dispone el uso de bienes públicos (calles, aceras y parques) sin mandato de ley y, además, la utilización de fondos y propiedades públicas para fines privados; la ausencia de un fin público legítimo y la "privatización" de las calles; violación del derecho a la libre expresión, asociación y libertad religiosa, en la medida en que el sistema impide el acceso a las calles

conectadas del entorno y de las comunidades periféricas. En consecuencia reivindican al criminal al igual que las actividades ilícitas que estos representan a través del escepticismo social que proyectan.

"4. Cambios y evidentes complicaciones en las políticas públicas vigentes y en los servicios a las comunidades.

"5. Una marcada puesta en cuestión respecto al poder del Estado y de su capacidad de dominio y diligencia frente al crimen. Por otro lado se puede vislumbrar un incremento en el uso de los mecanismos privados de represión, para guardar el orden social.

"6. Estos proyectos urbanos, su endoso y proliferación representan simbólicamente un explícito reconocimiento de la primacía y dominio que sobre el espacio poseen las prácticas ilegales. Prácticas que fuerzan a la ciudadanía a desarrollar patrones de hermetismo colectivo, respaldados por todo un montaje comercial que se nutre de ellos y de esta caótica condición social.

"7. En términos de accesibilidad en casos de emergencias o desastres naturales estas barreras pueden representar serios inconvenientes, poniendo en peligro la vida y propiedad de la comunidad en pleno.

"En síntesis, las unidades vecinales representan instrumentos de enorme utilidad en tanto y en cuanto estén orientadas a la acción pluriclasista. Pero el replanteamiento de estas unidades vecinales a través de estos nuevos formatos urbanos redundan en productos y subproductos detrimentales a nuestra formación social." Caso Núm. CE-91-786, Petición de *certiorari*, Apéndice IV, Anejo IV-18, págs. 250-252.

Igual preocupación señala así Serrano Geyls:

"El resultado evidente de estos proyectos será el de gradualmente parcelar la ciudad capital y más adelante todas las ciudades y convertirlas en un conglomerado de pequeños feudos divididos por vallas a cargo de guardias que recibirán órdenes de grupos vecinales. Además de los resultados en cuanto a tránsito, polvo, accidentes y crímenes, ya mencionados, está el grave mal de que esas segregaciones acentuarán las ya existentes divisiones económicas y sociales entre diversos grupos de la población. Si los que tenemos medios económicos cerramos nuestras calles ¿por qué los que no tienen esos medios no han de exigir del gobierno que cierre las suyas? Y si eso sucede ¿podrá en realidad gobernarse una comunidad urbana en esas condiciones? ¿Conduciría esa parcelación a incrementar grandemente los conflictos y odios entre diversas clases económicas y a la larga y por esa razón a aumentar la criminalidad?" R. Serrano Geyls, *Comunicación a Oficina de Servicios Legales del Municipio de San Juan*, pág. 5, Apéndice.

y aceras públicas; infracción al derecho de intimidad al requerírsele identificación a las personas que van a entrar a la comunidad, y una aplicación desigual del principio de igual protección de las leyes al permitir que algunos grupos de personas tengan acceso a las calles de determinada comunidad y otros no. Examinémoslos.

Nuestra Asamblea Constituyente en el Art. VI, Sec. 9 de la Constitución del E.L.A., *supra*, ed.1982, pág. 369, estableció que "[s]ólo se dispondrá de las propiedades y fondos públicos para fines públicos y para el sostenimiento y funcionamiento de las instituciones del Estado, y en todo caso por autoridad de ley". Al interpretar esta disposición hemos reiterado que un bien de dominio y uso público *no es susceptible de enajenación* o *posesión privada — Ortiz Carrasquillo v. Municipio de Naguabo*, 108 D.P.R. 366, 369 (1979); *Rubert Armstrong v. E.L.A.*, 97 D.P.R. 588, 616 (1969); *Balzac v. Registrador*, 51 D.P.R. 757, 759 (1937)— salvo su desafectación y ello, mediante legislación.

Cónsono con ese enfoque de inspiración democrática, "[d]esde tiempos inmemoriales los parques, las plazas y las calles en Puerto Rico han constituido foros de divulgación, de intercambio y de crítica de ideas. Es en ellos en donde la conciencia ciudadana y particular forma de ver el mundo tienen impacto y repercuten. Son los foros públicos por excelencia para la divulgación y expresión de ideas. Las calles en particular constituyen un instrumento eficaz de divulgación de ideas accesible para aquellos individuos y grupos que no cuentan con suficientes recursos económicos y que no tienen, por tanto, acceso a los medios de comunicación masiva como lo son la radio, la televisión y la prensa. *Los derechos de expresión y el uso de las vías públicas en Puerto Rico*, Comisión de Derechos Civiles de Puerto Rico, 1971". *Pacheco Fraticelli v. Cintrón Antonsanti*, 122 D.P.R. 229, 241–242 (1988).[19]

---

[19] Desde su decisión en *Hague v. C.I.O*, 307 U.S. 496, 515 (1939), el Tribunal Supremo de Estados Unidos ha sostenido que las calles y los parques,

Frente a esos usos y costumbres, surge la Ley Núm. 21, según enmendada, *supra, vital* para combatir la criminalidad. Ésta permite que la comunidad participe activamente mediante la autorización para "establecer mecanismos que *controlen* los accesos" —(énfasis suplido) Exposición de Motivos de la Ley Núm. 21, *supra*, 1987 Leyes de Puerto Rico 67— de los vehículos de motor y el uso público de calles y caminos. No impide ni prohíbe el uso público de las calles y aceras; más bien, permite algún grado de control de sus usos. La ley no traslada ni delega el mantenimiento de las calles, las aceras y los parques a los residentes, sino que, por el contrario, reconoce el deber de los organismos y funcionarios públicos de continuar brindando los servicios esenciales a la comunidad. *No estamos propiamente ante una legislación que persiga privatizar calles y aceras.*

En rigor jurídico y científico, no cabe hablar propia-

---

"[i]ndependientemente de donde radiquen sus títulos son para uso público y los ciudadanos tener reuniones, comunicar sus pensamientos y discutir asuntos públicos". (Traducción nuestra.) La vigencia de esta norma es indiscutible. En *Boos v. Barry*, 485 U.S. 312, 318 (1988), el Tribunal expresó que las calles y aceras públicas son foros públicos tradicionales que "ocupan una posición especial en términos de la protección de la Primera Enmienda donde la habilidad del gobierno para restringir la expresión es muy limitada." (Traducción nuestra.)

En *Frisby v. Schultz*, 487 U.S. 474, 480–481 (1988), el Tribunal reafirmó a *Hague v. C.I.O.*, supra, y aclaró que el carácter de foro público tradicional de las calles es *independiente* de su naturaleza residencial o comercial:

"... nuestras decisiones que califican las calles y aceras públicas como foros públicos tradicionales no son invocaciones accidentales de 'un cliché', sino reconocimiento de que [i]ndependientemente de donde radiquen sus títulos se han mantenido para uso público" *Hague v. CIO, supra*, pág. 515, (Roberts, J.). No se requiere una investigación particular sobre la naturaleza residencial o comercial de una calle específica, todas las calles públicas se mantienen para uso público y se consideran apropiadamente foros públicos tradicionales." (Traducción nuestra.)

En *Perry Ed. Assn. v. Perry Local Educators' Assn.*, 460 U.S. 37 (1983), el Tribunal elaboró los criterios de escrutinio aplicables a la reglamentación gubernamental de la expresión en los foros públicos tradicionales. Cuando la reglamentación excluye la expresión por razón de su contenido, el Estado tiene que demostrar que la reglamentación es necesaria para proteger un interés gubernamental apremiante y la interferencia es ajustada a lo necesario para fomentar ese interés (*narrowly tailored*). Si la reglamentación se limita al tiempo, lugar y manera de expresarse, el Estado tiene que demostrar que tal reglamentación es neutral en cuanto al contenido de la expresión, la interferencia es ajustada a lo necesario para fomentar un interés gubernamental significativo y que se han dejado abierta otras alternativas para la expresión. *Perry Ed. Assn. v. Perry Local Educator's Assn.*, supra, pág. 45.

mente de privatización de aceras y calles.([20]) Cabe reproducir las manifestaciones del entonces Senador Fernando Martín García (P.I.P.), en ocasión de discutirse el 5 de marzo de 1992 el P. del S. 1200, enmendatorio de la Ley Núm. 21, *supra*:

Pero no nos engañemos, el efecto jurídico de esto no es, ni podría ser, es que no podría ser el de convertir una calle pública en Puerto Rico en una calle que es para uso exclusivo de los residentes, para el cual tengan el poder legal de impedir, de impedir el acceso de nadie. Cuando la ley original habla otra vez ambiguamente de que no se puede prohibir el acceso a iglesias, facilidades, parques, un parque y una calle no tienen jurídicamente naturaleza distinta, son ambas una tan pública como la otra. Proveen al ciudadano una facilidad tan una como la otra; no puede ser que yo puedo ir a la cancha de baloncesto a tirar canasto, pero si voy a la cancha de baloncesto a mirar el canasto se me prohíbe el acceso. Así es que legalmente el día en que se quiera permitir que una urbanización en efecto se convierta en un condominio, es decir, que pueda legalmente decir, "el que no vive aquí no puede entrar", *eso requiere una transformación jurídica mucho más compleja de la que está envuelta en esta ley.* Y además, supondría, supondría que los vecinos se tendrían, primero que adquirir, adquirir las facilidades públicas entre ellas las calles. Y tendrían en su momento también que hacerse cargo de su reparación. Yo presumo que el País no está listo para esto, esto haría quebrar a cualquier asociación de vecinos, si se tuvieran que imponer el comprar la calle. Pero por otro lado tampoco podemos levantar falsas ilusiones sobre lo que estamos haciendo. Repito, en ese sentido las preguntas del senador Ramos me parecen acertadas. Nadie en Puerto Rico, no hay ley ésta, ni la anterior, que impida jurídicamente, no digo yo en términos prácticos, uno no vive ahí y ve un guardia, una barrera, se va para otro sitio. Pero nada que jurídicamente impida que yo transite por una calle pública de Puerto Rico sin tener que proveerle explicaciones a nadie mientras sea una calle pública. Y digo esto, en primer lugar, porque es la verdad. Y en segundo lugar, para que aquellos que piensen que esta legislación debe ir más lejos que sepan que habría que

---

([20]) España ha desarrollado y culminado verdaderamente el concepto de urbanizaciones privadas. Véanse: J. Martin Blanco, *Las urbanizaciones privadas y su posible configuración jurídica*, Ministerio de la Vivienda, 1973; M. Gitrama González, *Propiedad y Urbanismo*, Ed. Montecorvo, 1978; P. Escribano Collado, *Las vías urbanas, concepto y régimen de uso*, Ed. Montecorvo, 1973.

hacer enmiendas más profundas. (Énfasis suplido.) XLIV (Núm. 19) Diario de Sesiones de la Asamblea Legislativa, págs. 373-374.

En el mismo tenor ha expuesto Serrano Geyls:

Recuérdese de entrada que lo que se pretende cerrar son calles y parques públicos. Esos son lugares, como ha dicho el Tribunal Supremo de Estados Unidos, que el Estado "retiene en fideicomiso para el uso del público" y que desde tiempo inmemorial son los sitios preferidos para la comunicación pública e interpersonal. El estado no puede mantener el carácter público de esos lugares y a la vez entregarles su control a unas personas privadas para *que ellas excluyan al público de su uso*. Es también de muy dudosa constitucionalidad que el Estado utilice dinero público para reparar calles y parques de los cuales se excluye al público y que benefician principalmente a ciertas personas privadas. (Énfasis suplido.) Serrano Geyls, *supra*, pág. 3.

## VIII

Según hemos indicado, esta legislación tiene varios propósitos: (1) lograr que la comunidad se involucre en la lucha contra el crimen; (2) disminuir la sobrecargada labor de vigilancia que ejerce la Policía, y (3) promover una acción concreta e inmediata que "le devuelva la tranquilidad que nuestro pueblo requiere".[21] Frente al *comprobado uso desenfrenado de la combinación peatón-vehículo de motor, como instrumento preferido para la delincuencia*, definitiva e indudablemente esos propósitos son legítimos y responden realmente a un interés apremiante gubernamental: proteger al ciudadano y controlar la criminalidad dentro del entorno residencial.

---

[21] La Exposición de Motivos de la Ley Núm. 22 de 16 de julio de 1992, Leyes de Puerto Rico, pág. 141, que recientemente enmendó la Ley Núm. 21, *supra*, expresa que "[e]l sistema de control de acceso ha probado ser un mecanismo eficaz para reducir la incidencia criminal en las comunidades donde se ha establecido; además fomenta una convivencia segura y tranquila entre los miembros de las comunidades, lo que propicia una mejor calidad de vida".

Nuestro repertorio jurisprudencial parte de la visión de que el destino del vehículo de motor es la vía pública y, por sus características, existe un tratamiento distinto constitucional para éstos, *vis-á-vis* los hogares. *Pueblo v. Turner Goodman*, 110 D.P.R. 734, 738 (1981). *Pueblo v. Acevedo Escobar*, 112 D.P.R. 770, 776 (1982), reiteró "la diferencia conceptual y funcional entre una residencia o estructura (uso y ubicación fijos) y la movilidad y reglamentación de un vehículo de motor, al igual que la fluidez, rapidez y, en ocasiones, situaciones marginales en que ocurren los acontecimientos ...". También aludimos a que el "uso por las vías públicas de un automóvil, la facultad en ley de detener para fines de infracción de las leyes de tránsito y características del medio de locomoción, diluyen la razonable expectativa de privacidad con referencia a otros tipos de propiedad". (Énfasis en el original suprimido.) En *Pueblo v. Malavé González*, 120 D.P.R. 470, 479 (1988), señalamos que no podíamos ignorar que dada la movilidad del "automóvil en ocasiones es el medio utilizado por los delincuentes para sus actividades ilícitas y que con frecuencia es el producto del delito".

De su faz, el estatuto en discusión es de contenido *neutral*, pues si bien establece una restricción, no prohíbe ningún tipo de expresión específica. Tampoco impide que subsistan otros canales adecuados de comunicación, pues salvaguarda el derecho a utilizar las calles y aceras como foros públicos, con una mínima limitación.

La Ley Núm. 21, *supra*, no define ni enumera qué medidas deben adoptarse al implantar el control de acceso. No obstante, esa indefinición queda superada mediante el Reglamento Núm. 20, *supra*, adoptado por la Junta de Planificación. Éste, de manera específica, establece —como parámetros— las condiciones necesarias que forman parte del permiso concedido por el Municipio. Ello implica que toda ordenanza, que a esos efectos se apruebe, incorpora *de jure* esas condiciones y requisitos.

.Sin embargo, los residentes opositores sostienen que la Asociación, en su Reglamento Interno de Control de Accesos de la Urbanización Mansiones de Río Piedras (en adelante Reglamento Interno), vedó la entrada a personas que desean entregar hojas sueltas.[22] Efectivamente, la Sec. 7 del Reglamento Interno, *in fine*, "limita el acceso de grupos privados que vienen a distribuir hojas sueltas, religiosas o cualesquiera otros, entendiéndose que esta limitación no cubre el acceso de servicios de basura, de leche, de cartero, de luz eléctrica, de agua y tel[é]fono, etc.". Apéndice A, Reglamento Interno de Control de Accesos de la Urbanización Mansiones de Río Piedras. Esta disposición reglamentaria es impermisible y no puede prevalecer. La prohibición de entrada a la comunidad a esas personas impide el ejercicio de su derecho a la libre expresión y asociación, en contravención con lo dispuesto en la Constitución.[23]

Finalmente, los residentes opositores argumentan que el control implantado invade el derecho a la intimidad de los visitantes y residentes, pues el guardián de seguridad requiere al visitante que identifique al residente que va a visitar y lleva un registro.

## IX

La práctica generalizada —utilizada por la Asociación— consiste en que el guardián de seguridad privado desde la caseta pide a los ciudadanos que se identifiquen con su

---

[22] En cuanto a éste y a otros planteamientos, le reconocemos *legitimación activa* a los residentes opositores para formular planteamientos sobre la libertad de expresión y asociación de terceros según nuestra jurisprudencia. *Pueblo v. Hernández Colón*, 118 D.P.R. 891, 898–899 (1987).

[23] Consistentemente se ha sostenido que la distribución puerta a puerta de hojas sueltas y otra literatura es una forma de lenguaje protegido por la Primera Enmienda federal. *Secretary of State v. Joseph Co.*, 467 U.S. 947 (1984); *Heffron v. Int'l Soc. for Krishna Consc.*, 452 U.S. 640, 647 (1981); *Schaumburg v. Citizens for a Better Environ.*, 444 U.S. 620, 632 (1980); *National Anti–Drug Coalition, Inc. v. Bolger*, 737 F.2d 717, 720 (7mo Cir. 1984). Ese enfoque se justifica a base de que es el medio de expresión menos costoso y accesible para muchas personas y grupos.

nombre y la residencia que van a visitar. Establece el primer párrafo de la Sec. 7 del Reglamento Interno:

> Toda persona no-residente en la Urbanización que desee visitar, familiares, amigos, etc. tendrá acceso a la Urbanización exclusivamente por la entrada de la Calle Begonia donde *deberá identificarse con el guardia de seguridad y mencionar el motivo de su visita.* El guardia de seguridad tomará el nombre del visitante, así como una descripción breve del vehículo con el número de tablilla y el nombre del residente hacia donde se dirige. (Énfasis suplido.) Apéndice A, Reglamento Interno de Control de Accesos de la Urbanización Mansiones de Río Piedras.

Esa acción, fundamentada en el aludido Reglamento debe examinarse al amparo de nuestros pronunciamientos sobre el derecho a la intimidad.

En *Arroyo v. Rattan Specialties, Inc.*, 117 D.P.R. 35, 62 (1986), nos reafirmamos en que los "derechos a la dignidad, integridad personal e intimidad son derechos constitucionales fundamentales que gozan de la más alta jerarquía y constituyen una crucial dimensión en los derechos humanos. Su protección es necesaria para que se pueda lograr una adecuada paz social o colectiva. Una persona respetada en su intimidad y dignidad —que no es otra cosa que el amplio y, en ocasiones, complejo mundo interior individual— sentirá y vivirá la paz, el respeto y la consideración merecida por todo ser humano en una sociedad. Es de esperarse, pues, que esos mismos sentimientos, vitales para una ordenada, racional y pacífica convivencia social, sean proyectados de manera efectiva a nuestro orden social".

El sistema de control de acceso establecido por la Asociación en este caso, en la medida en que exige a los visitantes divulgar información personal sobre el propósito de su paso por una vía pública, ciertamente interfiere con la intimidad. Además, incide en la intimidad de los residentes opositores ya que el guardián obtiene conocimiento y mantiene un registro de las personas que visitan sus residen-

cias, "santuario" tradicional del ciudadano. *Sucn. de Victoria v. Iglesia Pentecostal*, 102 D.P.R. 20, 29 (1974).

El derecho a la intimidad opera *ex proprio vigore* y es oponible entre partes privadas. *Arroyo v. Rattan Specialties, Inc.*, supra, pág. 64, y casos allí citados.

Ahora bien, ante la alta incidencia del crimen en nuestro país y *el papel significativo del vehículo de motor, combinado con el crimen del delincuente peatonal, como medio preferido*, la necesidad de prevenirlo y la tranquilidad que debe haber en los hogares de nuestras urbanizaciones y comunidades, es evidente que *estamos ante un interés apremiante* susceptible de permitir alguna interferencia con el derecho a la intimidad.[24] Aunque para algunas personas los portones eléctricos, brazos mecánicos y otras barreras físicas, unido a la figura de autoridad de un guardián de seguridad, puedan tener un efecto intimidante o disuasivo (*chilling effect*) —o resultar mortificante o irritante— la "protección más liberal de los derechos del individuo ... establecida ... en [la] carta de derechos, no puede perder de vista el básico principio de que la *salud del pueblo es la suprema ley*. Los derechos individuales tienen que entenderse dentro del cuadro general de la sociedad con arreglo a las limitaciones inherentes a la vida en común". (Énfasis suplido.) 4 Diario de la Convención Constituyente. "No concebimos derecho de posición preferente a la libertad de estar y sentarse tranquilo en su casa." *Sucn. de Victoria v. Iglesia Pentecostal*, supra, pág. 23. "[U]na vida íntima familiar ... goza de primogenitura en nuestra descendencia constitucional." *P.R. Tel. Co. v. Martínez*, 114 D.P.R. 328, 338 (1983). Estamos ante unos intereses que reclaman ser armonizados, sin caer en intromisiones

---

[24] En ese sentido, en *Michigan Dept. of State Police v. Sitz*, 496 U.S. 444 (1990), el Tribunal Supremo federal, al amparo de las Enmiendas IV y XIV, validó constitucionalmente un programa de la Policía de Michigan de detener brevemente a los conductores para prevenir accidentes ocasionados por conductores ebrios.

Dicho foro resolvió que la invasión a la intimidad era razonable ante el interés apremiante del Estado de eliminar dicha situación en las carreteras.

excesivas. *E.L.A. v. Hermandad de Empleados*, 104 D.P.R. 436 (1975). Hagámoslo.

## X

*Primero*, por imperativo constitucional la intromisión permisible tiene que ser *mínima*, es decir, el guardián de seguridad puede preguntar y anotar el nombre y número de la tablilla del vehículo, y para confirmar esa informa-ción exigir la licencia de conductor y del vehículo. De no suministrarse esa información y documentos, podrá legíti-mamente *negar* la entrada.

*Segundo*, el guardián de seguridad puede inquirir el *motivo* de la visita, lugar específico hacia dónde se dirige e incluso a quién en particular va a visitar. Sin embargo, esa y cualquier otra información *adicional*, debe ser suminis-trada *voluntariamente*; el dejar de proveerla *no* podrá in-vocarse como *única* razón para negarse el acceso. *Salvo que el residente lo autorice por escrito*, el guardián no puede llevar un registro de las personas que voluntariamente han manifestado que van a visitarlo. De lo contrario, "al propietario al que se le *imponga* la medida verá cómo un guardián de seguridad inescrupuloso puede tomar nota de cu[á]ndo y qui[é]n lo visita, de sus hábitos de vida y de toda una serie de detalles de su vida íntima que, por más hon-rosa que sea, él desea y tiene derecho a que permanezca íntima". Luis Muñiz Argüelles, *Ponencia ante la Junta de Planificación de P.R. sobre el Borrador Reglamento Control*, 18 de agosto de 1987, pág. 5. (Énfasis suplido.) Caso Núm. RE-91-139, Alegato de tríplica de la parte recurrida, Apéndice I, pág. 31.

*Tercero*, en cuanto a los *visitantes peatonales*, el guar-dián de seguridad puede exigirles sus nombres y algún tipo de identificación. De igual modo, puede requerirles que vo-luntariamente informen el propósito y destino, pero la ne-gativa a proveerla *tampoco* será motivo ni razón para im-

pedírseles la entrada. Aunque el debate legislativo de la Ley Núm. 21, *supra*, es escaso, el P. del S. 1436 —Ley Núm. 156, *supra*— clarifica que se consideró que A.R.Pᴇ. (ahora el municipio) "no puede dar permiso para ningún tipo de control de acceso, *a menos que no haya la libertad y la facilidad de acceso para todas las personas, incluyendo a los impedidos*". (Énfasis suplido.) Diario de Sesiones de 12 de mayo de 1988, pág. 1585.

*Cuarto*, la sola negativa a suministrar la información *adicional* y *voluntaria* antes referida, *enfatizamos*, no podrá invocarse para impedir la entrada de la persona, a menos que bajo las correspondientes Reglas de Procedimiento Criminal proceda válidamente un arresto.([25]) Tampoco será óbice para que preventivamente el guardián de seguridad

---

([25]) El guardián de seguridad obligado a efectuar un arresto lo hace al amparo de la Regla 12 de Procedimiento Criminal, 34 L.P.R.A. Ap. II, que dispone:

"Una persona particular podrá arrestar a otra:

"(a)Por un delito cometido o que se hubiere intentado cometer en su presencia. En este caso deberá hacerse el arresto inmediatamente.

"(b)Cuando en realidad se hubiere cometido un delito grave (*felony*) y dicha persona tuviere motivos fundados para creer que la persona arrestada lo cometió."

Nuestra jurisprudencia es escasa. En *Pueblo v. Rosario Igartúa*, 129 D.P.R. 1055, 1070 (1992), expresamos:

"Aunque muchas entidades públicas y privadas contratan agencias de seguridad privada y tienen empleados a cargo de la protección de sus propiedades, estos guardias particulares no son 'funcionarios del orden público' bajo la Regla 11 de Procedimiento Criminal, *supra*. *Pueblo v. Velazco Bracero*, supra. Por ende, al efectuar arrestos su autoridad emana de la Regla 12 de Procedimiento Criminal, *supra*, y es necesario que cumpla con los requisitos allí provistos. En particular, la Regla 12 de Procedimiento Criminal, *supra*, requiere que tenga certeza de que se ha cometido o intentado cometer un delito en su presencia o que tenga motivos fundados para creer que la persona arrestada cometió un delito grave que en realidad se había cometido. Nuestro ordenamiento, además, requiere que la persona particular efectúe el arresto inmediatamente y lo entregue a un funcionario de orden público o lo lleve 'sin demora innecesaria ante el magistrado disponible más cercano ...'. Regla 22(a) de Procedimiento Criminal, 34 L.P.R.A. Ap. II. D. Nevares-Muñiz, *Sumario de derecho procesal penal puertorriqueño*, 3ra ed. rev., Hato Rey, Ed. Inst. Desarrollo del Derecho, 1989, Sec. 5.71, pág. 47." (Énfasis en el original.) Véase, además, *Pueblo v. Velazco Bracero*, 128 D.P.R. 180 (1991).

En cuanto a la jurisprudencia norteamericana que esboza un criterio similar, véanse: *Loden v. State*, 406 S.E.2d 103 (1991); *State v. Walker*, 459 N.W.2d 527 (1990); *Grant v. Farnsworth*, 869 F.2d 1149 (8vo Cir. 1989); *Scanlon v. Flynn*, 465 F. Supp. 32 (S.D. New York 1979); *United States v. Hillsman*, 522 F.2d 454 (7mo Cir. 1975); *Monteiro v. Howard*, 334 F. Supp. 411 (D. Rhode Island 1971); *Scanapico v. Richmond, Fredericksburg & Potomac R. Co.*, 439 F.2d 17 (2do Cir. 1970); *United States v. Chodak*, 68 F. Supp. 455 (D. Maryland 1946).

active aquellos sistemas de seguridad y vigilancia que existan *en situaciones potencialmente peligrosas o altamente sospechosas*, según lo ameriten las distintas circunstancias *o que se solicite la ayuda e intervención directa e inmediata de la Policía.*

*Quinto*, para beneficio y orientación de *toda la ciudadanía*, la información sobre vehículos de motor que deberá suministrarse y susceptibles de corroborarse documentalmente (nombre, tablilla y licencias, respectivamente); la voluntariedad de la información sobre motivo de la visita, destino y acceso *vehicular y peatonal*, y las consecuencias que conllevan, deberán explicarse y *hacerse constar en rótulos y avisos en sitios visibles en las área de control.*

*Sexto*, demás está decir que cualquier abuso de poder expone a la Asociación, al guardián de seguridad y su patrono a las acciones remediales judiciales correspondientes.

En *conclusión*, reafirmamos que bajo nuestra Constitución todos los ciudadanos tienen derecho a utilizar *pacíficamente* las calles, las aceras y los parques de cualquier comunidad que haya establecido el sistema de control de acceso vehicular y peatonal. Sin embargo, "[é]stos no tienen más derechos que sus vecinos". *Pueblo v. Hernández Colón*, 118 D.P.R. 891, 905 (1987). La Ley Núm. 21, según enmendada, *supra*, que forma parte de un plan vital e integral gobierno-ciudadanía para combatir el crimen, es *constitucional*. No limita de manera *absoluta* el acceso de las aceras y vías públicas. "El fin de la Constitución es la convivencia social con respeto y justicia para todos. Su vitalidad descansa en su dinamismo. Es un documento que rebasa las preferencias personales de sus autores y plasma las esperanzas de ulteriores generaciones. Su factura es moderna, de lenguaje claro y sencillo, susceptible a una continua renovación. No está escrito en lengua extinta, arduo de descifrar y referente a asuntos esotéricos. Interpretamos una Constitución, no los Rollos del Mar Muerto.

Nuestra decisión no es incompatible con las garantías que un Estado democrático debe a sus ciudadanos." *P.R. Tel. Co. v. Martínez*, supra, págs. 349–350.

En protección del derecho a la intimidad, reiteramos que los guardias de seguridad que implantan los controles de acceso pueden preguntar y llevar un registro del nombre del conductor y el número de tablilla del vehículo de motor. Pueden corroborar esa información pidiendo que se les muestre la licencia del conductor y la del vehículo. La disposición del Reglamento Interno —de que el guardián de seguridad *preguntará* al visitante la información adicional (motivo y nombre del residente al que va a visitar)— debe entenderse voluntaria. No pueden *compulsoriamente* inquirir el motivo y destinatario de la visita. Mantener un registro al efecto requiere autorización del residente. Sujeto a la identificación debida, reconocemos además el libre acceso peatonal. Cualquier otra información será brindada sobre *fundamentos voluntarios*. A la brevedad posible la Asociación enmendará su reglamento para armonizarlo con esta decisión y, además, adoptará *interinamente* las medidas correspondientes para fijar los rótulos y avisos necesarios, según aquí ordenado; ello, sin menoscabo de implantar cualesquiera otras medidas *permanentes* que la Junta de Planificación adopte al revisar el Reglamento Núm. 20, *supra*, para actualizarlo a estos pronunciamientos.

Por los fundamentos expuestos, confirmaríamos la sentencia en el caso Civil Núm. KPE-90-1382 que reconoció acceso igualitario y ordenó a la Asociación entregarles el control (*beeper*) y a llave a los demandantes *sin* pagar las cuotas de mantenimiento. Revocaríamos la resolución emitida en los casos consolidados Civil Núm. KAC-90-1233 y sumariamente desestimaríamos las demandas incoadas contra los residentes en cobro de tales cuotas.

Continuaría dilucidándose en instancia las reclamaciones por daños y perjuicios contra la Asociación. Dicho foro

velaría y, además, quedaría autorizado a adoptar las providencias necesarias para el fiel cumplimiento de nuestro mandato.

## XI

Como *EPÍLOGO*, lamentamos no haber podido convencer a la mayoría del Tribunal de acoger totalmente nuestra propuesta originalmente circulada y adjudicar también, sin más demora, los planteamientos constitucionales. Salvo en su imaginación, no existe controversia sobre hechos esenciales que lo impidan. *Artificialmente* pretenden crearla en torno al contenido, vigencia y forma de implantación del Reglamento Interno. A esos efectos nos dicen que los residentes opositores no acompañaron ningún documento que avalara su contención ni demostraron que la Asociación esté poniendo en vigor dicho reglamento. Opinión mayoritaria, pág. 217. A renglón seguido afirman "desconoce[r] la *práctica actual* de los guardianes que atienden la entrada en la intersección de las calles Begonia y Lirio, y la dinámica entre éstos y las personas que intentan entrar a Mansiones". (Énfasis en el original.) Opinión mayoritaria, pág. 217. Con este aserto, la mayoría entra en el mundo de los ciegos y arbitrariamente soslaya los hechos establecidos en los documentos y autos del caso.

Se trata de unas aseveraciones genéricas, incorrectas y confusas. Merecen precisarse y aclararse. Los autos y documentos descartados por la mayoría revelan diáfanamente la existencia de *un (1) sólo* Reglamento Interno de Control de Accesos de la Urbanización Mansiones de Río Piedras, *aprobado* el 29 de mayo de 1990, enmendado posteriormente el 3 de octubre de 1991. Otro documento contiene las "reglas básicas" para el uso más efectivo del sistema al reinstalarse el control de acceso el 3 de mayo de 1991.

En lo *pertinente* (sección 7), la copia del Reglamento In-

terno presentada por los residentes opositores es *igual y contiene* el *mismo texto* que la copia sometida por la Asociación. *En este extremo, su lenguaje original permaneció intacto al ser enmendado.* Incluso, el Secretario de Justicia, por conducto de la Procuradora General, en su alegato (Caso Núm. RE-91-139, Informe de la Procuradora General, pág. 55), no cuestiona su vigencia y citó su Sec. 7, *supra*, para renuentemente *aceptar* que, si bien "pudiese contener alguna disposición que infrinja el derecho a la intimidad de los residentes objetantes no tiene nada que ver con la ley". Íd., pág. 54.

La mayoría del Tribunal parece olvidar el aforismo elemental de "admisión de parte, relevo de prueba". Desde el 26 de julio de 1990 la Asociación en su demanda *invocó la existencia de dicho reglamento* y expuso que, a tenor con él, los vehículos de los residentes identificados con una calcomanía tenían "paso libre sin ningún tipo de restricción", pero que a "los no residentes se *les requiere identificarse* con el guardia de seguridad y mencionar el motivo de su visita". Caso Núm. CE-91-786, Petición de *certiorari*, Apéndice I, pág. 24. ¿Cómo puede entonces la mayoría decir que desconoce las disposiciones reglamentarias y así intentar crear dudas y controversias donde no las hay? ¿Cómo pueden seriamente afirmar que no se demostró que en la práctica se sigue ese reglamento? ¿Qué otro propósito podría tener la presentación del Reglamento Interno por la Asociación y los residentes opositores? Creemos que están subestimando la inteligencia de *todas las partes*, restándole valor forense y seriedad al proceso probatorio judicial habido en el tribunal de instancia. En definitiva, no hay margen para especular en lo referente a la Sec. 7, *supra*, su operación y las restricciones y violaciones reglamentarias a los derechos a la libertad de expresión, culto y protección a la intimidad.

Unimos como Apéndice A a este disenso dichos documentos, *cuya legitimidad está fuera de toda duda.* De ese

modo el lector podrá corroborar *directamente*, sin necesidad de interpretaciones, dónde radica la *verdad*. Le revelará contundentemente la existencia de las disposiciones reglamentarias antes transcritas, cuya inconstitucionalidad *surge de su faz*.

De hecho, las partes coinciden en cuanto a la forma y manera limitante en que se ha puesto en vigor dicho reglamento. *De sus escritos y alegatos no surge cuestionamiento o duda*. Nada hay en los autos que revele que su implantación se haya desviado de las referidas normas reglamentarias. En este extremo el error de la mayoría es *grave* y los conduce a *otro mayor*. Los lleva a afirmar que desconocen "la *práctica actual* de los guardianes" —(énfasis en el original) opinión mayoritaria, pág. 217— que no saben cuál información se pide a los visitantes vehiculares y peatonales; que desconocen la existencia de un registro de visitantes y que ignoran las limitaciones impuestas a los grupos religiosos. Íd. Al cualificar así la mayoría su argumento ("práctica *actual*"), simplemente tratan de superar la realidad fáctica expuesta. Introducen una peligrosa nueva técnica adjudicativa apelativa, esto es, a partir de esta decisión todo litigante vendrá obligado a "actualizar" constantemente los hechos probados.

Pasan por alto "las reglas básicas para un más efectivo control de acceso" antes aludidas (Apéndice A, IV, de esta ponencia), que en lo pertinente demuestran la práctica siguiente:

1. Los residentes identificarán sus vehículos con el "sticker" del timón en el lado izquierdo del cristal delantero. Para que el guardia identifique fácilmente el "sticker", colóquele un papel blanco detrás. El guardia permitirá el acceso inmediatamente y sin requerir identificación a todos los residentes en vehículos con "sticker". *Todo vehículo sin "sticker" tiene que identificarse con el guardia de seguridad para lograr acceso a la urbanización*. CONSIGA EL "STICKER" DE SU AUTOMOVIL EN LA CALLE GARDEN, FA, MATTEI.
2. Todos los visitantes *se detendrán* en el área del micrófono, se *identificarán* con el guardia (informará el nombre y apellido y

nombre y dirección del residente que va a visitar). Para nuestra seguridad, *no se permitirá el acceso al visitante que no sepa el nombre y la dirección del residente que viene a visitar. Infórmele a sus familiares y amigos del proceso de identificación con el guardia para lograr acceso.*
3. Cuando un residente celebre una actividad con muchos invitados, le recomendamos que haga una *lista de los invitados* y se la entregue al guardia. Esto facilitará el acceso y evitará los tapones innecesarios.
4. Los visitantes para prácticas deportivas en el Parque de Mansiones *tienen que estar autorizados* por la Asociación Recreativa. El guardia *le permitirá el acceso al Parque* a las personas incluidas en la lista que nos suministre la Asociación Recreativa.
5. Los residentes que tengan personas que le vayan a dar servicio pueden darle los nombres al guardia para facilitarle el acceso.
6. Los visitantes que vengan a la urbanización después de las 10:00 pm serán anunciados al residente por teléfono. *Se permitirá el acceso solamente si el residente lo autoriza.* Asegúrese de que la Asociación tenga su número de teléfono para poder avisarles estas visitas nocturnas. (Énfasis suplido y en el original.) Opinión disidente, Apéndice A-IV.

Toda esta ceguera temporal fáctica nos recuerda "la censura expresada por Bentham al efecto de que el arte de la jurisprudencia consiste en desconocer metódicamente *lo que todo el mundo sabe*". (Énfasis suplido.) *Ballester v. Tribunal de Apelación*, 61 D.P.R. 474, 507–508 (1943). Repetimos, no existen controversias de hechos; han sido creadas *ficticiamente para evadir* tener que resolver los planteamientos constitucionales. Unimos también como Apéndice B las páginas correspondientes a los escritos de las partes que revelan parte de esa discusión.

Al rehusar la mayoría decidir los planteamientos constitucionales adecuadamente presentados y discutidos por los residentes opositores Caquías Mendoza *etc.* y demás partes, acogen la postura del Secretario de Justicia. Así, la propia mayoría se encarga de restarle importancia y valor de precedente a su opinión. *Como método adjudicativo tiene el serio defecto de que no precisa los deberes y derechos, deja de proveer soluciones y omite remediar los*

*excesos*. Una vez más se apartan injustificadamente de honrar el principio de *stare decisis* . Peligrosamente reducen a un estado de *hibernación judicial* los pronunciamientos de *Pueblo v. Hernández Colón*, supra, en que reconocimos la legitimación activa de los litigantes para defender los derechos de terceros no presentes en un caso "en el área de los derechos constitucionales de libertad de expresión y asociación". *Pueblo v. Hernández Colón*, supra, pág. 898.

Ese proceder *pilatesco* contribuye a que subsistan las *dudas, arbitrariedades, abusos y malos entendidos entre la ciudadanía*, residentes, asociaciones de residentes, municipios y demás agencias encargadas de implantar la legislación que autoriza el cierre de calles y control de acceso como mecanismo para reducir la criminalidad en las urbanizaciones.

Hace siglos Aristóteles, en uno de sus célebres pasajes de la *Ética a Nicomaco*, (M. Araujo y J. Marías, trads.) Madrid, Centro de Estudios Constitucionales, 1985, Libro IV, 4, nos dijo que "[c]uando los hombres dudan del medio justo recurren al juez, y esto es como si recurriesen a lo justo mismo, porque el juez debe ser a modo de lo justo animado". ¿Es justicia viviente la opinión mayoritaria? ¿Efectiva y rápida? Ambas interrogantes son en la negativa; aunque ciertamente al llevar la mayoría a lo *absurdo* la sabia doctrina de no resolver cuestiones constitucionales innecesariamente *logra mantener la incertidumbre y posponer lo imposponible.*

Aún así, la mayoría no ha podido evitar y se ha visto forzada a penetrar, aunque tímidamente, en la dimensión constitucional del caso. Así trasluce de la crucial directriz impartida al tribunal de instancia de que "deber[á] siempre tener presente su deber de interpretar la Constitución de manera que pued[a] *garantizar su vigor y relevancia ante las realidades de nuestros tiempos"* (énfasis suplido), opinión mayoritaria, pág. 189, y, además, aplicar el criterio de "razonabilidad" al evaluar la ley. Opinión mayoritaria,

pág. 207. Si a esos pronunciamientos unimos las conclusiones específicas, el significado y el *"compromiso solemne"* que explica el Juez Asociado Señor Rebollo López en su Opinión de *¡conformidad!*, pág. 336, y, también, todos los "señalamientos idóneos" de la Opinión de *¡conformidad!* del Juez Asociado Señor Fuster Berlingeri, pág. 337 —entre los cuales se destaca su criterio de que constitucionalmente el derecho de expresión "no significa que cualquier persona puede exigir el libre acceso a cualquier calle o parque a cualquier hora del día para cualquier fin" (opinión de conformidad del Juez Asociado Señor Fuster Berlingeri, pág. 346)— *anticipamos que aunque tardíamente, en el futuro, la mayoría sostendrá la constitucionalidad de la Ley Núm. 21, según enmendada, supra, siguiendo en términos generales, con lenguaje distinto y algunas modificaciones, el marco conceptual, las ideas y los restantes pronunciamientos concebidos y propuestos en esta opinión.*

# *APÉNDICE A*

I – Contestación a Interrogatorio

II – Reglamento Interno de Control de Accesos de la
 Urbanización Mansiones de Río Piedras, apro-
 bado originalmente el 29 de mayo de 1990

III – Reglamento Interno de Control de Accesos de la
 Urbanización Mansiones de Río Piedras

IV – Reglas para un Más Efectivo Sistema de Con-
 trol de Acceso

V – Reglamento Interno de Control de Accesos de la
 Urbanización Mansiones de Río Piedras, según
 enmendado el 3 de octubre de 1991

En el Tribunal Superior de Puerto Rico

Sala de San Juan

Asociación de Residentes de la
Urbanización Mansiones de Río Piedras

vs.

José R. Caquías Mendoza y otros

Civil # 90-1221 (908)

Sobre:
Daños y Perjuicios

-------------------------------------

Contestación a Interrogatorio

Al Honorable Tribunal:

Comparece la parte demandante, Asociación de Residentes de la
úrbanización Mansiones de Río Piedras, Inc. representada por su
abogado que suscribe y muy respetuosamente somete contestación al
interrogatorio que dirigiera la parte demandada, José R. Caquías
Mendoza y otros.

2. Se incluye copia fotostática del:
 Reglamento Original de la Asociación de Residentes de la
 Urbanización Mansiones de Río Piedras.
 Reglamento con las enmiendas de la Asociación de Residentes de
 la Urbanización Mansiones de Río Piedras
 Reglamento de Control de Acceso según se aprobó el 29 de mayo
 de 1990
 Reglamento de Control de Acceso según se enmendó el 3 de
 octubre de 1991.

 A) Se incluye en la fotostática de la pregunta (2).

 B) Se contestó en la pregunta (2).

 C) Se aprobaron tanto en Reuniones de la Junta como en
 Asambleas de Miembros.

 D) Las minutas de estas asambleas están en el Libro de Actas
 que está en poder de la Secretaria, Sra. Amilda Román.
 Los demandados pueden coordinar con la Sra. Román, calle
 Clavel 1793, teléfono 760-1341 para examinar y sacar las
 copias fotostáticas de las páginas del Libro de Actas.

 i) Todas las enmiendas a los reglamentos se han
 aprobado por unanimidad de los miembros
 presentes en las Asambleas; y así consta en las
 actas de las distintas Asambleas.

3. En las actas de esas reuniones la secretaria certificó el
 quorum y los socios presentes aprobaron el mismo, según se
 requiere por el reglamento. No se tienen las listas de las
 firmas de los asistentes a las Asambleas.

 A) Las minutas de estas asambleas están en el Libro de Actas
 que está en poder de la Secretaria, Sra. Amilda Román.
 Los demandados pueden coordinar con la Sra. Román, calle
 Clavel 1793, teléfono 760-1341 para examinar y sacar las
 copias fotostáticas de las páginas del Libro de Actas.

APÉNDICE [II]

## REGLAMENTO INTERNO DE CONTROL DE ACCESOS DE LA URBANIZACIÓN MANSIONES DE RÍO PIEDRAS

Sección 1.00 – Disposiciones Generales

1.01 – Título – Este Reglamento se denominará y citará como "Reglamento Interno de Control de Accesos de la Urbanización Mansiones de Río Piedras" y será parte integral del Reglamento de la Asociación de Residentes de Mansiones de Río Piedras.

1.02 – Autoridad – Este Reglamento se adopta al amparo de la Ley Núm. 21 del 20 de mayo de 1987, según enmendada, al Reglamento de Planificación Núm. 20, conocido como "Reglamento de Control de Tránsito y Uso Público de calles locales y a la Ordenanza del Municipio de San Juan Núm. 40 – Serie 1989-90.

1.03 – Propósito – El propósito de este Reglamento es el establecer las normas y procedimientos para el establecimiento, uso y mantenimiento de los controles de acceso establecidos o que se establezcan en la Urbanización Mansiones de Río Piedras, así como las acciones a tomarse por el incumplimiento a lo establecido.

1.04 – Aplicación – Las disposiciones contenidas en este Reglamento aplicarán y cubrirán a todo residente, invitado, o cualquier persona que desee tener acceso a la Urbanización.

1.05 – Vigencia – Este Reglamento comenzará a regir una vez aprobado por la Asamblea General de Residentes de la Urbanización Mansiones de Río Piedras a tenor con la Ordenanza Núm. 40 – Serie 1989-90 emitida por el Municipio de San Juan autorizando el cierre y control de los accesos a la Urbanización.

1.06 – Términos empleados – Cuando así se justifique su uso en este Reglamento, se entenderá que toda palabra

usada en singular también incluye el plural y viceversa y el masculino incluirá el femenino y viceversa.

1.07 – Interpretación del Reglamento – La Asociación de Residentes de la Urbanización Mansiones de Río Piedras podrá, mediante resolución al efecto, clarificar o interpretar las disposiciones de este Reglamento que creen o puedan crear conflicto de intereses en armonía con los fines y propósitos generales de la Ley Núm. 21 del 30 de mayo de 1987, según enmendada, el Reglamento de Planificación Núm. 20 y la Ordenanza Núm. 40 del Municipio de San Juan – Serie 1989-90.

1.08 – Violaciones – Cualquier violación o incumplimiento a las disposiciones de este Reglamento estará sujeta a aquellas acciones administrativas que aquí se consignan.

1.09 – Cláusula de Salvedad – Si cualquier disposición, palabra, oración, inciso, subsección o sección del presente Reglamento fuera impugnada por cualquier razón ante un Tribunal y declarada inconstitucional o nula, tal sentencia no afectará, menoscabará o invalidará las restantes disposiciones y partes de este Reglamento, sino que su efecto sólo se limitará a las disposiciones, palabras, oraciones, incisos, subsección o sección así declarada inconstitucional o nula y la nulidad o invalidez de cualquier disposición, palabra, oración, inciso, subsección, sección en alguno caso específico no afectará o menoscabará su aplicación o validez en cualquier otro caso, excepto cuando expresamente se invalide para todos los casos.

Sección 2. – Definiciones

1) Acceso – cualquier espacio que permita la entrada o salida de los predios de la Urbanización Mansiones de Río Piedras.

2) Asociación – es la Asociación de Residentes de la Urbanización Mansiones de Río Piedras, Inc.

3) Persona – Toda persona natural o jurídica, pública o privada y cualquier agrupación de ellas.

4) Propietario – dueño de un solar o residencia en la Urbanización.

5) Residente – persona que reside en la Urbanización y que puede o no ser el dueño de la propiedad que ocupa.

6) Urbanización – es el grupo de viviendas y demás facilidades vecinales con su extensión territorial que lleva el nombre de Urbanización Mansiones de Río Piedras.

7) Vía – es las calles de la Urbanización.

8) Control de acceso – la forma de reglamentar la entrada y salida a la Urbanización.

9) Miembro – familia residente en la Urbanización que está acogida a la membresía de la Asociación.

Sección 3. – Control de Acceso

La Urbanización tiene sólo dos accesos para la entrada y salida a la misma. Mediante la Ordenanza Núm. 40 del Municipio de San Juan Serie 1989-90, el Municipio de San Juan autorizó el cierre de la Calle Begonia mediante el uso de caseta con guardia de seguridad y portones mecánicos y el cierre de la Calle Gardenia Esquina Lirio mediante el uso de portones eléctricos controlados por "Beeper".

Sección 4. – Uso de Controles de Acceso

Toda familia que sea miembro activo de la Asociación tendrá derecho a recibir mediante un depósito de $35.00 un "Beeper.

Aquellas familias miembros que deseen y posean más de un automóvil podrán tener "Beepers" adicionales, siempre y cuando paguen el depósito correspondiente por cada "Beeper" y demuestren mediante evidencia fehaciente que los "Beepers" adicionales serán utilizados por los automóviles que poseen mediante título de los mismos.

Aquellas familias que no sean miembros de la Asocia-

ción utilizarán el acceso de la Calle Begonia Esquina Lirio donde se encuentra el Guardia de Seguridad. Disponiéndose que el "Beeper" es propiedad de la Asociación de Residentes, Inc. El uso del "Beeper" se obtiene por la aportación de un depósito de $35.00 para los residentes miembros. Si éstos lo prestan o transfieren a personas no-residentes o no-miembros se les privará del beneficio, solicitándoles la entrega de dicho "Beeper" y devolviéndoles el depósito.

El acceso de la Calle Gardenia provee un portón peatonal controlado por llave la cual estará disponible sólo a los residentes que expresamente la soliciten y demuestren la necesidad de poseer la misma. Disponiéndose, que si la llave se perdiere, el residente no podrá solicitar otra hasta pasados treinta (30) días de que notificase por escrito la referida pérdida.

El costo de la llave será de $15.00. Disponiéndose, que para mayor seguridad el portón de la Calle Gardenia y Lirio estará cerrado de 10:00 P.M. a 6:00 A.M. y el acceso vehicular a la Urbanización será únicamente por el portón de las Calles Begonia y Lirio, donde está ubicada la caseta del Guardia.

Sección 5. – Uso de Calcomanías

Para la fácil identificación de los automóviles de los residentes de la Urbanización se les proveerá una calcomanía debidamente identificada, la cual deberá adherirse en el lado izquierdo del cristal delantero del automóvil de todo aquel residente que demuestre mediante evidencia fehaciente que el vehículo es de su propiedad. Disponiéndose, que todo residente es responsable de quitarle la calcomanía al automóvil cuando el carro fuese vendido o cuando hay que sustituir la calcomanía por alguna razón se traerá la calcomanía vieja y entonces se sustituirá.

Sección 6. – Cuota

Se cobrará una cuota mensual a todos los miembros de la Asociación de Cuarenta y Cinco Dólares ($45.00), los cuales sustituirán la cuota establecida en el Reglamento de la Asociación de Residentes en su Sección 8; la cual irá destinada al pago de guardia de seguridad, costos de mantenimiento de los sistemas electrónicos, pagos de agua, luz y teléfono de la caseta del guardián de seguridad y cualquier otro gasto incidental para el adecuado funcionamiento de los controles de acceso, así como para cualquier otra obra o gasto que sea necesario realizar en la Urbanización a tenor con los propósitos generales y específicos que crearon la Asociación.

Disponiéndose que durante los primeros tres meses el pago de la cuota irá destinado a cubrir los gastos de construcción e instalación del sistema. El pago de la cuota se hará al principio de cada mes. Se dispone además, que de la Asociación estar solvente económicamente después de realizar los gastos de funcionamiento y mantenimiento del sistema de control de acceso, así como cualquier otro gasto incidental, podrá destinarse mediante Resolución al efecto, parte de ese sobrante a la Asociación Recreativa de la Urbanización para el mantenimiento del Parque.

Sección 7. – Entrada Controlada a No-Residentes

Toda persona no-residente en la Urbanización que desee visitar familiares, amigos, etc. tendrá acceso a la Urbanización exclusivamente por la entrada de la Calle Begonia donde deberá identificarse con el guardia de seguridad y mencionar el motivo de su visita. El guardia de seguridad tomará el nombre del visitante, así como una descripción breve del vehículo con el número de tablilla y el nombre del residente hacia donde se dirige.

En caso de que algún residente-miembro haya dado instrucciones para ser llamado antes de dejar pasar a alguien, el guardia le notificará la visita telefónicamente.

Aquellos residentes miembros con actividades especiales en su hogar, que tengan visitantes asiduos a su residencia, podrán dar la lista al Guardia de Seguridad para facilitar el proceso de acceso.

Visitantes autorizados por la Asociación Recreativa de Mansiones de Río Piedras para ofrecer servicios o participar de actividades deben ser informados a la Asociación para que éstos impartan las instrucciones al Guardián.

Los proveedores de serivicios privados deberán identificarse con el Guardia de Seguridad y éste deberá cotejar por vía telefónica o mediante autorización escrita, el acceso de los mismos.

Se limita el acceso de grupos privados que vienen a distribuir hojas sueltas, religiosas o cualesquiera otros, entendiéndose que esta limitación no cubre el acceso de servicios de basura, de leche, de cartero, de luz eléctrica, de agua y de teléfono.

## Sección 8. – Lista de Miembros

La Asociación llevará un control mensual de sus miembro[s] y del pago de cuotas. Miembros que se tarden en pagar dos mensualidades o más se les eliminará el derecho a "Beeper" y pasarán a ser considerados como residentes no-miembros.

## Sección 9. – Administración

El establecimiento, uso y mantenimiento del Control de Acceso de la Urbanización estará adscrita a la Asociación como una de sus funciones encaminadas a fomentar la seguridad personal y de la propiedad en la Urbanización de forma tal que tienda a mejorar la calidad de vida y la tranquilidad emocional de las familias que allí residen.

La Asociación designará a un miembro de la Junta para ser responsable de dar las instrucciones al Guardia y de supervisar que el Guardia esté cumpliendo con el sistema de identificar y registrar los datos requeridos a los

visitantes. Ese miembro de la Junta será responsable de recibir las observaciones o querellas de los residentes sobre el funcionamiento del sistema y tendrá la potest[ad] de decidir la acción a seguir para corregir o modificar el procedimiento práctico establecido siguiendo las normas establecidas en este Reglamento. Disponiéndose, que cualquier procedimiento no contemplado en las normas de este Reglamento, se discutirá en la próxima reunión de la Asociación.

Todo cambio en procedimiento se notificará a los residentes por escrito indicándose la fecha de efectividad del mismo.

Sección 10. – Cobro de Cuotas

Para facilitar el cobro de la cuota mensual, los miembros de la Asociación podrán optar por escoger pagos de descuento automático con el Banco Popular o el Sistema de Cobro de Cuotas conocido como Edu-pago también del Banco Popular y el Pago Directo.

Sección 11. –

La Asociación hará gestiones encaminadas a conseguir un seguro de responsabilidad pública que cubra el control de acceso de la urbanización.

Sección 12. – Este Reglamento podrá ser enmendado únicamente en Asamblea General de Residentes de la Urbanización Mansiones de Río Piedras.

APROBADO: Hoy 29 de mayo de 1990 en Asamblea General de Residentes.

_____

Presidenta

# [APÉNDICE III]

## REGLAMENTO INTERNO DE CONTROL DE ACCESOS DE LA URBANIZACIÓN MANSIONES DE RÍO PIEDRAS

Sección 1.00 – Disposiciones Generales

1.01 – Título – Este Reglamento se denominará y citará como "Reglamento Interno de Control de Accesos de la Urbanización Mansiones de Río Piedras" y será parte integral del Reglamento de la Asociación de Residentes de Mansiones de Río Piedras.

1.02 – Autoridad – Este Reglamento se adopta al amparo de la Ley Num. 21 del 20 de mayo de 1987, según enmendada, al Reglamento de Planificación Num. 20, conocido como "Reglamento de Control de Tránsito y Uso Público de calles locales y a la Ordenanza del Municipio de San Juan Num. 40 – Serie 1989-90.

1.03 – Propósito – El propósito de este Reglamento es el establecer las normas y procedimientos para el establecimiento, uso y mantenimiento de los controles de acceso establecidos o que se establezcan en la Urbanización Mansiones de Río Piedras, así como las acciones a tomarse por el incumplimiento a lo establecido.

1.04 – Aplicación – Las disposiciones contenidas en este Reglamento aplicarán y cubrirán a todo residente, invitado, o cualquier persona que desee tener acceso a la Urbanización.

1.05 – Vigencia – Este Reglamento comenzará a regir una vez aprobado por la asamblea General de Residentes de la Urbanización Mansiones de Río Piedras a tenor con la Ordenanza Num. 40 – Serie 1989-90 emitida por el Municipio de San Juan autorizando el cierre y control de los accesos a la Urbanización.

1.06 – Términos empleados – Cuando así se justifique su uso en este Reglamento, se entenderá que toda palabra usada en singular también incluye el plural y viceversa y el masculino incluirá el femenino y viceversa.

1.07 – Interpretación del Reglamento – La Asociación de Residentes de la Urbanización Mansiones de Río Piedras podrá, mediante resolución al efecto, clarificar o interpretar las disposiciones de este Reglamento que creen o puedan crear conflicto de intereses en armonía con los fines y propósitos generales de la Ley Num. 21 del 30 de mayo de 1987, según enmendada, el Reglamento de Planificación Num. 20 y la Ordenanza Num. 40 del Municipio de San Juan – Serie 1989-90.

1.08 – Violaciones – Cualquier violación o incumplimiento a las disposiciones de este Reglamento estará sujeta a aquella acciones administrativas que aquí se consignan.

1.09 – Cláusula de Salvedad – Si cualquier disposición, palabra, oración, inciso, subsección o sección del presente Reglamento fuera impugnada por cualquier razón ante un Tribunal y declarada inconstitucional o nula, tal sentencia no afectará, menoscabará o invalidará las restantes disposiciones y partes de este Reglamento, sino que su efecto sólo se limitará a las disposiciones, palabras, oraciones, incisos, subsección o sección así declarada inconstitucional o nula y la nulidad o invalidez de cualquier disposición, palabra, oración, inciso, subsección, sección en alguno caso específico no afectará o menoscabará su aplicación o validez en cualquier otro caso, excepto cuando se invalide para todos los casos.

Seccion 2. – Definiciones

1) Acceso – cualquier espacio que permita la entrada o salida de los predios de la Urbanización Mansiones de Rio Piedras.

2) Asociaci[ó]n – es la Asociacion de Residentes de la Urbanización Mansiones de Rio Piedras, Inc.

3) Persona – Toda persona natural o jurídica, publica o privada y cualquier agrupación de ellas.

4) Propietario – dueño de un solar o residencia en la Urbanización.

5) Residente – persona que reside en la Urbanización y que puede o no ser el dueño de la propiedad que ocupa.

6) Urbanización – es el grupo de viviendas y demás facilidades vecinales con su extensión territorial que lleva el nombre de Urbanización Mansiones de Rio Piedras.

7) Via – es las calles de la Urbanización.

8) Control de acceso – la forma de reglamentar la entrada y salida a la Urbanización.

9) Miembro – familia residente en la Urbanización que est[á] acogida a la membresía de la Asociación.

Sección 3. – Control de Acceso

La Urbanización tiene solo dos accesos para la entrada y salida a la misma. Mediante la Ordenanza Num. 40 del Municipio de San Juan Serie 1989-90, el Municipio de San Juan autorizó el cierre de la Calle Begonia mediante el uso de caseta con guardia de seguridad y portones mecánicos y el cierre de la Calle Gardenia Esquina Lirio mediante el uso de portones eléctricos controlados por "Beeper".

Sección 4. – Uso de Controles de Acceso

Toda familia que sea residente de la Urbanización que pague la cuota de mantenimiento del Sistema de Control o que tenga un derecho reconocido expresamente por la ley tendrá derecho a recibir mediante un depósito de $35.00 un "Beeper". Disponiéndose que el "Beeper" es propiedad de la Asociación de Residentes, Inc.

Aquellas familias residentes que deseen y posean más de un automóvil podrán tener "Beepers" adicionales, siempre y cuando paguen el depósito correspondiente por cada "Beeper" y demuestren mediante evidencia fehaciente que los "Beepers" adicionales serían utilizados por los automóviles que poseen mediante título de los mismos.

Disponiéndose que el uso del "Beeper" es exclusivo de los residentes que pagan la cuota del Sistema de Control de Acceso. Si estos lo prestan o transfieren a personas no residentes o no miembros, se les privará del beneficio, solicitándoceles la entrega de dicho "Beeper" y devolviéndosele el depósito.

El acceso de la Calle Gardenia provee por razones de mayor seguridad durante las horas de la noche en que los residentes descansan y no pueden estar alerta a situaciones imprevistas tales como: desperfectos mecánicos o de suspensión temporera del servicio eléctrico se acuerda que este portón permanecerá cerrado de 10:00 pm a 6:00 am. El acceso vehicular a la urbanización será únicamente por el portón de la Calle Begonia y Lirio donde está ubicada la caseta del Guardia.

El acceso de la Calle Gardenia provee un portón peatonal controlado por llave la cual estará disponible sólo a los residentes; disponiéndose, que si la llave se perdiere, el residente no podrá solicitar otra hasta pasado treinta (30) días de que notificase por escrito la referida pérdida.

El costo de la llave será de $15.00.

Sección 5. – Uso de Calcomanías

Para la fácil identificación de los automóviles de los residentes de la urbanización se les proveerá una calcomanía debidamente identificada, la cual deberá adherirse en el lado izquierdo del cristal delantero del automóvil de todo aquel residente que demuestre mediante evidencia fehaciente que el vehículo es de su propiedad. Disponiéndose, que todo residente es responsable de quitarle la calcomanía al automóvil cuando el carro fuese vendido o cuando hay que sustituir la calcomanía por alguna razón se traerá la calcomanía vieja y entonces se sustituirá.

Sección 6. – Cuota

Se cobrará una cuota mensual de cuarenta y cinco ($45.00) a todos los residentes participantes del Sistema de Control de Acceso, la cual irá destinada al pago del servicio de guardia de seguridad, costos de mantenimiento de los sistemas electrónicos, pagos de agua, luz, y teléfono de la caseta del guardián de seguridad y cualquier otro gasto incidental para el adecuado funcionamiento de los controles de acceso, así como para cualquier otra obra o gasto que sea necesario realizar y establecer la reserva suficiente para garantizar la permanencia del Sistema de Control de Acceso.

Disponiéndose que durante los primeros tres meses el pago de la cuota irá destinado a cubrir los gastos de construcción e instalación del sistema. El pago de la cuota se hará al principio de cada mes. Se dispone además, que de la Asociación estar solvente económicamente después de realizar los gastos de funcionamiento y mantenimiento del sistema de control de acceso, así como cualquier otro gasto incidental, podrá destinarse mediante Resolución al efecto, parte de ese sobrante a la Asociación Recreativa de la Urbanización para el mantenimiento del Parque.

Sección 7. – Entrada Controlada a No-Residentes

Toda persona no-residente en la Urbanización que desee visitar familiares, amigos, etc. tendrá acceso a la Urbanización exclusivamente por la entrada de la Calle Begonia donde deberá identificarse con el guardia de seguridad y mencionar el motivo de su visita. El guardia de seguridad tomará el nombre del visitante, así como una descripción breve del vehículo con el número de tablilla y el nombre del residente hacia donde se dirige.

En caso de que algún residente-miembro haya dado instrucciones para ser llamado antes de dejar pasar a alguien, el guardia le notificará la visita telefónicamente.

Aquellos residentes miembros con actividades especia-

les en su hogar, que tengan visitantes asiduos a su residencia, podrán dar la lista al Guardia de Seguridad para facilitar el proceso de acceso.

Visitantes autorizados por la Asociación Recreativa de Mansiones de Río Piedras para ofrecer servicios o participar de actividades deben ser informados a la Asociación para que éstos impartan las instrucciones al Guardián.

Los proveedores de servicios privados deberán identificarse con el Guardia de Seguridad y éste deberá cotejar por vía telefónica o mediante autorización escrita, el acceso de los mismos.

Se limita el acceso de grupos privados que vienen a distribuir hojas sueltas, religiosas o cualesquiera otros, entendiéndose que esta limitación no cubre el acceso de servicios de basura, de leche, de cartero, de luz eléctrica, de agua y teléfono.

Sección 8. – Lista de Miembros

La Asociación llevará un control mensual de sus miembros y del pago de cuotas. Miembros que se tarden en pagar dos mensualidades o más se les eliminará el derecho a "Beeper" y pasarán a ser considerados como residentes no-miembros.

Sección 9. – Administración

El establecimiento, uso y mantenimiento del Control de Acceso de la Urbanización estará adscrita a la Asociación como una de sus funciones encaminadas a fomentar la seguridad personal y de la propiedad en la Urbanización de forma tal que tienda a mejorar la calidad de vida y la tranquilidad emocional de las familias que allí residen.

La Asociación designará a un miembro de la Junta para ser responsable de dar las instrucciones al Guardia y de supervisar que el Guardia esté cumpliendo con el sistema de identificar y registrar los datos requeridos a los visitantes. Ese miembro de la Junta será responsable de

recibir las observaciones o querellas de los residentes sobre el funcionamiento del sistema y tendrá la potestad de decidir la acción a seguir para corregir o modificar el procedimiento práctico establecido siguiendo las normas establecidas en este Reglamento. Disponiéndose, que cualquier procedimiento no contemplado en las normas de este Reglamento, se discutirá en la próxima reunión de la Asociación.

Todo cambio en procedimiento se notificará a los residentes por escrito indicándose la fecha de efectividad del mismo.

Sección 10. – Cobro de Cuotas

Para facilitar el cobro de la cuota mensual, los miembros de la Asociación podrán optar por escoger pagos de descuento automático con el Banco Popular o el Sistema de Cobro de Cuotas conocido como Edu-pago también del Banco Popular y el Pago Directo.

Sección 11.

La Asociación hará gestiones encaminadas a conseguir un seguro de responsabilidad pública que cubra el control de acceso[.]

## APÉNDICE [IV]

3 de mayo de 1991

### REGLAS PARA UN MAS EFECTIVO SISTEMA DE CONTROL DE ACCESO

Reestablecemos el Sistema de Control de Acceso con gran entusiasmo y la plena confianza de que nuevamente operará con eficiencia y efectividad. Para su éxito total necesitamos la cooperación de todos los residentes. A continuación las reglas básicas para un más efectivo control de acceso:

*Identificación de Residentes y Visitantes*

1. Los residentes identificarán sus vehículos con el "sticker" del timón en el lado izquierdo del cristal delantero. Para que el guardia identifique fácilmente el "sticker", colóquele un papel blanco detrás. El guardia permitirá el acceso inmediatamente y sin requerir identificación a todos los residentes en vehículos con "sticker". *Todo vehículo sin "sticker" tiene que identificarse con el quardia de sequridad para lograr acceso a la urbanización.* CONSIGAEL "STICKER" DE SU AUTOMOVIL EN LA CALLE GARDENIA, FA. MATTEI.
2. Todos los visitantes se detendrán en el área del micrófono, se identificarán con el guardia (informará el nombre y apellido y nombre y dirección del residente que va a visitar). Para nuestra seguridad, no se permitirá el acceso al visitante que no sepa el nombre y la dirección del residente que viene a visitar. *Infórmele a sus familiares y amigos del proceso de identificación con el guardia para lograr acceso.*
3. Cuando un residente celebre una actividad con muchos invitados, le recomendamos que haga una lista de los invitados y se la entregue al guardia. Esto facilitará el acceso y evitará los tapones innecesarios.

4. Los visitantes para prácticas deportivas en el Parque de Mansiones tienen que estar autorizados por la Asociación Recreativa. El guardia le permitirá el acceso al Parque a las personas incluidas en la lista que nos suministre la Asociación Recreativa.

5. Los residentes que tengan personas que le vayan a dar servicio pueden darle los nombres al guardia para facilitarles el acceso.

6. Los visitantes que vengan a la urbanización después de las 10:00 pm serán anunciados al residente por teléfono. Se permitirá el acceso solamente si el residente lo autoriza. Asegúrese de que la Asociación tenga su número de teléfono para poder avisarles estas visitas nocturnas.

## REGLAS PARA EL GUARDIA

1. A los guardias de seguridad se les requerirá que traten con cortesía y respeto a todos los residentes y visitantes. De igual manera, esperamos que los residentes y visitantes sean corteses y respetuosos con los guardias.

2. Los guardias serán responsables de:
que a la caseta sólo entren las personas autorizadas por la Asociación: el supervisor de la compañía de seguridad y la supervisora del control de acceso.
evitar las distracciones, visitas y tertulias en los predios de la caseta durante las horas de trabajo.

3. Las utilidades de la caseta del guardia (teléfono, agua, luz, equipo, etc.) son para el uso exclusivo del Sistema de Control de Acceso.

## INFORMACION ADICIONAL

1. El portón de la calle Gardenia es entrada exclusiva para residentes. Los visitantes utilizarán la entrada de la calle Begonia y se identificarán con el guardia de seguridad. Los residentes no darán acceso a visitantes por la calle Gardenia.

2. Para nuestra seguridad, el portón de la calle Gardenia permanecerá cerrado de 10:00 pm a 6:00 am (las horas de servicio de este portón están controladas por un "timer", una interrupción en el servicio eléctrico puede atrasar la hora de cierre y de apertura. Sea paciente!)

3. Si el portón de la calle Gardenia se queda abierto por un lapso de tiempo prolongado, pídale la llave del panel del "breaker" y reprograme el mismo. Nuestra seguridad depende de que todos nos preocupemos y cooperemos, AYUDANOS!

4. "Beeper"– Se oprimirá el botón (1) para entrar y el botón (2) para salir. El portón está programado para cerrar automáticamente tan pronto pase el automóvil. Mantenga su automóvil y su persona fuera del área de movimiento del portón para evitar accidentes.

La Asociacion de Residentes ha designado a la SRA. CUCA VIDAL, vecina de la calle Gardenia, supervisora del Sistema de Control de Acceso. El trabajo de Cuca es voluntario y muy sacrificado, su motivación es el bienestar de la comunidad y el éxito del Sistema. Necesitamos la cooperación y tolerancia de todos. GRACIAS!

CUALQUIER OBSERVACION O SUGERENCIA PARA MEJORAR EL SISTEMA DE CONTROL DE ACCESO, DEBEN LLAMAR A CUCA AL 761–7405.

# APÉNDICE V

## REGLAMENTO INTERNO DE CONTROL DE ACCESOS DE LA URBANIZACIÓN MANSIONES DE RÍO PIEDRAS

### Sección 1.00 Disposiciones Generales

1.01 Título-

Este reglamento se denominará y citará como "Reglamento Interno de Control de Accesos de la Urbanización Mansiones de Río Piedras"

1.02 Autoridad

Este Reglamento se adopta al amparo de la Ley Núm. 21 del 20 de mayo de 1987, según enmendada, al Reglamento de Planificación Núm. 20, conocido como "Reglamento de Control de Tránsito y Uso Público de calles locales y a la Ordenanza del Municipio de San Juan Núm. 40 – Serie 1989-90.

1.03 Propósitos

El propósito de este Reglamento es el establecer normas y procedimientos para el establecimiento, uso y mantenimiento de los controles de acceso establecidos o que se establezcan en la Urbanización Mansiones de Río Piedras.

1.04 Aplicación

Las disposiciones contenidas en este Reglamento aplicarán y cubrirán a todo residente, invitado o cualquier persona que desee tener acceso a la Urbanización.

### 1.05 Vigencia

Este Reglamento comenzará a regir tan pronto la Asamblea General de Residentes de la Urbanización Mansiones de Río Piedras lo apruebe a tenor con la Ordenanza Núm. 40 – Serie 1989-90 emitida por el Municipio de San Juan autorizando el cierre y control de los accesos a la Urbanización.

### 1.06 Términos empleados

Cuando así se justifique su uso en este Reglamento, se entenderá que toda palabra usada en singular también incluye el plural y viceversa y el masculino incluirá el femenino y viceversa.

### 1.07 Interpretación del Reglamento

La Asociación de Residentes de la Urbanización Mansiones de Río Piedras podrá, mediante resolución al efecto, clarificar·o interpretar las disposiciones de este Reglamento en casos de duda o conflicto en armonía con los fines y propósitos generales de la Ley Núm. 21 del 20 de mayo de 1987, según enmendada, el Reglamento de Planificación Núm. 20 y la Ordenanza Núm. 40 del Municipio de San Juan – Serie 1989-90.

### 1.08 Violaciones

Cualquier violación o incumplimiento a las disposiciones de este Reglamento estará sujeta a aquellas acciones administrativas que aquí se consignan.

## 1.09 Cláusula de Salvedad

Si cualquier disposición, palabra, oración, inciso, subsección o sección del presente Reglamento fuera impugnada por cualquier razón ante un Tribunal y declarada inconstitucional o nula, tal sentencia no afectará, menoscabará o invalidará las restantes disposiciones y partes de este Reglamento, sino que su efecto sólo se limitará a las disposiciones, palabras, oraciones, incisos, subsección, sección así declarada inconstitucional o nula y la nulidad o invalidez de cualquier disposición, palabra, oración, inciso, subsección, sección en algún caso específico excepto cuando expresamente se invalide para todos los casos.

Sección 2. Definiciones

1. Accesibilidad-cualidad de poder llegar a un destino.

2. Acceso-Vía Pública con la cual colinda un solar o propiedad [o] la cual sirve de entrada y salida al solar o propiedad.

3. Asociación-es la Asociación de Residentes de la Urbanización Mansiones de Río Piedras, Inc.

4. Persona-Toda persona natural o jurídica, pública o privada y cualquier agrupación de ellas.

5. Propietario-due[ñ]o de un solar o propiedad en la Urbanización.

6. Residente-persona que reside en la Urbanización y que puede o no ser dueño de la propiedad que ocupa.

7. Urbanización-es el grupo de viviendas y demás facilidades vecinales que lleva el nombre de Urbanización Mansiones de Río Piedras.

8. Vía-es las calles de la Urbanización.

9. Control de Acceso-la forma de reglamentar la entrada y la salida a la Urbanización.

10. Miembro-familia residente en la Urbanización que está acogida a la membresía de la Asociación.

Sección 3. Control de Acceso

La urbanización tiene sólo dos accesos para la entrada y salida a la misma. Mediante la Ordenanza Núm. 40 del Municipio de San Juan Serie 1989-90, el Municipio de San Juan autorizó el cierre de la Calle Begonia mediante el uso de caseta con guardia de seguridad y portones mecánicos y el cierre de la Calle Gardenia Esquina Lirio mediante el uso de portones eléctricos controlados por "Beeper".

Sección 4 Uso de los Controles de Acceso

Toda familia que sea residente de la Urbanización que pague la cuota de mantenimiento del Sistema de Control de Acceso o que tenga un derecho reconocido expresamente por la ley tendrá derecho a comprar un "Beeper" que le permitirá acceso por la calle Gardenia. Los residentes de la Urbanización Mansiones de Río Piedras que firmaron un contrato de arrendamiento de "beepers" con la Asociación de Residentes de Mansiones de Río Piedras serán los propietarios de los mismos efectivo al momento de rescindir el contrato de arrendamiento de "beeper" suscrito con la Asociación. Los $35.00 que los residentes pagaron a la Asociación como depósito por cada "beeper" al momento de firmar el contrato de arrendamiento será el precio de venta de los mismos. La Asociación será responsable de codificar los "beepers" de aquellos residentes con derecho a poseer y usar los mismos para lograr acceso a la urbanización.

Aquellas familias residentes que deseen y posean más de un automóvil podrán tener "Beepers" adicionales, siempre y cuando paguen por cada "Beeper" y demuestren mediante evidencia fehaciente que los "Beepers" adicionales serán utilizados por los automóviles que poseen mediante título de los mismos.

Disponiéndose que el uso del "Beeper" es exclusivo de los residentes que pagan la cuota del Sistema de Control de Acceso o que tenga un derecho reconocido expresamente por la ley. Si estos lo prestan o transfieren a personas no residentes o no miembros se les privará del beneficio.

Disponiéndose que el código de seguridad que controla

los portones de acceso a la urbanización son propiedad exclusiva de la Asociación de Residentes de Mansiones de Río Piedras. Sólo las personas autorizadas expresamente por la Asociación tendrán acceso al código de seguridad y a codificar los "beepers" de los residentes. La utilizacón o transferencia del código de seguridad a personas no autorizadas por la Asociación constituye un delito y estarán sujetas a cualquier acción que proceda en derecho.

El acceso de la Calle Gardenia, por razones de mayor seguridad durante las horas de la noche en que los residentes descansan y no puedan estar alerta a cualquier situación, tal como un corte de luz o desperfecto mecánico, en que el portón se pueda quedar abierto se acuerda que este portón permanecerá cerrado de 10:00 pm a 6 am.

El acceso de la Calle Gardenia provee un portón peatonal controlado por llave la cual estará disponible sólo a los residentes disponiéndose, que si la llave se perdiere, el residente no podrá solicitar otra hasta pasados treinta (30) dias de que notificase por escrito la la referida pérdida.

El costo de la llave será de $15.00.

Sección 5. Uso de Calcomanías

Para la fácil identificación de los automóviles de los residentes de la Urbanización, se les proveerá una calcomanía debidamente identificada a todo aquel residente que demuestre mediante evidencia fehaciente que el vehículo es de su propiedad. La calcomania deberá adherirse en el lado izquierdo del cristal delantero del automóvil. Disponiéndose, que todo residente es responsable de quitarle la calcomanía al automóvil cuando el carro fuese vendido o cuando haya que sustituir la calcomanía por alguna razón se traerá la calcomanía vieja y entonces se sustituirá. Todo automóvil que no tenga una calcomanía en el cristal delantero, aunque se identifique como residente, tendrá que identificarse con el guardia de seguridad.

Sección 6 Cuota

Se cobrará una cuota mensual de cuarenta y cinco ($45.00), la cual irá destinada al pago de guardia de seguridad, costos de mantenimiento de los sistemas electrónicos, pagos de agua, luz y teléfono de la caseta del guardián de seguridad y cualquier otro gasto incidental para el adecuado funcionamiento de los controles de acceso, así como para cualquier otra obra o gasto que sea necesario realizar y establecer la reserva suficiente para garantizar la permanencia del Sistema de Control de Acceso.

Disponiéndose que durante los primeros tres meses el pago de la cuota irá destinado a cubrir los gastos de construcción e instalación del sistema. El pago de la cuota se hará al principio de cada mes.

Los residentes que tengan un problema económico temporero que le imposibilite el cumplir con el pago de la cuota mensual establecida, podrá someter una solicitud de rebaja de cuota de mantenimiento a la Asociación. La solicitud y documentos que justifican la rebaja de pago de cuota mensual serán sometidos a la consideración del Auditor de la Asociación, quién determinará si el residente es elegible a la reducción temporera de pago de mantenimiento solicitada. Las solicitudes de reducción de pago de cuota de mantenimiento se revisarán cada 6 meses.

Sección 7 Entrada controlada a No-Residentes

Toda persona no residente en la Urbanización que desee visitar familiares, amigos, etc. tendrá acceso a la Urbanización exclusivamente por la calle Begonia donde deberá identificarse con el guardia de seguridad. El guardia de seguridad tomará el nombre del visitante, así como una descripción breve del vehículo con el número de tablilla y el nombre del residente hacia donde se dirige. Después de las 10pm, para mayor seguridad de los residentes, el guardia de seguridad le avisará por teléfono a los residentes los visitantes que interesen lograr acceso a nuestra urbaniza-

ción para hacerles una visita. El residente debe autorizar su entrada.

En aquellos casos en que algún residente haya dado instrucciones para que le llamen antes de dejar pasar a alguien, el guardia llamará por teléfono para notificar la visita.

Aquellos residentes con actividades especiales en su hogar, que tengan visitantes asiduos a su residencia, podrán dar la lista al Guardia de Seguridad para facilitar el proceso de acceso.

Visitantes autorizados por la Asociación Recreativa de Mansiones de Río Piedras para ofrecer servicios o participar de actividades deben ser informados a la Asociación para que éstos impartan las instrucciones al Guardián.

Los proveedores de servicios privados deberán identificarse con el Guardia de Seguridad y éste deberá cotejar por vía telefónica o mediante autorización escrita, el acceso de los mismos.

Se limita el acceso de grupos privados que vienen a distribuir hojas sueltas, religiosas o cualesquiera otros, entendiéndose que esta limitación no cubre el acceso de servicios públicos tales como: de basura, de leche, de cartero, energía eléctrica, agua y de teléfono, etc.

Sección 8 Lista de Residentes

La Asociación llevará un control mensual de sus residentes y del pago de cuotas. Los residentes que se tarden en pagar dos mensualidades o más, se les suspenderá el derecho a usar el "beeper" hasta tanto pague las mensualidades adeudadas e inicie nuevamente los pagos mensuales acordados.

Sección 9 Administración

El establecimiento, uso y mantenimiento del Control de Acceso de la Urbanización estará adscrita a la Asociación como una de sus funciones encaminadas a fomentar la se-

guridad personal y de la propiedad en la Urbanización de forma tal que tienda a mejorar la calidad de vida y la tranquilidad emocional de las familias que allí residen.

La Asociación designará a un miembro de la Junta para ser responsable de dar las instrucciones al Guardia y de supervisar que el Guardia esté cumpliendo con el sistema de identificar y registrar los datos requeridos a los visitantes. Ese miembro de la Junta será responsable de recibir las observaciones o querellas de los residentes sobre el funcionamiento del sistema y tendrá la potestad de decidir la acción a seguir para corregir o modificar el procedimiento práctico establecido siguiendo las normas establecidas en este Reglamento. Disponiéndose, que cualquier procedimiento no contemplado en las normas de este Reglamento, se discutirá en la próxima reunión de la Asociación.

Todo cambio en procedimiento se notificará a los residentes por escrito indicándose la fecha de efectividad del mismo.

Sección 10 Cobro de Cuotas

Para facilitar el cobro de la cuota mensual, los residentes de la Urbanización, podrán optar por escoger pagos de descuento automático con el Banco Popular o el Sistema de Cobro de Cuotas conocido como Edu–Pago también del Banco Popular y el Pago Directo. La Asociación podrá contratar los servicios de un profesional en cobros de dinero para realizar estas funciones cuando entienda que redundaría en beneficio y permanencia del sistema de control de acceso.

Sección 11 Seguro de Responsabilidad Pública

La Asociación hará gestiones encaminadas a conseguir un seguro de responsabilidad pública que cubra el control de acceso de la urbanización.

Sección 12 Enmienda

Este reglamento podrá ser enmendado únicamente en Asamblea General de Residentes de la Urbanización Mansiones de Río Piedras.

3 de octubre de 1991

# APÉNDICE B

TRANSCRIPCIÓN DE PÁGINAS DE LOS ESCRITOS DE

LAS PARTES SOBRE PLANTEAMIENTOS CONSTITU-

CIONALES

ESTADO LIBRE ASOCIADO DE PUERTO RICO
TRIBUNAL GENERAL DE JUSTICIA
EN EL TRIBUNAL SUPREMO

ASOCIACION DE RESIDENTES DE
MANSIONES DE RIO PIEDRAS, INC.
 Demandante-Recurrida

 VS.

WILFREDO BAEZ Y OTROS
 Demandados-Peticionarios

CIVIL NUM.

SOBRE: CERTIORARI

PETICION DE CERTIORARI

LCDO. HECTOR M. COLLAZO MALDONADO # 5613
LCDO. MANUEL BETANCOURT AVILES #7199

Abogados de la Recurrida
Medical Center Plaza, Local Núm.5
Calle 3 S.E., Núm.1051
Urb. La Riviera , Río Piedras
Puerto Rico, 00921
Tel. 749-0827

LCDA. MARITZA JULIA RAMOS #7068

Abogada de los Peticionarios
Calle Harding Núm.I-8
Urb. Parkville, Guaynabo
Puerto Rico, 00969
Tel. 789-3177

EN GUAYNABO, PUERTO RICO
27 de noviembre de 1991.

[...] ciar el CONTROL son aquellos que suscribieron un Contrato de Mantenimiento; ANEJOS IV-1, IV-13 y IV-14, págs. 72–74, 224 y 232. De hecho, en junio de 1988 la recurrida circuló una lista de las personas que respaldaban el CONTROL en la que no se incluyó el nombre de los peticionarios; ANEJO IV-41, págs. 329–330 Y no los incluyó porque a la recurrida le constaba que los peticionarios no respaldan en forma alguna el CONTROL.

Por otro lado, la recurrida pretende reclamar un derecho propietario sobre las claves o códigos de seguridad de los controles remotos que accionan los portones del CONTROL. Aceptar esa proposición sería equivalente a decir que la recurrida es dueña del derecho de propiedad ínsito en el control de entrada y salida de los peticionarios a su residencia y a MANSIONES. Nada hay en la Ley 21 que le otorgue a la recurrida ese derecho propietario ni a imponer castigo a aquellos que no pagan. La Sec. 5.03, inciso 8 del Reglamento 20 señala que el que pretenda establecer unos controles tiene que garantizar acceso por igual y en todo momento a todos los residentes de la comunidad; dicha garantía incluso fue suscrita por la ASOCIACION (ANEJO IV-54, pág. 445). En igual sentido la Sec. 2da. de la ORDENANZA establece que no se puede establecer discrímenes contra los que no aportan para sostener el CONTROL y que éstos tienen los mismos derechos que los que pagan.

E. Quinto señalamiento de error o controversia:

La recurrida estableció de forma arbitraria que el portón instalado en la Calle Gardenia permanecería cerrado durante el período de 10:00 p.m. a 6:00 a.m. (ANEJO IV-25, pág. 274), por lo que a los peticionarios y a los demás residentes se les obliga a entrar durante ese horario por la Calle Begonia. Una lectura de la ORDENANZA refleja que no hay nada en ésta que autorice el cierre de los portones electrónicos del CONTROL durante cualquier período del día o de la noche. También es necesario recordar que la

ORDENANZA se promulga al amparo de la Ley 21 que sólo establece controles de acceso. Bajo esta legislación no procede el cierre de calles ya que la legislación para esos fines es la Ley Núm. 81 del 30 de agosto de 1991, Art. 10.015.

F. Sexto señalamiento de error o controversia:

En nuestra Moción de Sentencia Sumaria Parcial le planteamos al Honorable Tribunal Superior que la controversia podía ser resuelta utilizando la interpretación de la ley ya que el CONTROL fue implantado por la recurrida en violación de ley. No obstante, se planteó que en caso de que el Honorable Tribunal así no lo determinase entonces se solicitaba que se declarase inconstitucional la Ley 21. Se le solicitó al Honorable Tribunal Superior que en caso de no conceder el reclamo principal de decretar la ilegalidad del CONTROL ordenase notificar la impugnación de la constitucionalidad de la Ley 21 al Secretario de Justicia conforme lo dispone la Regla 21.3 de Procedimiento Civil o determinase que dicho requisito era innecesario conforme lo resuelto en Torres Solano vs. P.R. Telephone Co. 90 JTS 122, pág. 8197, 8207, confirmado en 91 JTS 77, pág. 8939. Este planteamiento también fue declarado no ha lugar en la Resolución aquí impugnada. Con todo respeto entendemos que incurrió en error el Honorable Tribunal Superior ya que estaba obligado a resolver en una u otra forma y la única vía que le estaba vedada fue precisamente la que tomó. Este argumento es tan evidente que se hace innecesario una mayor discusión.

Los peticionarios cuestionan la constitucionalidad de la Ley 21 en dos áreas: (a) la utilización de propiedades y fondos públicos para fines que no son públicos y/o la disposición de propiedades públicas sin un mandato de ley que lo disponga como se requiere en el Art. VI, Sec. 9 de nuestra Constitución y (b) que no garantiza, reconoce ni hace reserva expresa del derecho de los peticionarios a la libertad de expresión, libertad de religión y de su derecho a la privacidad.

Los Arts. 255 y 256 del Cód. Civ. establecen que las calles son bienes de uso y dominio público. Este Honorable Tribunal ha establecido que los bienes de uso público no son susceptibles de enajenación ni posesión privada por lo que el estado no puede disponer de ellos mientras tengan tal carácter. Rubert Armstrong vs. ELA 97 DPR 588, 616 (1969); Ortiz Carrasquillo vs. Municipio de Naguabo 108 DPR 366, 369 (1979) y; Balzac vs. Registrador 51 DPR 757, 759 (1937). Si las disposiciones de la Ley 21 se interpretan como un acto de privatización de las calles se estaría no sólo violando las disposiciones anteriores sino que al permitírsele a grupos privados que puedan excluir a otras personas del libre acceso a las comunidades cerradas por la Ley 21 se estaría violando el derecho a la libertad de expresión y se estaría fomentando un discrimen por razón de raza, color, origen o condición social en violación al Art. II, Sec. 1 de nuestra Constitución y además se estaría infringiendo disposiciones del Art. II, Sec. 7 de nuestra Constitución y Enmienda XIV, Sec. 1 de la Constitución de Estados Unidos.

Al no garantizarse por la Ley 21 el libre flujo de las personas a las comunidades cerradas no sólo se limita la libertad de expresión sino que se restringe la libertad de religión. En MANSIONES la recurrida, amparándose en esta omisión de ley, ya dispuso por reglamento (ANEJO IV-17, pág. 244) que está prohibido distribuir hojas sueltas religiosas o de otra índole por grupos privados. Los peticionarios tienen derecho y así lo reclaman a recibir literatura religiosa sin restricción alguna según lo reconoció el Tribunal Supremo de Estados Unidos en Marsh v. Alabama 326 US 501 (1946); Tucker vs. Texas 326 US 517 (1946); Schneider vs. State 308 US 147 (1939); Cantwell vs. Connecticut 310 US 296 (1940); Martin vs. Struthers 319 U.S. 141 (1943); Follett vs. Mc Cormick 321 US 573 (1944) y; Widmar vs. Vincent 454 US 263 (1981), entre otros. En el presente caso, la libertad de religión de los peticionarios se

está coartando al impedir que éstos tengan acceso a hojas sueltas y otro material religioso impreso distribuído normalmente de casa en casa y al no garantizarse expresamente ese derecho.

## VI. SUPLICA

POR TODO LO CUAL los peticionarios muy respetuosamente solicitan de este Honorable Tribunal que expida el auto de Certiorari para revisar la Resolución del Honorable Tribunal Superior, Sala de San Juan del 31 de octubre de 1991 en el caso Civil KAC 90-1233 y que proceda a dictar sentencia sumaria parcial concediendo los remedios solicitados en nuestra Moción de Sentencia Sumaria Parcial. Suplicamos de este Honorable Tribunal que expida dicho auto tomando en consideración que existe un conflicto irreconciliable entre la Resolución emitida en el caso Civil KAC 90-1233 y la Sentencia emitida por el Juez Superior Hon. Arnaldo López en el caso KPE 90-1382 (pendiente de revisión por este Honorable Tribunal en el recurso RE 91-139) quién dictó dicha Sentencia de forma sumaria y además por concurrir las circunstancias expuestas en los incisos (1), (2), (3), (4), (7) y (11) de la Regla 19A del Reglamento de este Honorable Tribunal. Se solicita con todo respeto, además, que la consideración de este recurso se consolide con el recurso RE 91-139 pendiente ante la consideración de este Honorable Tribunal; el peticionario Wilfredo Báez es el único que no es parte en el recurso RE 91-139.

RESPETUOSAMENTE SOMETIDA.

CERTIFICO: Que ya notifiqué personalmente copia fiel y exacta de esta Petición en el día de hoy a los abogados de la recurrida Lcdo. Héctor M. Collazo Maldonado y Lcdo. Manuel Betancourt Avilés en su dirección en el Medical Center Plaza, Local 5, Calle 3 S.E., Núm. 1051, Urb. La Riviera, Río Piedras, P.R., 00921.

En Guaynabo, Puerto Rico, hoy 27 de noviembre de 1991.

> [*Fdo.*] Lcda. Maritza Juliá Ramos
> #7068
> Calle Harding Núm. I–8
> Urb. Parkville, Guaynabo
> P.R., 00969
> Tel. 789–3177

ESTADO LIBRE ASOCIADO DE PUERTO RICO
TRIBUNAL GENERAL DE JUSTICIA
EN EL TRIBUNAL SUPREMO

ASOCIACION DE RESIDENTES DE
MANSIONES DE RIO PIEDRAS, INC.
 Demandante-Recurrida

!CIVIL NUM.' CE 91-786

VS.

SOBRE: CERTIORARI

WILFREDO BAEZ Y OTROS
 Demandados-Peticionarios

ALEGATO DE LOS PETICIONARIOS

LCDO. HECTOR M. COLLAZO MALDONADO #5613
LCDO MANUEL BETANCOURT AVILES #7199

Abogados de la Recurrida
Medical Center Plaza, Local Núm. 5
Calle 3 S.E., Núm. 1051
Urb. La Riviera, Río Piedras
Puerto Rico, 00921
Tel. 749-0827

LCDA. MARITZA JULIA RAMOS #7068

Abogada de los Peticionarios
Calle Harding Núm. I-8
Urb. Parkville, Guaynabo
Puerto Rico, 00969
Tel. 789-3177

EN GUAYNABO, PUERTO RICO
24 de febrero de 1992.

[...] efectiva para prevenir riesgos a la vida e integridad corporal en casos de emergencia y desastres: De la Cruz vs. Toro Sintes 112 DPR 650, 657 (1982), Consejo de Titulares vs. Vargas 101 DPR 579, 586 (nota al calce 7) (1973) y Consejo de Titulares del Condominio McKinley Court vs. Rullán, 90 JTS 72, pág. 7773 (1990).

F. Sexto señalamiento de error o controversia:

En nuestra Moción de Sentencia Sumaria Parcial le planteamos al Hon. Tribunal Superior que la controversia podía ser resuelta utilizando la interpretación de la ley ya que el CONTROL fue implantado por la recurrida en violación de ley. No obstante, se planteó que en caso de que el Hon. Tribunal así no lo determinase entonces se solicitaba que se declarase inconstitucional la Ley 21. Se le solicitó al Hon. Tribunal Superior que en caso de no conceder el reclamo principal de decretar la ilegalidad del CONTROL ordenase notificar la impugnación de la constitucionalidad de la Ley 21 al Secretario de Justicia conforme lo dispone la Regla 21.3 de Procedimiento Civil o determinase que dicho requisito era innecesario conforme lo resuelto en Torres Solano vs. P.R. Telephone Co. 90 JTS 122, pág. 8197, 8207, y 91 JTS 77, pág. 8939. Este planteamiento también fue declarado no ha lugar en la Resolución aquí impugnada. Con todo respeto entendemos que incurrió en error el Hon. Tribunal Superior ya que estaba obligado a resolver en una u otra forma.

Los peticionarios cuestionan la constitucionalidad de la Ley 21 en dos áreas: (a) la utilización de propiedades y fondos públicos para fines que no son públicos y/o la disposición de propiedades públicas sin un mandato de ley que lo disponga como se requiere en el Art. VI, Sec. 9 de nuestra Constitución y (b) que no garantiza, reconoce ni hace reserva expresa del derecho de los peticionarios a la libertad de expresión, libertad de religión y de su derecho a la

privacidad. Es necesario examinar el alcance de la Ley 21 y su posible conflicto con òtras leyes y con la Constitución.

Para analizar el alcance de la Ley 21 es forzoso contrastarla con las disposiciones relevantes del Cód. Civ. El Art. 256 del Cód. Civ. establece que "Son bienes de uso público en Puerto Rico y en sus pueblos, los caminos estaduales y los vecinales, las plazas, calles..."; véase, además el Art. 255 del Cód. Civ. Interpretando dichas disposiciones este Honorable Tribunal señaló en Gobierno de la Capital vs. Consejo Ejecutivo 63 DPR 434, 459 (1944) que los bienes de uso público son aquellos "...para ser usados libremente por el público en general..." y que los bienes patrimoniales del estado son aquéllos que se "...usan para fines públicos pero a los cuales el público no tiene constante y general acceso." Ya desde Saldaña vs. Consejo Municipal de San Juan 15 DPR 37, 51 (1909) este Honorable Tribunal estableció que las calles "...han sido destinadas al uso de los habitantes de la ciudad, y todos y cada uno de ellos desde el Gobernador, en su palacio, hasta el limosnero en su choza tienen derecho al uso libre y continuado de las mismas."

El uso público de calles y caminos implica que el acceso del pueblo a ellas no puede ser impedido y que incluso están fuera del comercio de los hombres, incluyendo al estado. Los bienes de uso público no son susceptibles de enajenación ni posesión privada por lo que el estado no puede disponer de ellos mientras tengan tal carácter; éste sólo puede disponer de bienes patrimoniales: Rubert Armstrong vs. ELA 97 DPR 588, 616 (1969); Ortiz Carrasquillo vs. Municipio de Naguabo 108 DPR 366, 369 (1979) y; Balzac vs. Registrador 51 DPR 757, 759 (1937). Conforme a lo dispuesto por este Honorable Tribunal en ese último caso citado, es necesario que cese el uso público del bien antes de que se pueda disponer de él ya que mientras esto no se haga "...la libertad de enajenación queda restringida..." (Véase al respecto el análisis contenido en el ANEJO IV-19, págs. 256–260 de la Petición). Estas limitaciones inheren-

tes a los bienes de uso público plantean contradicciones imposibles de armonizar con la práctica seguida por la recurrida en la implantación del CONTROL.

Si se le reconociese facultad a la recurrida para limitar, restringir o impedir el acceso de vehículos y personas a MANSIONES, como lo ha estado haciendo, entonces se trataría de un acto de privatización de las calles sin que se hubiese determinado por la Ley 21 o por otra ley que las calles donde se establecen los controles ya no son un bien de uso público. Más aún, esa interpretación presentaría un conflicto irreconciliable con las disposiciones del Art. VI, Sec. 9 de la Constitución de Puerto Rico que establece que "Sólo se dispondrá de las propiedades y fondos públicos para fines públicos y para el sostenimiento y funcionamiento de las instituciones del Estado, y en todo caso por autoridad de ley." En el caso de los controles este conflicto se presenta en dos dimensiones: (a) la transferencia o privatización de la calle, que es una disposición de propiedad pública a una persona o entidad privada sin que medie compensación y (b) el mantenimiento de esas calles así privatizadas sufragado con fondos públicos. Si bien los tribunales no han establecido una definición uniforme de lo que constituye un fin público, cabe preguntarse, ¿qué justificación puede existir para impedir que unas personas tengan acceso o puedan utilizar libremente y sin restricción las calles de una comunidad o urbanización? ¿No se estaría estableciendo un discrimen por razón de raza, color, origen o condición social en violación a lo dispuesto en el Art. II, Sec. 1 de nuestra Constitución? ¿No se estaría negando la igual protección de las leyes; Art. II, Sec. 7 de nuestra Constitución y Enmienda XIV, Sec. 1 de la Constitución de Estados Unidos? ¿O es que estamos condenados a vivir en fortines urbanos? Si tratamos de justificar que existe cualquier razón que nos condene a vivir segregados entonces también tendríamos que concluir que la inviolabilidad de la dignidad humana que proclama nuestra Constitución

(Art. II, Sec.1) es sólo retórica y letra muerta. No existiendo fin público legítimo entonces la privatización de las calles sería inconstitucional. En todo caso la privatización debe surgir de forma diáfana y no por meras inferencias ya que el Art. VI, Sec. 9 de nuestra Constitución requiere que la disposición de propiedades públicas se hará sólo por autoridad de ley. Entendemos que la Ley 21 no tiene ese alcance; si lo tuviese entonces hay que utilizar el análisis constitucional antes expuesto.

La práctica seguida por la recurrida en MANSIONES presenta problemas constitucionales adicionales. Si la Ley 21 autorizara la práctica de requerirle al visitante que se identifique y que identifique al residente de MANSIONES que va a visitar, ¿en dónde queda el derecho a la privacidad de que habla nuestra Constitución (Art. II, Sec. 8)? A este respecto son muy ilustrativas las palabras de Luis Muñiz Argüelles, en ocasión de considerarse la aprobación del Reglamento 20 al indicar "...al propietario al que se le imponga la medida verá cómo un guardián de seguridad inescrupuloso puede tomar nota de cuándo y quién lo visita, de sus hábitos de vida y de toda una serie de detalles de su vida íntima que, por más honrosa que sea, él desea y tiene derecho a que permanezca íntima. (ANEJO IV-19, pág. 259 de la Petición).

En la medida en que se reconozca alguna facultad a la recurrida para excluir personas de MANSIONES o para imponer condiciones para su acceso estaríamos permitiendo que entre esas exclusiones se incluyan actividades de carácter religioso. Esta situación es más que una simple posibilidad al considerar el último párrafo de la Sec. 7 del reglamento del CONTROL que dispone sin ambages "Se limita el acceso de grupos privados que vienen a distribuir hojas sueltas, religiosas o cualesquiera otros ..." (ANEJO IV-17, pág. 244 de la Petición). ¿Cómo podemos armonizar esa limitación con la libertad de religión proclamada en nuestra Constitución (Art. II, Sec.3) y en la Constitución

de Estados Unidos (Primera Enmienda)? El Tribunal Supremo de Estados Unidos ha reconocido que las calles constituyen un foro público para el intercambio de ideas y que la libertad de expresión y de religión que consagra la primera enmienda de la Constitución Federal no puede ser coartada de forma irrestricta en éstas. Incluso hasta en predios privados y universidades se ha reconocido el derecho de las personas a expresar sus creencias religiosas sin que ésta pueda ser limitada arbitrariamente; se incluye en esta libertad religiosa el derecho a repartir y a recibir hojas sueltas y literatura religiosa; Marsh vs. Alabama 326 US 501 (1946); Tucker vs. Texas 326 US 517 (1946); Schneider vs. State 308 US 147 (1939); Cantwell vs. Connecticut 310 US 296 (1940); Martin vs. Struthers 319 US 141 (1943); Follett vs. McCormick 321 US 573 (1944) y; Widmar vs. Vincent 454 US 263 (1981), entre otros. En el presente caso la libertad de religión de los peticionarios se está coartando en contra del mandato constitucional al impedir que éstos tengan acceso a hojas sueltas y otro material religioso impreso distribuído normalmente de casa en casa. La Ley 21 es inconstitucional en la medida que no garantiza, reconoce o hace una reserva expresa del derecho de los peticionarios a la libertad de religión en ese aspecto.

Tan recientemente como el 23 de septiembre de 1991 la recurrida como parte de una organización a la que pertenece (nota al calce núm. 7, supra, pág. 13) solicitó una reunión con el Gobernador Hon. Rafael Hernández Colón urgiendo la aprobación del P. de la C. 1203 que fue presentado por el Representante Hon. Hiram Meléndez (quien es residente de MANSIONES) a solicitud de la recurrida (ANEJO VI-10, págs. 910–911 de la Petición). En dicha comunicación se señala que "...se cuestiona en los Tribunales la constitucionalidad de la Ley 21, ... lo que pone en gran peligro la permanencia de TODOS los sistemas de control de acceso establecidos. NOS URGE SU INTERVENCION."(Subrayado nuestro; ANEJO VI-10,

pág. 911 de la Petición). Si la Ley 21 es constitucional como señala la recurrida en su Moción en Oposición (ANEJO V-1, págs. 464–465 de la Petición) ¿porqué están convencidos de que los sistemas de control de acceso están en grave peligro? ¿No hay una inconsistencia insalvable? ¿O esto es producto de la ambivalencia característica de la recurrida que en un lugar dice una cosa y en otro lugar dice algo irreconciliable con lo primero? Y la urgente intervención que le solicitan al Hon. Gobernador, ¿será en relación al P. de la C. 1203 o con relación a los casos ante los tribunales?

No sólo a la recurrida parece preocuparle la evidente inconstitucionalidad de la Ley 21 sino que a algunos legisladores parece que también les ha llegado esa preocupación y así en la Exposición de Motivos de la R. de la C. 1576 presentada por los Representantes Hon. Hiram Meléndez y Hon. David Noriega y aprobada por la Cámara de Representantes el 12 de julio de 1990 se expresa "Con motivo del gran auge en la criminalidad se ha proliferado la práctica de que vecinos en las urbanizaciones decidan cerrar las calles al tránsito ordinario. En ocasiones esta práctica se ha establecido sin seguir los procedimientos de ley correspondiente,...Además..., se ha levantado por connotados juristas importantes interrogantes constitucionales sobre la legalidad de la privatización de calles construídas con fondos públicos." (ANEJO VI-11, pág. 912 de la Petición); véase también la R. del S. 210. El San Juan Star publicó sobre el Representante Hon. Hiram Meléndez: "Meléndez, who lives in a controlled-access urbanization, makes a clear distinction between resident groups which legally restrict traffic in and out of their communities and those which bar traffic from through streets or stop citizens from other communities from using public-funded parks or recreation areas. The Puerto Rican Independence Party lawmaker said that the latter cases raise constitutional questions about 'the legality of privatizing streets built with public funds.' He also sees problems concerning

the 'integration of communities' when urbanizations shut themselves off from their immediate surroundings." (APENDICE XI, pág. 76 de este Alegato). Estas expresiones hay que analizarlas recordando que en MANSIONES hay un parque recreativo público, supra pág. 2.

## VI. SUPLICA

POR TODO LO CUAL los peticionarios muy respetuosamente solicitan de este Honorable Tribunal que expida el auto de Certiorari para revisar la Resolución del Honorable Tribunal Superior, Sala de San Juan del 31 de octubre de 1991 en el caso Civil Núm. KAC 90-1233 y que proceda a dictar sentencia sumaria parcial concediendo los siguientes remedios:

1. Determine que el CONTROL fue implantado ilegalmente y en su consecuencia ordene que la recurrida cese y desista de operarlo y proceda con su remoción.

2. Determine que las autorizaciones suscritas por algunos de los peticionarios (ANEJO IV-4, págs. 153–158 de la Petición) no constituyen un contrato ni son fuente de obligación para con la recurrida y que los peticionarios no están obligados al pago de cantidad alguna para el sostenimiento del CONTROL. En su consecuencia se solicita que se declare NO HA LUGAR a la demanda sometida contra los peticionarios en todas sus partes.

3. Determine que los peticionarios tienen derecho a los controles remotos y a las claves o códigos de seguridad que accionan los portones electrónicos del CONTROL mientras éste continúe operando.

4. Determine que la recurrida no tiene derecho o facultad en ley para cerrar el acceso de la Calle Gardenia durante ningún período de tiempo durante el día o la noche.

5. De resultar insoslayable la adjudicación de los aspectos constitucionales para conceder el remedio justo reclamado por los peticionarios, se solicita que se declare inconstitucional la Ley 21. En este caso, se solicita que se determine si procede la notificación de la impugnación al

Secretario de Justicia conforme a la Regla 21.3 de Procedimiento Civil o si se exime ese requisito conforme a Torres Solano vs. P.R. Telephone Co., caso citado.

6. Dicte aquellos otros pronunciamientos y conceda aquellos otros remedios necesarios conforme a lo expuesto en este Alegato y en la Moción de Sentencia Sumaria Parcial.

RESPETUOSAMENTE SOMETIDA.

CERTIFICO: Que estoy enviando copia fiel y exacta del Alegato que antecede en el día de hoy por correo certificado a los abogados de la recurrida Lcdo. Héctor M. Collazo y Lcdo. Manuel Betancourt a su dirección en el Medical Center Plaza, Local Núm. 5, Calle 3 S.E., Núm. 1051, Urb. La Riviera, Río Piedras, P.R., 00921.

En Guaynabo, Puerto Rico, hoy 24 de febrero de 1992.

Lcda. Maritza Juliá Ramos #7068
Calle Harding Núm. I-8
Urb. Parkville, Guaynabo
P.R., 00969
Tel. 789–3177

ESTADO LIBRE ASOCIADO DE PUERTO RICO
TRIBUNAL GENERAL DE JUSTICIA
EN EL TRIBUNAL SUPREMO

ASOCIACION DE RESIDENTES DE
MANSIONES DE RIO PIEDRAS, INC.
 Demandante-Recurrida

CIVIL NUM. CE 91-786

 VS.

SOBRE: CERTIORARI

WILFREDO BAEZ Y OTROS
 Demandados-Peticionarios

ALEGATO DE DUPLICA DE LOS PETICIONARIOS

LCDO. HECTOR M. COLLAZO MALDONADO #5613
LCDO. MANUEL BETANCOURT AVILES # 7199

Abogados de la Recurrida
Medical Center Plaza, Local Núm. 5
Calle 3 S.E., Núm. 1051
Urb. La Riviera, Río Piedras
Puerto Rico, 00921
Tel. 749-0827

LCDA. MARITZA JULIA RAMOS #7068

Abogada de los Peticionarios
Calle Harding Núm. I-8
Urb. Parkville, Guaynabo
Puerto Rico , 00969
Tel. 789-3177

EN GUAYNABO, PUERTO RICO
23 de abril de 1992.

[...] rios y otros residentes no pagan la cuota del CONTROL, éste sigue operando. La demanda sometida por la recurrida reclamándole a los peticionarios daños ascendentes a $1,000,000.00 provocaría hilaridad si no fuese por el fin detrás de esa actuación que es el de infundir temor, miedo paralizante y el de reprimir la conciencia de los que difieren de sus ideas. La represión a los objetores es de tal naturaleza que en otras urbanizaciones aquellos temen identificarse por miedo a lo que les pueda suceder; APENDICE XI, pág. 132 de esta Dúplica. Sin embargo, y a pesar de todo lo que han vejado a los peticionarios (Alegato de los Peticionarios, págs. 10–14) éstos continúan firmes en sus convicciones por que: "No creemos que para el hombre civilizado la libertad de conciencia es menos importante que la libertad física." Aponte Martínez vs. Lugo, 100 D.P.R. 282, 294 (1971). Además los peticionarios concurren con la elocuente advertencia de Martin Niemoller, hecha en el año 1945, a los efectos de que:

> "En Alemania, los nazis primero persiguieron a los comunistas, pero yo, como no era comunista, no protesté. Más tarde vinieron tras los judíos, pero como yo no era judío, no protesté. Luego, comenzaron a perseguir a los miembros de las uniones obreras, más como yo no era unionado, no protesté. Más adelante la persecución se tornó contra los católicos, pero siendo yo protestante, no tuve por qué protestar. Luego vinieron por mí. Para entonces ya no había nadie que protestara por ninguno otro. Asegurémosno[s] de que tal cosa no vuelva a suceder". Aponte Martínez vs. Lugo, caso citado, pág. 294.

D. Inconstitucionalidad de la Ley Núm. 21–En su Replica (págs. 24 y 25) la recurrida intenta controvertir dos aspectos planteados por los peticionarios en su Alegato (págs. 43–48) sobre la constitucionalidad de la Ley Núm. 21; veamos los mismos:

1. La recurrida señala que la Ley Núm. 21 no tiene el efecto de privatizar las calles ni conlleva la utilización de propiedades o fondos públicos para fines que no son públicos. Sobre este aspecto el Senador Hon. Fernando

Martín señaló que "Las calles de Puerto Rico son públicas y de la misma forma en que en un condominio se daña el elevador y no se puede llamar al municipio para arreglarlo, si se pretende privatizar la calle, entonces no podemos pretender que los municipios nos las arreglen."; APENDICE XII, pág. 133 de esta Dúplica. No obstante es de conocimiento general que el propósito de los 'controles' es precisamente hacer un escrutinio de las personas que se van a dejar entrar y las que van a ser excluídas. De hecho, en algunas comunidades con 'controles' no hay guardia de seguridad y sólo puede entrar el que posee un control remoto o aquél a quien un residente con control remoto permite tal acceso; de hecho, hasta los carteros tienen problemas para entrar a las comunidades con 'controles' (APENDICE XIII, pág. 134 de esta Dúplica). También es de conocimiento general que en las comunidades con 'controles' los municipios contin[ú]an haciendo las reparaciones y asfaltado de calles (en MANSIONES ya el MUNICIPIO asfaltó la Calle Lirio después de la implantación del CONTROL). Siendo esto un hecho de conocimiento general es prudente recordar la cita contenida en la opinión disidente del Juez Asociado Hon. Antonio S. Negrón García en Mundo vs. Hernández Colón, caso citado, pág. 5898: "Los jueces no vivimos aislados en esta sociedad y no estamos ajenos a lo que sucede alrededor nuestro. No debemos por tanto prestarnos a jugar el juego de desconocer metódicamente lo que todo el mundo sabe." Al respecto la Senadora Hon. Victoria Muñoz ha señalado que: "Quedan aún interrogantes en cuanto a si en efecto se está dando privatización de calles y de infraestructura, cuyo mantenimiento está financiado con aportaciones de todos los contribuyentes."; Réplica, ANEJO XII, pág. 30. La Senadora Hon. Victoria Muñoz ha señalado también la necesidad de hacer un estudio y señala que "El estudio debe ser sobre cuán efectivo para controlar la criminalidad han sido los cierres o controles de acceso ... y la constitucionalidad de privatizar las calles ..."; APENDICE

XII, pág. 133 de esta Dúplica. Igual preocupación expresó el Representante Hon. Hiram Meléndez; Alegato de los peticionarios, pág. 48 y APENDICE XI, pág. 76). El asunto está planteado; le toca ahora a este Honorable Tribunal decidir y resolver la controversia.

2. La recurrida señala en su Réplica, pág. 25, que no se ha violado el derecho de libertad de religión de los peticionarios. Sobre este aspecto basta hacer dos observaciones: primera, que el último párrafo de la Sec. 7 del reglamento del CONTROL dispone sin ambages "Se limita el acceso de grupos privados que vienen a distribuir hojas sueltas, *religiosas* o cualesquiera otros ..."; (Subrayado nuestro), Petición de Certiorari, ANEJO IV-17, pág. 244; y segunda, que desde que se implantó el CONTROL los peticionarios no han tenido más acceso a la literatura religiosa que antes se repartía de casa en casa y aquellos reclaman ese derecho. La situación de MANSIONES no es única; en otra urbanización la Presidenta de la Asociación de Residentes anunció con gran regocijo que en relación a los 'controles': "Otra de las ventajas mencionadas por Puig fue la exclusión de ...visitas de grupos religiosos..."; APENDICE XIV, pág. 135 de esta Dúplica.

La recurrida apenas comenta el aspecto de los efectos de la Ley Núm. 21 sobre la libertad de culto y de religión de los peticionarios (garantizados por el Art. II, Sec. 3 de nuestra Constitución y la Primera Enmienda de la Constitución de los Estados Unidos). No obstante, la única expresión que hace dirigida a estos fines es totalmente incorrecta; dicha expresión es que "... la libertad de vivir en paz en nuestro hogar es un derecho de superior jerarquía Constitucional" que la libertad religiosa; Réplica, pág. 25. Los casos citados por la recurrida para sostener tal desacierto expresan una posición que contradice la posición de aquélla.

En Sucn. De Victoria vs. Iglesia Pentecostal 102 D.P.R. 20, 27 (1974) precisamente este Honorable Tribunal sos-

tuvo que "No puede darse derecho contra derecho ni verdad contra verdad. Aún la cuestionable 'posición preferente' de algunos derechos no confiere la atribución de anular el de los demás, toda vez que ninguna de las libertades es absoluta. Los preceptos de la Carta de Derechos no se eliden sino que se refuerzan unos a otros." El problema planteado en dicho caso es una situación totalmente distinta a lo que reclaman los peticionarios. En Sucn. De Victoria vs. Iglesia Pentecostal, caso citado, el problema planteado era el que unos ruidos intensos y prolongados procedentes de la iglesia impedían que los residentes cercanos tuviesen paz y tranquilidad; ante ese conflicto entre dos derechos fundamentales este Honorable Tribunal buscó una solución salomónica que armonizó ambos derechos reconociendo la libertad de religión a la vez que garantizó el derecho a vivir en paz libre de contaminación por ruidos. En el caso de la Ley Núm. 21 y el CONTROL estamos en una situación totalmente distinta por cuanto se afecta negativamente y de forma absoluta el ejercicio pacífico, silencioso y ordenado de la libertad de religión. Ante esta situación los peticionarios solicitan que este Honorable Tribunal reconozca su derecho a la libertad de religión y culto y que no se permita que la Ley Núm. 21 constituya un impedimento a ese derecho. Recordamos la admonición de este Honorable Tribunal al efecto de que "No vacilaríamos en reprimir cualquier perturbación del derecho a profesar su religión ordenadamente." Sucn. De Victoria vs. Iglesia Pentecostal, caso citado, pág. 29.

En el caso de P.R. Tel. Co. vs. Martínez 114 D.P.R. 328 (1983) citado por la recurrida no se plantea ningún conflicto relacionado con la libertad de religión o culto. En este caso se examina el derecho a que no se intervengan las comunicaciones telefónicas en relación al derecho a la intimidad y se resuelve que en última instancia el primero no es de rango superior con respecto al segundo sino que es una de sus manifestaciones.

En E.L.A. vs. Hermandad de Empleados 104 D.P.R. 436 (1975) tampoco se plantea ningún conflicto relativo a la libertad de religión. Lo que está en controversia es el derecho a la libertad de expresión en contraposición con el derecho a la intimidad. Con respecto a estas garantías constitucionales este Honorable Tribunal expresó en las págs. 445–446 de ese caso que: "... el derecho a la intimidad goza de un altísimo sitial en nuestra escala de valores, pero lo mismo puede decirse ciertamente del derecho a la libre expresión y de otras libertades ... En muchas situaciones el derecho a la protección de la vida privada o familiar debe prevalecer sobre dichas libertades. En otras puede ocurrir a la inversa." Así, este Honorable Tribunal señaló que aunque el derecho a la intimidad "Ocupan un lugar privilegiado en la gama de derechos que la Constitución ampara ... Esto no quiere decir que el derecho a la intimidad vence a todo otro valor en conflicto bajo todo supuesto concebible"; E.L.A. vs. P.R. Tel. Co. 114 D.P.R. 394, 401 (1983). Siguiendo esas normas debemos concluir que cuando el ejercicio de la libertad de religión se hace en las condiciones particulares que señalan los casos de Sucn. De Victoria vs. Iglesia Pentecostal, antes citado, y en Lasso vs. Iglesia Pentecostal 91 JTS 74 (1991), confirmado en 91 JTS 86 (1991), sin dudas debe prevalecer el derecho a la intimidad. Por el contrario, cuando la restricción se produce sobre el derecho al ejercicio de la libertad de religión de forma ordenada entonces este derecho debe reconocerse como preeminente.

Resulta irónico que la recurrida cite el caso de E.L.A. vs. Hermandad de Empleados, caso citado, cuando aquella incurrió precisamente en la práctica allí vedada al organizar y participar sus Directores y miembros en una marcha-piquete el 1ro. de enero de 1991. Esta pasó y se detuvo frente a la residencia de los peticionarios (Alegato de los Peticionarios, pág. 12) y al así hacerlo, a éstos "Se le coarta su derecho a la tranquilidad y al descanso. Se le acosa. Se

le inquieta. Se altera no solamente el sosiego de su hogar, sino el de sus vecinos ..." E.L.A. vs. Hermandad de Empleados, caso citado, pág. 446.

## VI. RELACION DE LOS PETICIONARIOS Y LA RECU-RRIDA

A. En su Réplica (pág. 5), la recurrida se refiere a los peticionarios como si todos estuviesen en idéntica situación de hechos. Lo cierto es que los peticionarios forman un grupo heterogéneo y hay distinciones en detalles de hechos sobre cada uno de ellos. Así, por ejemplo, algunos peticionarios no firmaron 'papelitos' de clase alguna y los que los firmaron lo hicieron en fechas diferentes; véase detalle al respecto en el Alegato de los Peticionarios, págs. 3–4.

B. En su Réplica (pág. 5), la recurrida asevera que los peticionarios "... fueron miembros de la Asociación de Residentes desde sus principios." Para aclarar ese aspecto basta examinar las solicitudes de admisión que somete la propia recurrida. En relación a éstas es necesario aclarar que las solicitudes de membresía de los peticionarios Varas y Anastacio Báez por sus fechas respectivas es evidente que se sometieron para ser admitidos como miembros de la ASOCIACION; Réplica, ANEJOS I y II, págs. 1–2. La solicitud del peticionario Ramírez es para ser miembro de la recurrida (ya que ésta quedó incorporada el 17 de febrero de 1988 como lo manifiesta la propia recurrida y según consta en la Petición de Certiorari, ANEJO V-10, pág. 543). En la solicitud del peticionario Rodríguez no consta la fecha en que fue sometida (Réplica, ANEJO IV, pág. 4) pero si se sometió en 1986 como asevera la recurrida (Réplica, págs. 3) entonces la solicitud era en relación a la ASOCIA-CION y no para la recurrida; ya que ésta no existía en el 1986. De los peticionarios Sierra, Molina y Wilfredo Báez no hay constancia alguna de que hayan solicitado ser admitidos como miembros de la ASOCIACION o de la recurrida. Llama la atención el hecho que la recurrida no manifiesta que de estas solicitudes de membresía la única

que consta que fue aprobada por la Junta de Directores de la ASOCIACION o de la recurrida es la del peticionario Varas; en las demás no consta que se hayan aprobado (Réplica, ANEJOS I al IV, págs. 1–4).

## VII. EXPRESIONES DE LA RECURRIDA RELATIVAS A JOSE R. CAQUIAS

De la Réplica refulge, a tal extremo que hiere la retina la manía y ojeriza de la recurrida hacia José R. Caquías. La situación alcanza tal paroxismo que la recurrida menciona a José R. Caquías en 17 ocasiones en cinco folios de su escrito (Réplica, págs. 2, 5, 7, 8 y 12) a pesar de que dicha persona no es parte en este recurso de Certiorari. Llama la atención que a quien no es parte se le mencione con un ahínco que no se observa en cuanto a los peticionarios que sí son parte en esta acción. Ese énfasis sobre una persona que no es parte en este recurso de certiorari sólo puede obedecer a una vindicta personal de la recurrida o de la paranoia colectiva y personal que la lleva a descargar su furia en una persona determinada cuando las actuaciones de la recurrida son cuestionadas.

La manía de la recurrida hacia José R. Caquías llega a tal extremo que en su Réplica (pág. 8), destaca visualmente su alegación de que esa persona utilizó su influencia y su posición de juez al hacerle acercamientos a los residentes de MANSIONES y presentarse como "Yo soy el Juez José Caquías ...". Para probar ese desvarío, la recurrida señala que había incluído las págs. 59, 60, 83, 90, 91 y 93 de la deposición tomada a José R. Caquías el 4 de octubre de 1990 (Petición de Certiorari, ANEJO VI-9, págs. 904–909). La alegación de que José R. Caquías se presentaba como el Juez José Caquías es mendaz, inflamatoria, impertinente y constituye un fraude a este Honorable Tribunal. Es mendaz según surge de la propia prueba a que se refiere la recurrida. En las págs. 59, 60, 83, 90 y 93 de la deposición tomada a José R. Caquías los temas tratados son distintos a lo que intentaba probar la recurrida

(Petición de Certiorari, ANEJO VI-9, págs. 904–909). Sólo la pag. 91 trata sobre esa alegación. De dicha pág. 91 surge claramente que el Lcdo. Héctor Collazo preguntó si esa persona se presentaba diciendo que era el Juez Caquías y que la respuesta de éste fue: "No, eso no es así ..."; Petición de Certiorari, ANEJO VI-9, pág. 908. Sin embargo, la recurrida pretende hacerle creer a este Honorable Tribunal que lo que constituyó una pregunta del Lcdo. Héctor Collazo fue una admisión de José R. Caquías. Tal acción constituye sin duda fraude a este Honorable Tribunal. Aunque este Honorable Tribunal ha señalado que el fraude no se presume, en este caso el fraude queda probado por el hecho de que ya la aseveración mendaz a que nos referimos la había expuesto la recurrida ante el Hon. Tribunal Superior (Petición de Certiorari, ANEJO V-1, pág. 458) y ya había quedado demostrada su mendacidad ante ese Honorable Tribunal (Petición de Certiorari, ANEJO VI-1, págs. 880–881) y aún así la recurrida vuelve a insistir en ello. Además, la alegación es inflamatoria porque pretende crear animosidad hacia José R. Caquías con el único fin de desvirtuar la justa reclamación de los peticionarios y desviar la atención de las controversias reales de la reclamación. Finalmente, la alegación es impertinente porque no tiene relación alguna con las controversias reales planteadas en esta acción.

Otros aspectos en que se transluce la manía de la recurrida hacia José R. Caquías es en el incidente que se señala en el apartado IV (A) 2, de esta Dúplica, supra, págs. 9–10 y en los apartados (A) a(C) a continuación:

A. El señor José R. Caquías no fue asesor legal de la ASOCIACION ni de la recurrida como asevera esta última. Aquél redactó un borrador de un Reglamento interno para la ASOCIACION pero ese fue un hecho aislado. La redacción de ese borrador fue hecha como un favor personal en consideración a la Sra. Mildred Diez quien le hizo la solicitud. El señor José R. Caquías no estuvo pendiente de

si se aprobó o no la versión del Reglamento interno que él redactó ya que él no formaba parte de la directiva de la ASOCIACION, ni participaba de su proceso decisional, ni era consultado, ni daba su opinión en los asuntos de la ASOCIACION ni de la recurrida; el Reglamento interno es distinto a y no tiene relación con el reglamento del CONTROL.

B. La recurrida señala en su Réplica que José R. Caquías fue asesor del Presidente de la Cámara de Representantes y como tal participó en la redacción del proyecto de ley que finalmente se convirtió en la Ley Núm. 21. Es cierto que José R. Caquías fue asesor legal del Hon. José R. Jarabo e incluso fue Director de su Oficina de Asesores. El proyecto de ley que luego se convirtió en la Ley Núm. 21 no se originó en la Cámara de Representantes, sino en el Senado (P. del S. 814) e incluso el proyecto de enmiendas a dicha ley también se originó en el Senado (P. del S. 1436). El señor José R. Caquías en efecto participó en revisar esos proyectos cuando se sometieron a la consideración de la Cámara de Representantes pero su participación no fue para plasmar su propia visión sobre el concepto sino para darle forma a lo que los señores Representantes querían aprobar; si la recurrida no lo sabe, la facultad de aprobar leyes corresponde a los legisladores y no a los asesores. Más aún, durante los casi cuatro años que José R. Caquías trabajó en la Cámara de Representantes participó en la redacción de innumerables piezas legislativas, guiado no por su criterio personal, sino siguiendo las instrucciones que recibía de los que tienen la facultad de legislar.

C. La recurrida en su empeño de distraer la atención de los aspectos esenciales de esta acción y por lo antes señalado en los primeros párrafos de este apartado VII, supra, págs. 31–32 indica que José R. Caquías logró que se presentara en la Asamblea Legislativa un proyecto de ley relativo a los 'controles'. Es curiosa esta expresión cuando la recurrida se cuida de no decir que a su vez ha montado una campaña de presión tan brutal que inclu[....]

EN EL TRIBUNAL SUPREMO DE PUERTO RICO

ASOCIACION DE RESIDENTES DE : CIVIL NUM. CE 91-786
MANSIONES DE RIO PIEDRAS, INC. : .
Representada por su Junta de :
Directores. :

 Demandantes-Recurridos :

 Vs. :

WILFREDO BAEZ Y OTROS : SOBRE: CERTIORARI

 Demandados-Recurrentes :

ALEGATO DE LOS DEMANDANTES RECURRIDOS

LIC. MARITZA JULIA RAMOS
COLEGIADO #7068
ABOGADA DE LOS PETICIONARIOS
CALLE HARDING NUM. I-8
URB. PARKVILLE
GUAYNABO, P.R. 00969

LIC. HECTOR M COLLAZO MALDONADO
COLEGIADO #5613
LIC. MANUEL A. BETANCOURT AVILES
COLEGADO #7199
MEDICAL CENTER PLAZA
OFICINA #5
CALLE 3 SE NUM. 1051
RIO PIEDRAS, P.R. 00921

responde al interés de mayor seguridad, y proteger a toda la comunidad en horas de la noche. Todos entran por la entrada donde se encuentra el guardia de seguridad. El movimiento de vehículos en horas de la noche, después de las 10:00 pm, es minimo. Después de todo, la Urbanización Mansiones de Río Piedras es una comunidad pequeña.

F. Sexto señalamiento de error:

"Erro el Honorable Tribunal al no tomar determinación respecto a la solicitud de los peticionarios de que se determinara si procedía notificar la impugnación de la constitucionalidad de la Ley 21 al Secretario de Justicia conforme lo dispone la Regla 21.3 de Procedimiento Civil o si dicho requisito era innecesaria y al no resolver el planteamiento de incostitucionalidad de la Ley 21.

Entendemos que no debe haber duda de que conforme a la Regla 21.3 de Procedimiento Civil debió notificarse al Secretario de Justicia de la impugnación de la constitucionalidad de la Ley 21, supra.

A pesar de lo anterior los demandados-recurrentes discuten extensamente la controversia sobre la constitucionaldiad de la Ley 21, supra. Se alega lo siguiente:

1. Utilización de propiedades y fondos públicos para fines que no son públicos y/o la disposición de propiedades públicas sin un mandato de ley que lo disponga como se requiere en el Artículo VI, Sección 9 de la Constitución.

2. No garantizar, reconocer ni hacer reserva expresa del derecho de los peticionarios a la libertad de expresión, libertad de religión y derecho a la privacidad.

3. No existiendo fines públicos legítimos entonces la privatización de la Calle sería inconstitucional. Los demandados-recurrentes se preguntan, ¿Que justificación puede existir para impedir que una persona tenga acceso o pueda utilizar libremente y sin restricción las calles de una comunidad o urbanización?

La Ley 21, supra, constituye un esfuerzo legítimo del gobierno de Puerto Rico de integrar a la comunidad en la lucha contra el problema número 1 de Puerto Rico: La Criminalidad. La prensa diaria de nuestro país ha descrito el problema de la siguiente manera: (Anejo X).

"Los vecinos de las Urbanizaciones Venus Gardens, en Río Piedras, y el Conquistador, Trujillo Alto, han puesto el grito en el cielo ante la ola de asaltos y escalamiento a todas horas y durante cualquier día, que están amenazando con la vida de adultos y niños. En la última semana ha habido no menos de 6 robos a plena luz del día en ambas Urbanizaciones y cuentan que frente a la ola no se ha intensificado el patrullaje policiaco. El acto es sencillo: esperar que alguien llegue a su casa, sacan un arma de fuego, le encañonan, penetran en el hogar y cargan el botín en el carro del dueño o la dueña, porque tampoco escat[i]man por sexo. Mientras tanto, los vecinos empiezan a hablar sobre una contraofensiva propia, debido a la ineficacia de la Policía".

"Desespera el Pueblo por el auge criminal. Interpretan el apoyo popular a la pena capital como un llamado urgente a que se ponga coto a la violencia que vive el país".

"La sensación de impotencia ante la criminalidad que abruma al país lleva a los puertorriqueños a considerar la pena de muerte como medida para enfrentar a los maleantes en una reacción que rompe precedentes de aversión a la pena capital".

"Es un grito de desesperación ..., Es indignación espontánea de un pueblo que no aguanta más criminalidad".

El legislador captó y entendió el grito de deseperación e indignación expon[tá]nea de un pueblo que no aguanta más criminalidad.

Los peticionarios establecen como una de las razones para oponerse al CONTROL el que, a su entender, los CONTROLES no constituyen una solución a la criminalidad. Coincidimos con los peticionarios en que el

CONTROL DE ACCESO no es la solución mágica al problema número uno de nuestra sociedad: la criminalidad. Para resolver el problema de la criminalidad tenemos que regresar a la familia, la comunidad, a la escuela, a los valores morales, éticos y religiosos. Mientras tanto se logra este regreso, las personas necesitan vivir con tranquilidad y seguridad y buscan alternativas a corto plazo que les permitan lograr sus objetivos de mejorar su calidad de vida. EL CONTROL DE ACCESO, en las comunidades en las cuales se ha establecido, ha probado ser un remedio eficaz para controlar la criminalidad; lo que resulta en una reducción dramática de los delitos. Así lo certifica el superintendente de la Policía, Ismael Betancourt Lebrón en su memorando del 25 de febrero de 1991, y cito "El control de acceso ha contribuido grandemente en el Puerto Rico de hoy a minimizar la incidencia criminal". (anejo XI). Tanto es así, que recientemente, al efectuar el operativo en el Residencial Público Neme[s]io R. Canales, el superintendente de la Policía expresó públicamente a los medio noticiosos que él recomendaba se implantara el SISTEMA CONTROL DE ACCESO CON PORTONES ELECTRÓNICOS como alternativa adecuada y efectiva para proteger la vida de los residentes de Canales. Los tres candidatos a Gobernador en las próximas elecciones apoyan el control de acceso ((Anejo XII).

Mansiones de Río Piedras es un ejemplo de las Urbanizaciones que antes de establecer el CONTROL DE ACCESO tenían un alto índice de criminalidad y que luego de establecido el CONTROL, se ha minimizado dramáticamente, reduciendo al mínimo los delitos. El informe ASJ 15-91-099 (Anejo XIII) demuestra claramente que en Mansiones de Río Piedras el CONTROL DE ACCESO ha sido el mecanismo responsable de que se haya reducido la criminalidad.

El informe ASJ 15-91-099 cubre el período entre julio de 1990 y enero de 1992 (19 meses). En ese lapso de tiempo, el

informe registra la ocurrencia de 13 delitos. De los 13 delitos registrados en el período cubierto por el informe, 7 ocurrieron durante el período de enero de 1991 a abril de 1991, período en el cual el Sistema de CONTROL DE ACCESO no estuvo en funcionamiento y 2 delitos de apropiación ilegal registrados (el 15 de julio de 1990 y el 18 de diciembre de 1990) corresponden a una finca independiente propiedad del Sr. Carlos Padín Vega que colinda con la Urbanización cuyo acceso principal es por la Carretera 744 de Cupey. En 15 meses de funcionamiento el CONTROL DE ACCESO en Mansiones de Río Piedras se han registrado tan sólo 4 delitos. Si se analiza la ocurrencia y naturaleza de estos 4 delitos podemos concluir que en 2 de esos delitos: querella 90-1262-7921 del 13 de diciembre de 1[9]90 de la Sra. Leonilda Olabarría Hernández y la querella 91-1262-2619 del 16 de mayo de 1991, la persona logró acceso por áreas de la periferia de la urbanización que están bajo el absoluto control del propietario de la vivienda (Anejo XVI). Los 2 delitos restantes corresponden a situaciones de poco impacto económico y de los cuales no se tiene información confiable de la fecha ni de las circunstancias específicas de lo ocurrido. En entrevista telefónica con al Srta. Lucette Cardona Serrano, persona perjudicada en la querella 90-1262-4228 del 8 de julio de 1990, ella nos aseguró que los actos informados en esta querella ocurrieron en fecha anterior al establecimiento del CONTROL DE ACCESO y así lo informó al oficial policiaco que redactó el informe. Con relación a la querella 91-1262-3030 del 7 de junio de 1991, por la alegada apropiación ilegal del anillo y candado del contador de la luz, la persona perjudicada, Sr. Edwin Jiménez Irizarry es parte de este caso y cuya vivienda esta localiza al lado derecho detrás de la caseta del guardia. Esta ocurrencia se informo 3 días más tarde de la fecha de ocurrencia a la policía estatal, y nunca se informó al guardia de la caseta que está a una corta distancia de la residencia.

Los peticionarios traen a la atención de este Honorable Tribunal el problema de jóvenes y niños de tierna edad que conducen vehículos de motor de sus padres, motoras, "go karts" sin supervisión y pretenden hacer responsables al CONTROL DE ACCESO de lo que es un problema común a TODAS las urbanizaciones (LAS QUE TIENEN CONTROL Y AQUELLAS QUE NO TIENEN CONTROL) en donde hay jóvenes y niños desprovisto de la supervisión adecuada de sus padres. Pretender hacer responsable al CONTROL DE ACCESO Y A LA ASOCIACIONES DE RESIDENTES QUE LO ADMINISTRA de todos los actos privados de sus residentes resulta ser una pretensión irrazonable e ilógico de transferir las responsabilidades y obligaciones inherentes a la función que tiene cada padre con respecto a sus hijos a la ASOCIACION DE RESIDENTES. Sin embargo, el mantener el CONTROL DE ACCESO en nuestra urbanización ha permitido que la comunidad se conozca y que participe activamente en la solución de los problemas comunitarios. Se facilita la identificación de cualquier problema o circunstancias que afecten la calidad de vida de nuestra comunidad con la gran ventaja de que se puede identificar los jóvenes y niños que incurren en conducta no aceptable; y como una gran familia, con prontitud y diligencia se dialoga y se orienta directamente a los padres. La Asociación de Residentes cuenta con muchos residentes responsables, amantes de la ley [y] el orden, que están dispuestos a colabora[r] previniendo actos delictivos y orientando y guiando a nuestro niños y jóvenes en [la] consecución de actividades de desarrollo positivo. Lamentablemente, la urbanización también tiene un grupo de residentes que prefieren ser testigos de las actuaciones delictivas de nuestros niños y jóvenes que ocurren en su presencia, cruzar sus brazos sin ni siquiera intentar detenerlas o informarlas a la policía, y luego traen los datos específicos que le fueron negados a la Asociación o a las autoridades policíacas, a la atención de este Honora-

ble Tribunal en un intento por manchar la dignidad de toda una comunidad responsable y amante de la Ley y el orden. Tanto los niños que transitan en motoras, etc, como el alegado incidente de los jóvenes que tiraron las piedras frente al portón de la calle gardenia la ocurrencia de estos eventos ocurren a la vista del Sr. William Varas, peticionario y demandante en el caso KPE 90-1382; que en ambas ocasiones, es testigo presencial de los hechos, no actúa para prevenir sus consecuencias y se niega a cooperar con la Asociación de Residentes en su esfuerzo por identificar los responsables para orientar a los padres. La Asociación de Residentes se mantiene firme en su propósito de mejorar la calidad de vida y actúa diligentemente y con prontitud para resolver los problemas que le traen a su atención.

Los peticionarios traen a la atención de este Honorable Tribunal la comunicación escrita por la presidenta de la Asociación Recreativa de Mansiones de Río Piedras en la alerta a los padres sobre ha[ll]azgos encontrados en el parque de la Urbanización que hace presumir que las facilidades se estaban utilizando fines distintos a los legítimamente reconocidos de recreación y deportes y nuevamente pretenden responsabilizar al CONTROL DE ACCESO por esta situación. También incluye como evidencia la querella 92-1262-0662 del 31 de enero de 1992, en donde dos jovencitos lograron acceso al urbanización con el propósito de utilizar las facilidades del Parque; y luego de estar en los predios del mismo, asaltaron a mano armada a todos los presente[s]. Los peticionarios tienen conocimiento de que las facilidades recreativas de la Urbanización Mansiones de Río Piedras están administradas por la Asociación Recreativa actúa como una corporación sin fines de lucro independiente bajo las disposiciones del Reglamento de la Asociaciones Recreativas que aprueba el Departamento de Recreación y Deporte[s] y del cual la Asociación de Residentes no tiene control ni in[j]erencia legal. Por tal razón, y porque existe libre acceso a las áreas recreativas de la ur-

banización, y la administración de estas facilidades recrea-
tivas recae, por mandato expreso de ley en la Asociación
Recreativa, entendemos que los peticionarios actúan de
mala fe cuando por un lado proclaman y defienden vehe-
mentemente el libre uso y disfrute de las facilidades re-
creativas para atacar el CONTROL DE ACCESO; y por
otro lado, hace responsable al CONTROL de las activida-
des delictivas que surgen como consecuencia lógicas y pre-
decibles de mantener el libre acceso a estas facilidades.
Exigen y defienden el libre acceso, y luego no quieren acep-
tar el precio de disfrutar de libre acceso: la posibilidad de
ser víctima de un acto delictivo y tratan de responsabilizar
de estos actos delictivos al CONTROL DE ACCESO.

Los demandados-recurrentes señalaron que desde el
Gobernador, en su palacio, hasta el limosnero es su choza
tienen igual derecho de uso de calles. Saldaña vs. Consejo
Municipal de San Juan, 15 DPR, p. 37, 51 (1909). Nos pre-
guntamos si los der[e]chos del gobernador y del limosnero
reconocido en el 1909 son iguales a los derechos del crimi-
nal del Puerto Rico de 1992 que espera en la calle al frente
de su casa en una urbanización para al momento de usted
entrar a la casa encañonarle con una pistola frente a sus
hijos y esposa. Es posible que salga vivo del evento si tiene
suerte; aunque de seguro el autom[ó]vil o propiedades del
hogar las perderá. Pero sin lugar a duda el daño sufrido a
la tranquilidad del hogar, privacidad familiar y p[é]rdida
de propiedad será permanente e irreparable. Su dignidad
de ser humano y todos sus der[e]chos contitucionales
est[á]n desprovistos de protección adecuada. La Ley 21,
supra, es un esfuerzo, entre otros, para atacar el problema
que hemos descrito. El derecho del uso legítimo de las ca-
lles no puede convertirse en el derecho del uso ilegal y
perverso de la misma. No hay derecho a usar las calles
para violar la ley y cometer delitos.

Le Ley 21, supra, regula el Control de acceso; no la pro-
hibición de acceso a las calles en las urbanizaciones. La

Ley 21, supra, garantiza el uso legítimo de las calles; y sirve de instrumento para controlar el uso ilegal de las calles. No se trata de privatizar las calles de urbanizaciones, ni la utilización de propiedades y/o fondos públicos para fines que no son públicos.

Aunque es un fin público y obligación del gobierno el proteger al ciudadano de la ola criminal que azota el país. La Ley 21, supra, es un medio de lograr ese fin público. La persona que interese usar la calle de una urbanización para robar, escalar y violar mujeres no puede alegar discrimen y violación de la igual protección de la leyes. (Artículo II, Sección I y Artículo II, Sección 7. de nuestra Constitución). Lo contrario es el argumento del absurdo y de la frivolidad.

Se alega violación a la libertad religiosa. (Artículo II, Sección 3 de nuestra Constitución). No hay duda de la importancia de la libertad religiosa dentro de nuestra ordenamiento constitucional; aunque la libertad de vivir en paz en nuestro hogar (garantizado por el Artículo 2, Sección 7 de nuestra Contitución) es un derecho de superior jerarquía Constitucional. Sucesión de Victoria vs. Iglesia Pentecostal, 102 DPR 20; Puerto Rico Telephone Company vs. Martínez, 114 DPR 328 (1983); E.L.A. vs. Hermandad de Empleados, 104 DPR 436. A pesar de todo lo anterior no hay prueba de clase alguna que se haya violado o se pueda violar el derecho de libertad religiosa de la demandada-recurrente.

POR TODO LO CUAL, los demandantes-recurridos muy respetuosamente solicitan de este Honorable Tribunal que no expida el auto de certiorari; y por tanto no se revise la Resolución del Honorable Tribunal Superior, Sala de San Juan del 31 de octubre de 1991 en el caso KAC 90-1233 y proceda a confirmar dicha Resolución

CERTIFICO: Haber enviado copia fiel y exacta del presente escrito a: Lic. Maritza Julia, a su dirección de récord.

En San Juan, Puerto Rico a 2 de abril de 1992,

RESPETUOSAMENTE SOM[ET]IDO

[*Fdo.*] LCDO. HECTOR M. COLLAZO
COLEGIADO NUMERO 5613
MEDICAL CENTER PLAZA LC–5
CALLE 3 SE NUMERO 1051
LA RIVIERA
RIO PIEDRAS, PR 00921
TEL: 749–0827 FAX: 781–3696

EN EL TRIBUNAL SUPREMO DE PUERTO RICO

JOSE R. CAQUIAS MENDOZA
INES MEJIAS PARADIS, ETC.

 Demandantes-Recurridos

 vs. RE-91-139 Revisión

ASOCIACION DE RESIDENTES DE
MANSIONES DE RIO PIEDRAS, INC., ETC.

 Demandados-Recurrentes

INFORME DE LA PROCURADORA GENERAL

LCDO HECTOR M. COLLAZO MALDONADO
LCDO. MANUEL BETANCOURT AVILES
MEDICAL CENTER PLAZA, LOCAL NUM. 5
CALLE 3 S.E. NUM. 1051
URB. LA RIVIERA
RIO PIEDRAS, P.R. 00921
TEL. 749-0827

LCDA. MARITZA JULIA RAMOS
CALLE HARDING NUM. I-8
URB. PARKVILLE
GUAYNABO, P.R. 00969
TEL. 789-3177

LCDO. OLGA M. SHEPARD
COLL Y TOSTE #54
HATO REY, P.R. 00918
TEL. 758-4220

 ANABELLE RODRIGUEZ
 Procuradora General
 Núm. Colegiada: 9572

 REINA COLON DE RODRIGUEZ
 Subprocuradora General
 Núm. Colegiada: 4894

 MARIA ADALJISA DAVILA
 Procuradora General Auxiliar
 Núm. Colegiada: 9543
 Departamento de Justicia
 Apartado 192
 San Juan, Puerto Rico 00902
 Tel. 721-2924

EN SAN JUAN, PUERTO RICO
A 6 DE NOVIEMBRE DE 1992

[...] investigación dual si la controversia sustantiva sobre validez es apropiada para resolución judicial y si el daño a la parte es suficiente para requerir una adjudicación".

No cabe duda entonces que se trata de una controversia judicial que no está completa o lista para adjudicación. Esto es así, porque no se demostró que dicha ley prohiba la entrada de determinadas personas a las urbanizaciones o que se hayan utilizado fondos públicos para la conservación de calles privadas. La opinión que emita el tribunal por tanto, será de naturaleza consultiva. Es de aplicación al caso de autos, la norma tantas veces enunciada por este Honorable Tribunal a los efectos de que no es función de los tribunales brindar asesoramiento o producir decisiones en abstracto y bajo hipótesis de índole especulativa. El Vocero v. Junta de Planificación, 88 JTS 46.

## C. IGUAL PROTECCION DE LAS LEYES

Aún cuando se superaran todos los obstáculos anteriores, también se equivocan los residentes objetantes al señalar que la Ley Núm. 21 infringe la igual protección de las leyes. Ello así, porque la clásula de igual protección de las leyes se activa únicamente cuando hay una legislación o acción del estado que cree clasificaciones entre grupos, discriminando a unos frente a otros. Berberena v. Echegoyen, 91 JTS 65. Los residentes objetantes no han señalado en ningún momento cuáles son las clasificaciones estatuídas en la Ley Núm. 21.

Es evidente, entonces que la Ley Núm. 21 tampoco infringe la igual protección de las leyes.

## D. CONSECUENCIAS JURIDICAS LEY 21

Aunque sostenemos que no se debe entrar a analizar los méritos de estas cuestiones por las razones expuestas an-

teriormente, queremos señalar lo siguiente en cuanto a la alegación de los residentes objetantes a los efectos de que la Ley Núm. 21 tiene el efecto de privatizar las calles. El Senador Fernando Martín al discutir las enmiendas a la Ley Núm. 21 argumentó:

Pero no nos engañemos, el efecto jurídico de esto no es, ni podría ser, es que no podría ser el de convertir una calle pública en Puerto Rico en una calle que es para uso exclusivo de los residentes, para el cual tengan el poder legal de impedir, de impedir el acceso de nadie. Cuando la ley original habla otra vez ambiguamente de que no se puede prohibir el acceso a iglesias, facilidades, parques, un parque y una calle no tienen jurídicamente naturaleza distinta, son ambas una tan pública como la otra. Proveen al ciudadano una facilidad tan una como la otra; no puede ser que yo puedo ir a la cancha de baloncesto a tirar canasto, pero si voy a la cancha de baloncesto a mirar el canasto se me prohíbe el acceso. Así es que legalmente el día en que se quiera permitir que una urbanización en efecto se convierta en un condominio, es decir, que pueda legalmente decir, 'el que no vive aquí no puede entrar', eso requiere una transformación jurídica mucho más compleja de la que está envuelta en esta ley. Y además, supondría, supondría que los vecinos se tendrían, primero que adquirir, adquirir las facilidades públicas entre ellas las calles. Y tendrían en su momento también que hacerse cargo de su reparación. Yo presumo que el País no está listo para esto, esto haría quebrar a cualquier asociación de vecinos, si se tuvieran que imponer el comprar la calle. Pero por otro lado tampoco podemos levantar falsas ilusiones sobre lo que estamos haciendo. Repito, en ese sentido las preguntas del senador Ramos me parecen acertadas. Nadie en Puerto Rico, no hay ley ésta, ni la anterior, que impida jurídicamente, no digo yo en términos prácticos, uno no vive ahí y ve un guardia, una barrera, se va para otro sitio. Pero nada que jurídicamente impida que yo transite por una calle pública de Puerto Rico sin tener que proveerle explicaciones a nadie mientras sea una calle pública. Y digo esto, en primer lugar, porque es la verdad. Y en segundo lugar, para que aquellos que piensen que esta legislación debe ir más lejos que sepan que habría que hacer enmiendas más profundas. Diario de Sesiones, Procedimiento y Debates de la Asamblea Legislativa, Vol. XLIV, núm. 19, págs. 373–374.

Esa es la única interpretación razonable de la Ley Núm.

· 21, nada hay en ella que demuestre que se están privatizando las calles.

## E. DERECHO A LA INTIMIDAD

Los residentes-objetantes también alegan que la Ley Núm. 21 les infringe su derecho a la intimidad. Sobre ese particular ni ellos ni nosotros hemos encontrado ninguna disposición de dicha ley que tenga ese efecto. Como correctamente señalan· los residentes objetantes lo único que hace dicha ley es darle facultad a la Asociación de Residentes para aprobar un Reglamento. El que el Reglamento aprobado por la Asociación de Residentes pudiese contener alguna disposición que infringa el derecho a la intimidad de los residentes objetantes no tiene nada que ver con la ley. Lo cierto es que la Ley no contiene ninguna disposición que infrinja el derecho a la intimidad de los residentes.[29]

Los residentes objetantes no han logrado identificar qué aspecto de su intimidad se vé afectado por la Ley 21. Figueroa Ferrer v. E.L.A., 107 D.P.R. 250 (1978). De existir

---

[29] Sección 7. Entrada Controlada a No–Residentes

Toda persona no-residente en la Urbanización que desee visitar familiares, amigos, etc. tendrá acceso a la Urbanización exclusivamente por la entrada de la Calle Begonia donde deberá identificarse con el guardia de seguridad y mencionar el motivo de su visita. El guardia de seguridad tomará el nombre del visitante, así como una descripción breve del vehículo con el número de tablilla y el nombre del residente hacia donde se dirige.

En caso de que algún residente-miembro haya dado instrucciones para ser llamado antes de dejar pasar a alguien, el guardia le notificará la visita telefónicamente.

Aquellos residentes miembros con actividades especiales en su hogar, que tengan visitantes asiduos a su residencia, podrán dar la lista al Guardia de Seguridad para facilitar el proceso de acceso.

Visitantes autorizados por la Asociación Recreativa de Mansiones de Río Piedras para ofrecer servicios o participar de actividades deben ser informados a la Asociación para que éstos impartan las instrucciones al Guardián.

Los proveedores de servicios privados deberán identificarse con el Guardia de Seguridad y éste deberá cotejar por vía telefónica o mediante autorización escrita, el acceso de los mismos.·

Se limita el acceso de grupos privados que vienen a distribuir hojas sueltas, religiosas o cualesquiera otros, entendiéndose que esta limitación no cubre el acceso de servicios de basura, de leche, de cartero, de luz eléctrica, de agua y de teléfono.

alguna disposición en el Reglamento de Asociación de Residentes que infrinja el derecho a la intimidad, lo único que tendría que analizarse sería dicho Reglamento. Ya que como es sabido el derecho a la intimidad es oponible entre partes privadas. *Arroyo v.. Rattan Specialties*, 117 DPR 35 (1986).

En conclusión, los residentes-objetantes no han demostrado cuál ha sido o en qué consiste el menoscabo al derecho a la intimidad por la ley 21.

## F. DERECHO A ASOCIARSE LIBREMENTE

Alegan los residentes-objetantes que la ley 21 atenta contra su derecho a asociarse libremente. Esto es así, porque en el Reglamento Interno de Control de Acceso de la Urbanización Mansiones de Río Piedras se estableció como requisito para tener derecho a controles remotos, ser miembros de la Asociación de Residentes.[30] Argumentaron los residentes objetantes que por diversas razones no desean ni tienen interés en ser miembros de la Asociación. Se niegan por sus convicciones personales a financiar actividades "sociales" o de otra índole de la recurrida.

Es difícil entender cómo la ley Núm. 21 infringe el derecho a asociarse libremente. Ello así porque no hemos encontrado en ella nada que obligue a los residentes-objetantes a pertenecer a la Asociación. Todo lo contrario, la propia ley en su sec. 15 señala:

Los residentes que no favorecieron el sistema de control de acceso no estarán obligados al pago de cuotas para el establecimiento, operación, mantenimiento o remoción de dicho sis-

---

[30] La Sección 4 del Reglamento en su parte pertinente dispone:

Aquellas familias que no sean miembros de la Asociación utilizarán el acceso de la Calle Begonia Esq. Lirio donde se encuentra el Guardia de Seguridad. Disponiéndose que el "beeper" es propiedad de la Asociación de Residentes, Inc. El uso del "beeper" se obtiene por la aportación de un depósito de $35.00 para los residentes miembros. Si éstos lo prestan o transfieren a personas no-residentes o no-miembros se les privará del beneficio solicitándoles la entrega de dicho "beeper" y devolviéndoles el depósito.

tema excepto en aquellos casos en que se comprometen mediante contrato por escrito.

En suma, en parte alguna de la Ley 21 se le requiere a los residentes asociarse para ningún propósito. Si el Reglamento es el que dispone el requisito de asociación es el que deberá analizarse. Pero el hecho de que en el reglamento aparezca ese requisito no se puede entender que la ley es inconstitucional. La Ley Núm. 21 en manera alguna obliga a los residentes a asociarse. No existe ninguna disposición en dicha ley que así lo requiera.

POR TODO LO CUAL, muy respetuosamente se le solicite a este Honorable Tribunal que devuelva los casos al tribunal de instancia con el propósito de que se celebre juicio en su fondo de manera tal que se puedan dilucidar todos y cada uno de los hechos pertinentes en controversia. También le solicitamos que se abstenga de entrar a analizar la validez constitucional de la ley Núm. 21.

RESPETUOSAMENTE SOMETIDO.

En San Juan, Puerto Rico, a 6 de noviembre de 1992.

[*Fdo.*] ANABELLE RODRIGUEZ
Procuradora General
Núm. Colegiada: 9572

[*Fdo.*] REINA COLON DE RODRI-
GUEZ
Subprocuradora General
Núm. Colegiada: 4894

[*Fdo.*] MARIA ADALJISA DAVILA
Procuradora General Auxiliar
Núm. Colegiada: 9543

## NOTIFICACION

CERTIFICO: Que se ha ordenado el envío por correo certificado con acuse de recibo copia del presente escrito a:

LCDO. HECTOR M. COLLAZO MALDONADO
LCDO. MANUEL BETANCOURT AVILES
MEDICAL CENTER PLAZA, LOCAL NUM. 5
CALLE 3 S.E. NUM. 1051
URB. LA RIVIERA
RIO PIEDRAS, P.R. 00921
TEL. 749-0827

LCDA. MARITZA JULIA RAMOS
CALLE HARDING NUM. I-8
URB. PARKVILLE
GUAYNABO, P.R. 00969
TEL. 789-3177

LCDO. OLGA M. SHEPARD
COLL Y TOSTE #54
HATO REY, P.R. 00918

En San Juan, Puerto Rico, a 6 de noviembre de 1992.

[*Fdo.*] MARIA ADALJISA DAVILA
Procuradora General Auxiliar
Núm. Colegiada: 9543
Departamento de Justicia
Apartado 192
San Juan, Puerto Rico 00902
Tel. 721-2924

MAD/ca/ode

## – O –

Opinión de conformidad emitida por el Juez Asociado Señor Rebollo López.

Como es de todos conocido, las leyes que aprueba nuestra Asamblea Legislativa regulan el funcionamiento de nuestra sociedad, en general, y el comportamiento de los ciudadanos que componen la misma, en particular. Hay algunas leyes que, por no afectar de manera directa los intereses de las personas, pasan desapercibidas para nuestra ciudadanía. *Otras, sin embargo, adquieren gran notoriedad; ello debido, principalmente, a que tienen un impacto enorme sobre la vida diaria y corriente de nuestros conciudadanos.*

Tal es la situación de las leyes en controversia en el presente caso, a saber: la Ley Núm. 21 de 20 de mayo de 1987 (23 L.P.R.A. sec. 64 *et seq.*) según la misma fue enmendada por las Leyes Núm. 156 de 10 de agosto de 1988 y la Núm. 22 de 16 de julio de 1992; leyes mediante las cuales, en síntesis, la Asamblea Legislativa autorizó, dentro de unos parámetros, a los residentes de urbanizaciones residenciales de nuestro País a *controlar* el acceso vehicular y peatonal, en las mencionadas urbanizaciones. Ello, a través de unas "asociaciones de residentes", integradas por dichos vecinos, que reciben un permiso a esos efectos de los municipios; a los cuales, a su vez, le fue delegado ese poder por la Legislatura.

El propósito, no hay duda, de la Asamblea Legislativa al aprobar las mencionadas piezas legislativas fue, como correctamente se señala en la Opinión mayoritaria, el de proveerle a la ciudadanía un instrumento —o alivio— para combatir la ola de criminalidad que azota a nuestra Isla. Dicho en forma más realista, *la aprobación de estas leyes constituyó una triste admisión de impotencia de parte de nuestro Gobierno en lo referente a la lucha contra la criminalidad*; esto es, el Gobierno, ante la imposibilidad de pro-

teger a los ciudadanos de este País, autorizó a éstos a encerrarse, aún más, en sus residencias, y, en adición, a separarse, todavía más, los unos de los otros.

Las *agrias controversias* y, en ocasiones, *serias confrontaciones* que han surgido entre nuestros ciudadanos respecto a la implantación de las mencionadas leyes se debe, de manera principal, a que esa ciudadanía fue *mal informada* por las Ramas Ejecutiva y Legislativa de nuestro Gobierno al momento de aprobarse las mencionadas leyes. *Se les hizo creer a nuestros ciudadanos que las referidas leyes permitían el cierre absoluto, o privatización, de las calles públicas que existen en las urbanizaciones residenciales que cualifican bajo la legislación en controversia.*

Nada más lejos de la realidad y la verdad. Atendidos los derechos que le garantiza la Constitución del Estado Libre Asociado de Puerto Rico a sus ciudadanos la veda, definitivamente, *no puede ser absoluta.*

Aclarado ese extremo, la cuestión a resolver, en términos generales, lo es si la referida legislación —la cual, repetimos, meramente autoriza a los residentes de urbanizaciones residenciales a *controlar* el acceso de vehículos y peatones en las mismas— *es o no constitucional.* Esto es, si la misma no infringe, fatalmente desde un punto de vista jurídico, los derechos que garantiza nuestra Constitución relativos a: la igual protección de las leyes, a la intimidad, a la libertad de culto, a la libre expresión y asociación, etc.

*La ciudadanía clama por orientación, de parte de este Tribunal, respecto a este asunto. Tiene derecho a ello.* Igual derecho tiene la Asamblea Legislativa de Puerto Rico, la cual hoy precisamente tiene bajo estudio y consideración el impacto y las consecuencias que sobre nuestro País ha tenido hasta la fecha la legislación mencionada. *No hay duda, en consecuencia, que una expresión, y determinación, final de parte de este Tribunal sobre la constitucionalidad de la referida legislación resulta ser esencial e indispensable.*

Como es sabido, una ley puede ser inconstitucional *de su faz* y/o en *su aplicación*. En la primera situación, la ley contiene en su terminología, el germen de la inconstitucionalidad. En dicha situación, se puede resolver, *a nivel apelativo*, el planteamiento constitucional *sin necesidad* de que se desfile prueba a nivel de instancia. Por otro lado, aun cuando una ley resista, de su faz, el escrutinio judicial de su validez, la misma podría guardar vicios de inconstitucionalidad si *en su aplicación* se vulneran derechos fundamentales de la persona. En esta situación se requiere, de ordinario, prueba al respecto. Véanse: *Rodríguez v. Depto. Servicios Sociales*, 132 D.P.R. 617 (1993); *Torres v. Castillo Alicea*, 111 D.P.R. 792, 800 (1981).

*Examinamos, brevemente y a la luz de los planteamientos de los peticionarios, si la legislación aquí en controversia es inconstitucional de su faz.* No creemos que lo sea. Los detractores de esta legislación alegan que la misma viola la Sec. 9 del Art. VI de nuestra Constitución, L.P.R.A., Tomo 1, por cuanto, *alegadamente*, permite el uso de bienes públicos —las calles— para propósitos privados, lo cual, naturalmente, de ser ello correcto violaría la Constitución. No tienen razón. La legislación impugnada faculta, de manera principal, a los municipios a conceder permiso para "el *control* del tráfico de vehículos de motor *y del uso público de las vías públicas* en paseos peatonales, calles, urbanizaciones y comunidades residenciales, públicas o privadas ...".([1]) (Énfasis suplido.)

Los aquí peticionarios tienen razón al señalar que la Constitución de Puerto Rico prohíbe el uso de bienes públicos para propósitos privados. *Sin embargo, bajo la legislación aquí en controversia, las calles de nuestro País siguen siendo públicas.*([2]) En adición, la Asamblea Legislativa

---

([1]) Art. 1 de la Ley Núm. 22 de 16 de julio de 1992 (23 L.P.R.A. sec. 64).

([2]) Véase las manifestaciones al respecto emitidas por el Senador Fernando Martín en el debate sobre la aprobación de dicha Ley. XLIV (Núm. 19) Diario de Sesiones de la Asamblea Legislativa 373–374.

tiene reconocida y amplia discreción para determinar lo que constituye un fin público. *McCormick v. Marrero, Juez*, 64 D.P.R. 260 (1944); *P.R. Telephone Co. v. Tribl. Contribuciones*, 81 D.P.R. 982 (1960); *P.S.P. v. E.L.A.*, 107 D.P.R. 590 (1978). Esta, aprobó la Ley Núm. 21, ante, y sus posteriores enmiendas, en un esfuerzo por integrar a la comunidad en la lucha contra el crimen. Como bien se señala en la Opinión mayoritaria del Tribunal, el propósito principal de esta ley es proveer a nuestra ciudadanía un instrumento adicional para combatir la criminalidad y así procurar su cooperación activa en la lucha contra el crimen. Este es, indudablemente, un fin público que responde a un propósito legislativo legítimo. Por lo tanto, los peticionarios no tienen razón al impugnar la validez constitucional de la citada Ley Núm. 21, según enmendada, bajo las disposiciones de la Sec. 9 del Art. VI de nuestra Constitución, ante.

Por otro lado, y en segundo lugar, los peticionarios también alegan que la legislación en controversia infringe su derecho a la intimidad, a la libertad de expresión, a la libertad de culto y a la libertad de movimiento. *Sobre este particular, ni ellos ni nosotros hemos encontrado ninguna disposición de dicha Ley que tenga, de por sí, el mencionado efecto.* Como hemos señalado, lo único que dicha legislación hace es facultar a la asociación de residentes de una urbanización para, en virtud del *poder delegado* por el Estado, aprobar un reglamento que regule el tráfico vehicular en su urbanización. Por tratarse de una delegación de poderes estatales, los mismos —y obviamente su ejercicio— estarán limitados por las disposiciones constitucionales que limitan los poderes del Estado. *En otras palabras, el Estado únicamente les delega a los municipios —y a través de éstos, a las asociaciones de residentes— el poder que tiene y lo hace sujeto a las limitaciones que sobre el Estado operan.*[3]

---

[3] La delegación de tal poder no viola, de por sí, ninguno de los derechos constitucionales arriba mencionados. La Ley Núm. 21 (23 L.P.R.A. sec. 64 *et seq.*) tam-

El hecho de que un reglamento, una vez aprobado por una asociación en particular, pueda contener alguna disposición que infrinja los mencionados derechos de los residentes o visitantes, o que el mismo pueda ser aplicado en forma ilegal, *no* guarda relación alguna con la constitucionalidad, de su faz, del estatuto. *En tal caso estaríamos ante una controversia sobre la constitucionalidad de la forma en que dicha asociación de residentes implementa, o ha implementado, las facultades que le han sido válidamente conferidas por virtud de la referida legislación.*

En resumen, de la faz del estatuto impugnado, *no* encontramos que la delegación de poderes estatales contenida en la legislación ante nuestra consideración atente, *de por sí*, contra los derechos a la intimidad, a la libertad de movimiento, a la libertad de expresión o a la libertad de culto de los residentes o visitantes de las urbanizaciones de nuestro País que cualifican, bajo la legislación impugnada, para controlar el tráfico vehicular en sus predios. *Ese aspecto tendrá que ser objeto de prueba, respecto a la fase de implementación del estatuto, en cada caso en particular.*

Similar razonamiento es aplicable a la alegación de los peticionarios a los efectos de que la legislación bajo examen viola la cláusula constitucional sobre igual protección de las leyes. *Un examen del estatuto revela que éste no crea, de su faz, clasificación alguna.*(4) Es cierto, sin embargo, que

---

poco resulta excesivamente amplia pues por tratarse de una delegación de poder estatal la facultad conferida a las asociaciones de residentes tiene unos parámetros definidos. El ámbito máximo de la facultad delegada está delineado por los límites de orden constitucional que operan sobre el Estado, por la propia Ley Núm. 21, según enmendada, ante, por el Reglamento Núm. 20 de 20 de enero de 1989 de la Junta de Planificación y por la ordenanza municipal que aprueba el sistema de control.

Dicho planteamiento es uno que está comprendido dentro del señalamiento que hacen los peticionarios a los efectos de·que la legislación en controversia resulta violativa del derecho a la libertad de expresión tanto bajo la Constitución de Puerto Rico como la de los Estados Unidos.

(4) Aún cuando en teoría podría argumentarse que el estatuto, al establecer el concepto de "control", crea una clasificación entre los residentes de la urbanización y los no residentes de la misma, *tal clasificación ni es sospechosa ni afecta, de por sí, derechos fundamentales.* El delegar poder para controlar el acceso sólo a los residentes se justifica porque ellos son quienes, por residir en el lugar a ser controlado, están mejor situados para ejercer el poder delegado y hacer realidad el propósito legislativo

puede ser posible que dicho estatuto resulte, *en su implementación*, en la creación de una "clase privilegiada"; esto es, que los residentes de las urbanizaciones "cerradas" obtengan beneficios, a manera de ejemplo, tales como aumento de valor en su propiedad y reducción en la incidencia criminal y/o, por el contrario, que los dueños de propiedades que queden fuera del "cierre" sufran devalorización de las mismas y aumento en la incidencia criminal. *Ello, sin embargo, no necesariamente tiene que ser así; esto es, el asunto es uno que tiene que ser objeto de prueba a nivel de instancia.*

Si es que se puede demostrar fehacientemente mediante la presentación de prueba a esos efectos que, *en su implementación*, dicha legislación efectivamente crea clasificaciones que pueden afectar derechos fundamentales de los ciudadanos, *entonces será el momento para determinar si la misma supera la aplicación de los criterios ("tests") que nuestra jurisprudencia ha establecido y utilizado en la determinación de la constitucionalidad de una ley, en la fase de su aplicación, por violar la cláusula sobre igual protección de las leyes.* Véase *Rodríguez Pagán v. Departamento de Servicios Sociales*, ante.

De manera, pues, que resulta obvio que la legislación hoy ante nuestra consideración no es, *de su faz*, inconstitucional por las razones que alegan los peticionarios. *Es correcto que en la Opinión del Tribunal ello no se concluye expresamente.* Ahora bien, un análisis cuidadoso de la misma revela que dicha determinación es una que se hace *sub silentio* en dicha Opinión mayoritaria. *No puede ser de otra manera.* Si los integrantes del Tribunal que suscriben la Opinión mayoritaria emitida pensaran de otra forma

---

que persigue la citada Ley Núm. 21. Además, presumiblemente todos —residentes y no residentes— están sujetos a los mismos criterios de control.

—esto es, que la legislación es inconstitucional de su faz—
*¿no vendrían obligados a así determinarlo en esta etapa?*([5])

La acción mayoritaria de devolver el caso al tribunal de instancia para que se reciba prueba sobre los diferentes aspectos que anteriormente hemos mencionado —en la etapa de aplicación del estatuto— ¿no presupone una *determinación previa* de que el estatuto es constitucional de su faz? *Flaco servicio le estaría haciendo el Tribunal a nuestra ciudadanía si, teniendo ahora la oportunidad de determinar que el estatuto impugnado es, de su faz, inconstitucional, así en estos momentos no lo hiciera e, incomprensiblemente, dejara dicha determinación para más tarde; causando así que las partes, innecesariamente, se involucren en gastos adicionales a nivel de instancia y, en adición, fomentando que los ciudadanos de nuestro País continúen incurriendo, futilmente, en gastos para "cerrar" sus urbanizaciones.* Presumimos la corrección de su proceder; nos negamos a pensar, y aceptar, lo contrario.

Establecido que la legislación ante nuestra consideración es, *de su faz*, constitucional, procedería examinar si la misma es inconstitucional *en su aplicación o implementación.* Ello, sin embargo, es un asunto *que deberá ser resuelto en el futuro, caso a caso, de acuerdo a los hechos particulares y específicos de cada uno de los mismos.* La decisión, no hay duda, es una que *no* será fácil de hacer. Un buen jurista podrá aducir, en apoyo de cualesquiera de las dos posibles alternativas, buenos y convincentes fundamentos. Ambas alternativas cuentan con fogosos e incansables propulsores y detractores. Es por ello que la decisión que al respecto tenga a bien emitir en el futuro cada uno de los integrantes del Tribunal, sea ésta cual sea,

---

([5]) De hecho, tanto en la petición de *certiorari*, como en el Alegato que radicaran ante este Tribunal, los peticionarios cuestionan la constitucionalidad de la Ley Núm. 21, *supra*, en dos (2) formas: (1) según el estatuto es aplicado por la Asociación de Residentes, y (2) de su propia faz. Véanse: Caso Núm. CE-91-786, Parte I, Petición de *certiorari*, pág. 18; Opinión disidente del Juez Asociado Señor Negrón García, Apéndice B.

será y podrá ser objeto de dura crítica. Dicha situación, sin embargo, *no* deberá nublar o perturbar nuestro entendimiento y, sobre todo, *nuestro solemne compromiso de siempre interpretar la Constitución en beneficio de los mejores intereses de la ciudadanía de este País.*

En cuanto a este aspecto de los recursos hoy ante nuestra consideración, *coincidimos con la Opinión mayoritaria de que la situación fáctica de los mismos no es la más indicada y/o apropiada para dilucidar, en forma definitiva, la constitucionalidad de la legislación en controversia en la etapa de su implementación.* Esto es, *no* consideramos errónea la reiteración y aplicación por el Tribunal, en el presente caso, de la norma jurisprudencial de abstención judicial en materia constitucional, establecida en nuestra jurisdicción desde hace más de tres (3) décadas, a los efectos de que el Tribunal no entenderá en una cuestión constitucional si los autos no son adecuados para hacer una determinación de esa índole. *E.L.A. v. Aguayo*, 80 D.P.R. 552, 596 (1958).

*En resumen*, brindamos nuestro voto de conformidad a la Opinión mayoritaria por entender, *en primer lugar*, que el resultado a que se llega en la misma —relativo a la dilucidación de las *controversias específicas* surgidas entre los vecinos de las urbanizaciones envueltas— es correcto. Lo hacemos, *en segundo término*, por cuanto no tenemos duda alguna de que la Opinión emitida parte de la premisa de que la legislación en controversia es, *de su faz*, constitucional. *En tercer lugar*, consideramos que la determinación del Tribunal de devolver el caso al foro de instancia, por razón de la ausencia de un cuadro fáctico completo relativo a la determinación de constitucionalidad del estatuto, *en su etapa de aplicación o implementación*, es una igualmente correcta en derecho.

*Por último* somos del criterio que de la Opinión mayoritaria emitida se desprende el compromiso solemne de parte de todos los miembros del Tribunal, que suscriben la

misma, de interpretar la Constitución, *respecto a la etapa de implementación del estatuto en el momento apropiado en el futuro*, teniendo presente, *en primer lugar*, que la misma es una que tiene que ser interpretada conforme, entre otros, a los cambios y problemas sociales que afectan y gravan la tranquilidad, paz y sosiego a que tienen derecho los ciudadanos de este País y, *en segundo lugar*, manteniendo presente que los derechos que garantiza nuestra Constitución, y que se levantan como posibles obstáculos a la validez constitucional de la legislación en controversia, *no* son absolutos.[6]

En atención a las razones antes expresadas, suscribimos la Opinión del Tribunal.

## − O −

Opinión de conformidad emitida por el Juez Asociado Señor Fuster Berlingeri.

Estoy de acuerdo, en general, con los pronunciamientos que la mayoría hace en su opinión, y con los resultados que en ella se anuncian, pero estimo necesario hacer unas expresiones adicionales en torno al asunto ante nos. Aunque favorezco la política judicial de no *resolver* asuntos constitucionales a menos que ello sea imprescindible, no creo que ésta impide hacer señalamientos idóneos sobre las cuestiones constitucionales que se traen prematuramente a nuestra consideración, *particularmente en casos excepcionales* como el de marras, en el cual los asuntos en cuestión son de la mayor importancia pública y existe un gran interés colectivo en que se diluciden expeditamente.

---

[6] En palabras de la Opinión mayoritaria, pág. 189: "la vitalidad de nuestra Constitución depende, en última instancia, de su capacidad para responder con acierto a los distintos problemas sociales, políticos y económicos que de tiempo en tiempo aquejen al país, y al aplicarla debemos recordar que '[i]nterpretamos una Constitución, no los Rollos del Mar Muerto'". Conforme el refrán popular, "al buen entendedor, con pocas palabras basta".

## I

Demás está decir que el asunto en torno al cual giran los casos ahora ante nos constituye una de las cuestiones públicas más controversiales y angustiosas que la colectividad puertorriqueña, incluso este Foro judicial, haya encarado en años recientes. Con intensidad superlativa y de la manera más dramática se contraponen derechos e intereses de la mayor jerarquía. Y en su raíz más honda pugnan inexorablemente visiones dispares sobre nuestra convivencia social y sobre las formas de enfrentar algunos de los graves problemas comunitarios que sufrimos.

Es menester comenzar estas expresiones acotando brevemente los elementos sobresalientes de la aludida controversia pública que da lugar a los pleitos ante nos. Ello es así porque, en fin de cuentas, la solución a los problemas de índole constitucional que este asunto suscita depende en gran parte de las características particulares de esa controversia. Si la controversia gira en torno a medidas dirigidas a proteger intereses estatales legítimos y preeminentes que se han canalizado debidamente, los problemas constitucionales pueden desvanecerse. En cambio, si la controversia surge por razón de que se han menoscabado impropiamente derechos personales del más alto rango, entonces las cuestiones constitucionales pueden ser determinantes. El análisis constitucional depende en gran medida de la naturaleza de los intereses sociales en pugna, por lo que debemos comenzar precisando cuál es la esencia de éstos.

La aludida controversia pública tiene como protagonistas, por un lado, a aquellas personas que amparadas por las leyes pertinentes reclaman el derecho a proteger sus vidas propias y su integridad física, y las de sus familiares; su propiedad, y su tranquilidad mediante la implantación de medidas de seguridad al nivel del área residencial. Este

derecho se proclama estentóreamente, con desafiante voluntad, como desesperado grito del alma.

La férrea determinación de miles de personas en incontables vecindarios y urbanizaciones de adoptar sistemas de cierre de calles ó de control de acceso a sus áreas residenciales nace del hondo desasosiego y de la desconcertante inseguridad que permean la vida familiar cotidiana, por causa de la implacable plaga de criminalidad que azota al país. Desde hace ya varias décadas, la comunidad puertorriqueña vive trágicamente afligida por el cáncer social de una delincuencia virulenta, que crece incontrolablemente cada día más, y que ha victimizado gravemente ya de un modo u otro, sino a todos los que vivimos en esta isla, al menos a algún pariente o amigo de todo residente, en la mayor parte de los casos.

La ciudadanía en general sufre los estragos no sólo de la desenfrenada violencia y del interminable pillaje causados por el crimen, y del justificado pavor que éste causa, sino que además padece de la desesperación que provoca la aparente inevitabilidad de la delincuencia. Sentimientos de impotencia e indefensión cunden en el ánimo de las personas al observar que la criminalidad aumenta implacablemente año tras año y que el Estado parece ser incapaz de contenerla, no empece las continuadas e insistentes promesas de políticos de todas las estirpes de que habrán de "bregar con mano dura" y poner coto a la criminalidad.

De esta ominosa convergencia de pesares inquietantes, de la combinación del dolor con el miedo y la desesperanza, nace la idea de ampliar el ámbito del propio encarcelamiento para extender al vecindario las rejas que antes se ponían sólo en las residencias. Surge como una panacea al terrible mal y se adopta con inusitada resolución, afincada firmemente la decisión de cerrar las calles en un sentido de defensa propia de hondo calado psíquico y gran emotividad.

Por otro lado, como protagonistas contrarios, se encuentran varios grupos sociales que por razones diversas se oponen al cierre de calles. Algunos son ciudadanos que han sufrido caramente los efectos deletéreos inevitables de dichos cierres. Entre éstos se encuentran personas envejecientes o impedidas que ya no pueden entrar o salir de sus urbanizaciones expeditamente. También están las personas que ahora tienen que tolerar tardanzas y molestias en su transitar urbano porque tienen que lidiar con "tapones" vehiculares que antes podían obviar utilizando calles y vías de acceso secundarias que ya no están abiertas a su uso. Un tercer sector dentro de este primer grupo lo constituyen las personas que viven en las avenidas principales o vías periféricas cuyo tránsito ha aumentado considerablemente al excluirse el paso a través de las calles locales de las urbanizaciones aledañas donde ha ocurrido un cierre. Éstas sufren no sólo el aumento en tránsito, sino también del incremento en ruido, polvo, accidentes, crímenes y otros que aquél apareja. Están incluidas además en este primer grupo aquellas personas cuyas propiedades colindantes han sufrido una considerable devaluación al quedar fuera del área protegida por el cierre, o cuyos negocios han mermado al limitarse el flujo de clientes potenciales dentro de dicha área. Hay otros más que pertenecen al grupo de los afectados adversamente. Son los que tienen que viajar distancias un poco mayores que antes para llegar a sus propias residencias o salir del vecindario; los que ya no tienen fácil acceso a un parque que antes disfrutaban a menudo, ni a la iglesia a la que acudían, y, finalmente, son los que ahora les toma más tiempo llegar incluso a la escuela donde los hijos estudian. Todos tienen en común que la vida cotidiana se les ha hecho más difícil en mayor o menor grado por razón de los cierres de calles que antes transitaban con frecuencia libremente.

Un segundo grupo que se opone a los cierres lo constituye personas que pueden o no estar *directamente* afecta-

das por el cierre pero que independiente de ello, no lo favorecen por razones esencialmente *políticas*, usado el término en su más prístina acepción. La principal preocupación de los que integran este grupo es relativa a los probables efectos adversos del cierre de calles sobre la colectividad y sobre la calidad de la vida comunal. Se preguntan si el cierre de calles es realmente una medida efectiva para combatir el crimen o si no es, en cambio, una ilusoria precaución que sólo sirve para desplazar la actividad criminal de un lugar a otro sin ninguna reducción neta en el mal social que nos aflige. Cuestionan si el aparente efecto de mayor seguridad para los que viven en el sector residencial donde ocurre el cierre no contribuye a dividir aún más y a hacer aún más desigual nuestra ya fragmentada y dispar colectividad, en la cual las grandes diferencias económicas entre grupos sociales se torna aún más evidente, ya que unos tienen la posibilidad y los medios para "proteger" sus vecindarios mientras muchos otros no los tienen. Sospechan que el falso sentido de tranquilidad que puede producir el cierre aminorará el clamor público ante el Gobierno respecto a resolver el problema de la criminalidad y reducirá en los ciudadanos favorecidos por el cierre su insistencia de que se tomen medidas efectivas para combatir la delincuencia. Les inquieta que la reciente parcelación de la comunidad, que la van convirtiendo en un "conglomerado de pequeños feudos" divididos por portones y vallas, ha de aumentar los conflictos y odios entre diversas clases económicas y, de ese modo, a la larga, aumentar la criminalidad. Más aún, les alarma que muchos vecindarios han procedido ya a cerrar sus áreas residenciales y privatizar sus calles *sin autorización*, ilegalmente, utilizando a veces para ello masivas barreras que son prácticamente inmovibles e impenetrables. Les preocupa que, al refugiarse en una medida como el cierre de calles, muchos ciudadanos reflejan su creciente sentido de desamparo comunal; que se está resquebrajando la solidaridad de la *polis*; que no se

confía en la colectividad para resolver los problemas comunes, y que está predominando entre nosotros el ominoso parecer de "sálvese el que pueda".

Uno y otro grupo, además, impugnan la constitucionalidad de los cierres de calles. Aducen que esta medida es ilegal y constituye una violación de varios de los derechos fundamentales que garantiza la Constitución. Plantean que, aunque algunos de los varios costos y efectos adversos ya aludidos provocados por el cierre de calles no ocurriesen, aún así dicha medida es inaceptable, por ser contraria a importantes valores sociales y principios de convivencia que están consagrados en nuestra ley fundamental.

## II

Sucintamente expresados, los principales planteamientos constitucionales que formulan los que se oponen al cierre de calles son los siguientes:

(1)que en la medida en que el cierre impida que calles y parques públicos puedan usarse como tradicionalmente se ha hecho para la comunicación pública y el intercambio y crítica de ideas, éste sería contrario a las garantías de libre expresión y asociación contenidas en nuestra Constitución y la federal;

(2)que en la medida en que el cierre impida un acceso razonable a sectores que desean divulgar sus particulares creencias religiosas y repartir propaganda sobre ellas, éste sería contrario a la libertad de culto garantizada por las dos constituciones;

(3)que en la medida en que el cierre dé lugar a que algunos de los no residentes sean detenidos antes de entrar a un vecindario y se les exija identificación y otra información como condición para permitírsele el paso, este sería contrario al derecho a la intimidad y a la protección contra registros y arrestos irrazonables garantizada por ambas constituciones;

(4)que en la medida en que el cierre constituye una "privatización" de las calles y los parques públicos dentro del área residencial sujeta a control, porque en efecto se excluye al público en general de su uso y se benefician de ellas sólo los residentes, éste sería contrario a la garantía de nuestra Constitución que prohíbe la utilización de fondos y propiedades públicas para fines privados;

(5)que en la medida en que el cierre produce efectos muy adversos sobre el valor en el mercado de propiedades colindantes excluidas del cierre o sobre el valor de propiedades en vías principales que reciben el tráfico vehicular que antes ocurría a través de las calles locales del vecindario cerrado, éste constituiría una privación de la propiedad sin el debido proceso de ley o una incautación (*taking*) que constitucionalmente requiere justa compensación;

(6)finalmente, que en la medida en que el cierre autorizado por ley permite que unos residentes tengan acceso a las calles y parques públicos de determinada comunidad pero otros no, éste sería contrario a los principios de igual protección de las leyes garantizados por ambas constituciones.

Los planteamientos anteriores evidentemente constituyen una seria y substancial impugnación de la legitimidad del cierre de calles y de la legislación en que se apoyan dichos cierres. Requieren cuidadoso examen oportunamente porque podrían dar base, ciertamente algunos de ellos, para declarar la falta de validez jurídica de la medida en cuestión, al menos en las formas en que se lleva a cabo actualmente.

## III

Como se puede colegir de lo expuesto previamente, tenemos ante nos una compleja situación donde se contraponen derechos e intereses de la mayor jerarquía. Encaramos válidos pero dispares reclamos que deben ser armonizados. Como ocurre con frecuencia en la vida del Derecho, es menester buscar un balance adecuado entre preciados valores jurídicos que se encuentran en conflicto.

Una parte importante del problema que presenta esta particular contraposición de importantes derechos e intereses sociales, es que giran en torno a una medida de alegada protección social cuyos efectos y consecuencias reales desconocemos mayormente. Poco sabemos en términos precisos y concretos sobre el resultado a corto y a largo plazo de los cierres de calles respecto a los propios vecindarios

donde ello ha ocurrido. Menos aún sabemos sobre el impacto de dichos cierres respecto al resto de la comunidad, sobre todo en cuanto a las áreas adyacentes que no han cerrado. Existen conjeturas razonables que sostienen el reclamo de que se trata de una medida de prevención de crímenes, junto con otras de comparable razonabilidad que sostienen el reclamo contrario de que a la larga esta medida aumentará la delincuencia en el país. No hemos tenido en Puerto Rico, ni en otros lugares parecidos, suficiente experiencia con esta medida para aquilatar sus méritos de modo confiable. Y, claro está, no hay evidencia empírica, producto de estudios científicos, que siquiera arroje luz sobre los supuestos efectos positivos o negativos del cierre de calles.

La solución que finalmente se le dé al conflicto en cuestión dependerá en gran medida de la información y el conocimiento que tengamos sobre los efectos y las consecuencias reales del cierre de calles, y mucho convendría que las personas interesadas o concernidas pudiesen adelantar esa solución final propiciando estudios científicos que ayuden a contestar algunas de las interrogantes que este asunto plantea. Mientras tanto, sin embargo, es menester tomar las decisiones pertinentes que intenten armonizar de algún modo razonable los importantes derechos e intereses sociales que están en conflicto.

La labor de armonizar esos derechos e intereses contrapuestos les corresponde inicial y primordialmente a las ramas políticas del Gobierno. El balance que se intente lograr entre los distintos reclamos en cuestión puede ser preceptuado de varias maneras, dependiendo de los valores e intereses específicos que se quieran favorecer, dentro del marco que fijan los requerimientos constitucionales. La labor de escoger un particular balance, un modo de armonizar los derechos e intereses en conflicto u otro, implica juicios valorativos sobre cuestiones sociales y económicas que propiamente le compete hacer a la Asamblea Legisla-

tiva y al Gobernador. En otras palabras, la reglamentación detallada del asunto ante nos, dirigida a atender y acomodar de manera concordante los dispares reclamos que están presentes en éste, requieren formular una política pública abarcadora sobre el particular, cosa que no le compete hacer a la rama judicial. Las ramas políticas vienen obligadas a actuar dentro del marco que le fijan las garantías y los derechos constitucionales, y por ello la legitimidad del esquema que éstas establezcan lo decide final y oportunamente nuestro foro, como Tribunal Supremo de Puerto Rico. Pero esa labor nuestra de pasar juicio final sobre la constitucionalidad del esquema legislativo es una función muy distinta a la de las ramas políticas, a las cuales propiamente les corresponde formular el esquema.

Una parte importante del problema que presenta el asunto ante nos es precisamente que *no existe una política pública detallada y abarcadora sobre dicho asunto*. La legislación y la reglamentación sobre el particular que están vigentes se quedan cortas, porque no atienden el asunto en cuestión en todos sus aspectos centrales. No proveen normas y directrices suficientes para contestar todas las interrogantes y dudas importantes que tienen los que quieren proteger sus vecindarios. Tampoco proveen garantías adecuadas para salvaguardar todos los derechos de los que se oponen a los cierres o de los que están adversamente afectados por éstos. La existencia de esas lagunas legislativas y reglamentarias es una de las causas de las muchas disputas que este asunto ha generado. Convendría que las ramas políticas del Gobierno actúen expeditamente para aprobar un esquema regulatorio adecuado, más abarcador y preciso que el que está vigente.

Al formular el esquema más completo que hace falta, es menester tener muy en cuenta varias nociones jurídicas que propiamente aplicadas pueden ayudar mucho a lograr un balance constitucionalmente aceptable de los intereses contrapuestos que el problema ante nos presenta. En pri-

mer lugar, debe tenerse en cuenta que aunque los derechos que se reclaman por unos y otros son todos del más alto rango, ninguno de ellos es tan absoluto que impida los inevitables ajustes y limitaciones que aparejaría un legítimo esfuerzo por armonizar lo que está en conflicto. Tomemos, por ejemplo, el fundamental derecho de expresión en las calles y los parques públicos. Nadie puede negar que su singular rango en nuestro ordenamiento constitucional exige la más esmerada protección. Pero ello no significa que cualquier persona puede exigir el libre acceso a cualquier calle o parque a cualquier hora del día para cualquier fin. Aún este primordial derecho es regulable, como lo ha sido en muchas ocasiones avaladas judicialmente, si los controles que se imponen respondiendo a otros intereses estatales preeminentes son de *contenido neutral*, si permiten una oportunidad adecuada para el ejercicio de la libre expresión y si no son más onerosos que lo que las circunstancias requieren.

Una segunda noción que es muy pertinente es que el esquema que ha de formularse puede legítimamente instaurar o permitir mayores o menores limitaciones a los derechos fundamentales conforme a justificadas diferencias en las circunstancias de cada situación. Es decir, no es menester tratar igualmente instancias que no son iguales. Por ejemplo, no es lo mismo reglamentar un área residencial en el centro de la ciudad a través de la cual pasan avenidas principales, que reglamentar suburbios que sólo tienen calles de uso estrictamente local. Tampoco es lo mismo reglamentar una extensa zona urbana, que reglamentar una pequeña zona de una o dos calles. Las limitaciones a derechos fundamentales que pueden implantarse en unas son menores que las que pueden implantarse en otras. Así, pues, el cierre *total* de calles que sería permisible a altas horas de la noche en un pequeño vecindario suburbano, no sería válido si ocurriese en el centro de la ciudad afectando vías periféricas.

Finalmente, la complejidad del asunto ante nos justifica el uso de opciones creativas. Es permisible diseñar medidas diferentes para un mismo fin, según lo requieran las realidades de cada caso. En algunas situaciones, por ejemplo la de las zonas residenciales grandes y céntricas, el cierre sólo será permisible si se instrumenta a través de vallas operadas por guardianes de seguridad con educada discreción para proteger los derechos de unos y otros. En cambio, en otras situaciones, como las de pequeños vecindarios en los suburbios, puede permitirse el cierre mediante portones automáticos, si éste ocurre sólo en determinados días y horas conforme a un justificado itinerario debidamente notificado al público concernido. Aun en otras situaciones puede permitirse un cierre más abarcador si los vecinos se hacen cargo de las reparaciones y el mantenimiento de la calle o redondel de uso muy particular que ellos mismos construyeron con fondos privados. Lo que el legislador debe tener claro es que existe un margen de flexibilidad en la formulación de las medidas que han de implantarse, que responde a la necesidad de atender las múltiples variantes que existen en esta complicada situación de preeminentes intereses sociales en conflicto.

El reto a la inventiva jurídica de las ramas políticas es claro. Tienen la responsabilidad de salvaguardar en lo esencial los auténticos derechos e intereses de los que se oponen al cierre de calles, sin dejar desamparados a los que legítimamente desean proteger sus vecindarios contra el pavoroso embate de la criminalidad controlando razonablemente el acceso a éstos. Oportunamente nos corresponderá determinar si lo dispuesto por dichas ramas cuadra debidamente dentro de los marcos que fija nuestro ordenamiento constitucional.